CV-10-5075 (JFB)

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

ARTEMIO CASTELLANOS,

*Petitioner,*

- against -

ROBERT KIRKPATRICK, SUPERINTENDENT,

*Respondent.*

# RESPONDENT'S
# AFFIDAVIT AND MEMORANDUM OF LAW
# IN OPPOSITION TO PETITION FOR
# A WRIT OF HABEAS CORPUS

**KATHLEEN M. RICE**
*District Attorney, Nassau County*
*Attorney for Respondent*
262 Old Country Road
Mineola, NY 11501
(516) 571-3800

Douglas Noll
Andrew Fukuda
  Assistant District Attorneys
      *Of Counsel*

## TABLE OF CONTENTS

Page

Affidavit in Opposition to Petition
  for a Writ of Habeas Corpus................................................................. i-iv

Respondent's Memorandum of Law in Opposition
  to Petition for a Writ of Habeas Corpus
        Statement of Facts
            Introduction.................................................................... 1
            The Evidence at the Suppression Hearing
                The People's Case.................................................... 2
                Defendant's Case..................................................... 5
                The Decision of the Hearing Court .......................... 5
            The Trial
                The People's Case.................................................... 5
                Defendant's Case..................................................... 11
                The People's Rebuttal Case..................................... 15
            The Verdict and Sentence ............................................ 16
            Defendant's Appeal from His Judgment of Conviction................ 17
            The Petition for a Writ of Habeas Corpus ......................... 19

Point I
        The Appellate Division Did Not Unreasonably Apply Clearly
        Established Federal Law In Rejecting Defendant's Confrontation
        Clause Claim. In Any Event, Any Violation Of The Confrontation
        Clause Was Harmless Error ................................................. 20

Point II
        The State Hearing Court Properly Denied Defendant's
        Suppression Motion With Respect To Admission Of His
        Written Confession............................................................... 31

Point III
        The Appellate Division Did Not Unreasonably Apply
        Clearly Established Federal Law In Rejecting Defendant's
        Probable Cause Claim; Defendant's Contrary Claim Is
        Procedurally Barred ............................................................. 41

Point IV
        Petitioner's Meritless Claim Of Newly Discovered Evidence
        Does Not Establish A Ground For Habeas Corpus Relief................ 54

Page

Conclusion.................................................................................................................... 58

Certificate of Service

Notice Regarding the Filing of Exhibits in Paper Form

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ARTEMIO CASTELLANOS,

                              Petitioner,          AFFIDAVIT IN OPPOSITION
                                                   TO PETITION FOR A WRIT
            -against-                              OF HABEAS CORPUS

                                                   CV-10-5075 (JFB)

ROBERT KIRKPATRICK, SUPERINTENDENT,

                              Respondent.
-----------------------------------------------------------------x

STATE OF NEW YORK)
                              ) ss.:
COUNTY OF NASSAU )

        ANDREW FUKUDA, being sworn, deposes and states as follows:

        1.      I am an assistant district attorney, of counsel to the District Attorney of the

County of Nassau, and am admitted to practice before this Court.

        2.      This affidavit is submitted in opposition to the above-captioned application

for habeas corpus relief.

        3.      By agreement with the Office of the New York State Attorney General, the

Nassau County District Attorney's Office is representing respondent in this matter.

        4.      Unless otherwise indicated, the following statements are made upon

information and belief, based upon the records and files of the Nassau County District

Attorney's Office.

        5.      The instant petition arises from incidents that occurred between the

months of May and June of 2005, when petitioner (hereinafter "defendant"), who was

approximately twenty-two years old at the time, anally sodomized the five-year-old son

i

of one of his best friends.  Defendant, who violated the child in a room he rented from the boy's father, repeatedly committed these acts with enough force and frequency to cause damage to the boy's anal and rectal area.  These crimes were not discovered until June 30, 2005, when the boy finally disclosed the crimes to his mother.  Results from a forensic examination corroborated the boy's claims.  Defendant later confessed both orally and in a signed confession.

6.     For these acts, defendant was charged, by Nassau County Indictment Number 2349N-05, with criminal sexual act in the first degree (New York Penal Law § 130.50[3]) and sexual abuse in the first degree (New York Penal Law § 130.65[3]).

7.     The jury found defendant guilty of both charges.  On July 10, 2006, the court sentenced defendant to a determinate term of imprisonment of twenty-five years and a five-year period of post-release supervision for his conviction of criminal sexual act, and a concurrent determinate term of imprisonment of seven years and a three-year period of post-release supervision for the sexual abuse conviction.

8.     In his brief to the Appellate Division, defendant raised six claims: (1) his conviction was against the weight of the evidence; (2) defendant's statement was coerced and should have been suppressed; (3) the trial court abused its discretion when it permitted a six-year-old child to testify; (4) the trial court erred in either permitting or obstructing the testimony of various witnesses; (5) the trial court failed to issue certain charges to the jury; and (6) defendant was arrested without probable cause.  On August 4, 2009, a unanimous panel of the Appellate Division, in describing the evidence of defendant's guilt as "overwhelming" (People v. Castellanos, 65 A.D.3d 555, 557 [2d Dept. 2009]), rejected all of defendant's claims as unpreserved and/or

ii

meritless.  In rejecting defendant's involuntary confession claim, the Appellate Division specifically found that "defendant improperly relies upon his own trial testimony in support of his contention that his statements were involuntarily made and the product of threats of physical harm." Id. at 556 (citations omitted).

9.      Renewing all of the claims he had raised before the Appellate Division (except his weight-of-evidence claim), defendant sought leave to appeal to the New York Court of Appeals.  On November 5, 2009, that court denied petitioner's leave application.  People v. Castellanos, 13 N.Y.3d 858 (2009).  Defendant did not seek a writ of certiorari in the United States Supreme Court and did not collaterally attack his conviction in the state courts.

10.     In the instant application for a writ of habeas corpus, dated November 3, 2010, defendant raises three of the claims he raised before the Appellate Division and in seeking leave to the New York Court of Appeals: (1) the trial court erred in obstructing the cross-examination of Dr. Lombardy and Detective Trujillo (Defendant's Memorandum at 39-65); (2) defendant's statement was coerced and should have been suppressed (Defendant's Memorandum at 66-90); and (3) defendant was arrested without probable cause (Defendant's Memorandum at 91-104).  Additionally, for the first time, defendant now presents an actual innocence claim (Defendant's Memorandum at 104-14).

11.     Petitioner is entitled to no relief.  The trial court's curtailment of the cross-examination of two witnesses for the prosecution was a provident exercise of its discretion because the excluded evidence was irrelevant, speculative and confusing for the jury.  In any event, error, if any, was harmless in light of the overwhelming evidence

iii

of defendant's guilt.   Defendant's claim that his confession was involuntary is procedurally barred because the state court, in rejecting his contention, relied on an adequate and independent state rule: namely, defendant's improper reliance on his own trial testimony in order to attack a decision reached after a pretrial hearing.  In any case, defendant's involuntariness claim is without merit because the police used a permissible ruse that did not cause defendant's will to be overborne.  In addition, defendant's claim that he was arrested without probable cause is procedurally barred and, in any event, meritless.  Finally, defendant's claim of actual innocence does not come remotely close to meeting the high standard required for relief on this basis.

12.   Pursuant to this Court's order, copies of the trial transcripts, briefs on appeal, letters seeking and opposing leave to appeal to the New York Court of Appeals, and the certificates denying leave are being provided to the Court under separate cover.

WHEREFORE, and for the reasons set forth in the accompanying memorandum of law, petitioner's application for a writ of habeas corpus should be denied.

Andrew Fukuda
Assistant District Attorney

Sworn to before me this
9th day of February, 2011

Notary Public

SUSAN BEALLIAS
Notary Public, State of New York
No. 30-4728937
Qualified in Nassau County
Commission Expires April 30, 2014

iv

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

ARTEMIO CASTELLANOS,

                           Petitioner,

           -against-

ROBERT KIRKPATRICK, SUPERINTENDENT,

                        Respondent.
---------------------------------------------------------------x

RESPONDENT'S MEMORANDUM
OF LAW IN OPPOSITION TO
PETITION FOR A WRIT OF
HABEAS CORPUS

CV-10-5075 (JFB)

## RESPONDENT'S MEMORANDUM OF LAW

## STATEMENT OF FACTS

Introduction

     Between the months of May and June of 2005, defendant, who was approximately twenty-two years old at the time, anally sodomized the five-year-old son of his best friend.  Defendant, who abused the child in a room he rented from the boy's father, repeatedly committed these acts with enough force and frequency to cause damage to the boy's anal and rectal area.  These crimes were not discovered until June 30, 2005, when the boy finally disclosed the crimes to his mother.  Results from a forensic examination corroborated the boy's claims.  Defendant later confessed orally and in a signed confession.

     For these acts, defendant was charged, by Nassau County Indictment Number 2349N-05, with criminal sexual act in the first degree (New York Penal Law § 130.50[3]) and sexual abuse in the first degree (New York Penal Law § 130.65[3]).

1

The Evidence at the Suppression Hearing

    The People's Case

    Sometime between July 7 and July 20, 2005, Detective EDWIN TRUJILLO spoke on the phone with Detective Diane Barbieri concerning an investigation of sex crimes committed upon a five-year-old boy who spoke predominantly Spanish (H. 13, 52).[1] Because Detective Trujillo was fluent in both English and Spanish[2] and had experience interviewing victims of sex crimes (H. 34, 138-39), Detective Barbieri requested that he personally interview the victim (H. 52). Barbieri also informed Trujillo that there was expert medical evidence confirming the fact that there had been repeated penetration of the boy (H. 66).

    On July 20, 2005, Trujillo interviewed the boy at the Garden City office of the Coalition Against Child Abuse and Neglect. During their meeting, the boy told Trujillo that defendant had on many occasions put his penis in the boy's anus while the boy was on a chair in defendant's room (H. 53, 57, 63). The victim also assured the detective that he knew the difference between the truth and a lie (H. 58). Based on that meeting and the expert medical findings which corroborated the victim's accusations,

---

1    Numbers in parentheses preceded by "H" refer to the Minutes of the Huntley/Dunaway Hearing on April 4, 5, and 6, 2006; numbers not preceded by any letter refer to the trial minutes. Unless otherwise indicated, references to the hearing minutes refer to the testimony of Detective Edwin Trujillo who was the only witness at the hearing. In order to protect the privacy of the victim, his mother and father will not be referred to by name in this brief but will be simply labeled as "mother" and "father" respectively, unless otherwise indicated.

2    Detective Trujillo was authorized and qualified by the Nassau County Police Department to effect official translations of statements, documents, and interviews from Spanish to English, and vice-versa (H. 35).

Trujillo believed he had probable cause to arrest defendant (H. 69).

On July 21, 2005, Trujillo and Barbieri located defendant, who was no longer living at the boy's residence, having been asked to move out because of the allegations against him. Trujillo asked defendant to come to his office in Bellmore to complete his investigation. Defendant complied, accompanied by his girlfriend, Flor Sosa  (H. 16, 18-20, 86-87).

After arriving at the Special Victim's Squad around 9:40 p.m., defendant was brought by Trujillo into a squad room where he was seated -- uncuffed and unrestrained -- in front of a desk. Also in the room, seated seven to ten feet away, were Barbieri and Detective Birdsall; they remained for the entire interview (H. 20-22, 110). Trujillo read to defendant in Spanish his rights from a Miranda card. After being read his Miranda rights, defendant wrote "si" on the card next to the word "comprende," as requested by Trujillo, to indicate his understanding of his rights. Defendant then signed his name and handed the card back to Trujillo. The detective then read the next portion of the card, which asked if defendant was now willing to answer questions. Following the same pattern, defendant indicated that he was. Trujillo then signed his name, and wrote his shield number, his command, and the date and time on the card (People's Exhibit 1 [Right's card]; H. 25-26, 45, 109).

Detective Trujillo then questioned defendant regarding the victim's allegations. Defendant initially denied any wrongdoing, expressed befuddlement as to why the child would make such an accusation, and denounced the corroborative medical findings as false. Defendant's position changed, however, after Trujillo, employing a ruse, told him that a laboratory down the hall was equipped with technology that could take an

3

impression of defendant's penis and compare the impression with impressions left on the victim's anus. Apparently believing Trujillo's ruse, defendant put his head down and admitted to sexually violating the child (H. 27-28, 128-29).

At first, defendant admitted that he had penetrated the boy's anus only once, an act that he characterized as a "mistake." But, after Trujillo told him that the medical evidence indicated otherwise, and that the victim himself had claimed having been violated many times, defendant recanted his initial response and stated that he had violated the boy on three occasions (H. 29-30, 119-20).

At about 10:30 p.m., Detective Trujillo began to memorialize this conversation into writing. Typing on a computer, Trujillo wrote the statement in Spanish, as defendant contemporaneously furnished him with more details. After the statement was completed, Trujillo read it to defendant in Spanish and then asked if there was anything that needed to be changed. Defendant answered no. Trujillo then printed it and asked defendant to read it himself (H. 30-32, 45).

After defendant read the first few sentences aloud, Trujillo asked him to read its remainder silently; after doing so, and finding no issue with its contents, defendant then signed the two-page statement at the bottom of each page. It was then shortly before midnight (H. 31-33, 39, 45, 113-16, 692-95).

Throughout the entire two-hour interview, defendant's demeanor was "subdued," "cooperative," and "quiet" (H. 36). He was given soda to drink, and was never restrained with handcuffs. At no time was he touched, yelled at, threatened, or promised anything by anyone (H. 36-37).

4

Defendant's Case

Defendant presented no witnesses at the suppression hearing.

The Decision of the Hearing Court

At the close of the hearing, the hearing court concluded that Detective Trujillo had probable cause to arrest defendant prior to questioning him, that defendant's statement had been lawfully obtained, and that the statement was made voluntarily and not as the result of force, coercion, threats, or duress (H. 177-79).

The Trial

The People's Case

On June 30, 2005, the victim's MOTHER[3] returned from work to her residence in Freeport, Nassau County.  She lived in a two-floor home with her immediate family, i.e., her husband (the victim's FATHER) and their two sons: the oldest a six-year-old and the victim, who was five at the time.  Also residing with the family was defendant and his girlfriend, Flor Sosa, who occupied a room on the second floor; a brother of the victim's mother, who occupied a first-floor room adjacent to the victim's parents; and a family friend, Elias, who lived in a second-floor room.[4] Every part of the house was accessible to its inhabitants (Mother: 903-07; Lopez: 379-81).

That night, during dinner, a family relative suddenly called the mother into the

3  In order to protect the privacy of the victim, his mother and father will not be referred to by name in this brief but will be simply labeled as "mother" and "father" respectively, unless otherwise indicated.

4  Defendant's brother-in-law, Dimas Ramirez, also stayed in the house for a few days in May and June of 2005 (Lopez: 379).

5

living room where he had been playing with her two boys.  Something was odd:  the victim's penis was erect.  After the older brother gave an explanation for his brother's erect penis, the mother immediately took the victim into the bedroom.  There, despite his mother's persistent queries, the boy refused to say anything because he said he had been threatened by "the person that was doing that to him" into silence (Mother: 913-17, 965).  Finally, the victim relented and told his mother that defendant had previously instructed him to remove his pants so that defendant could "put his dick in [the victim's] ass" (Mother: 971-72).  "[T]rembling," the boy then disclosed to his mother, in detail, that he had been sexually abused by defendant (Mother: 916-17).

As the victim would later testify at trial, defendant had -- on many occasions -- taken off the victim's clothes and "put his dick in [victim's] ass" while kneeling behind the boy, hurting him each time (Victim: 879, 882-83, 889, 892, 895).  The crime always took place in defendant's room on a brown chair when no one else was around (Victim: 879, 883, 895).  While defendant was abusing the victim, he cautioned the boy not to tell his parents (Victim: 886, 888, 897).

Immediately after learning of her child's abuse by defendant, the mother went to her husband's workplace and told him what their son had said.  The victim's father was shocked and, initially, in disbelief (Mother: 918).  He and defendant were very close friends, like brothers.  They had been raised together in the same village in Guatemala, and had attended the same school and church.  As president of the church youth group in Guatemala, the father had given defendant the privilege of reading from the Bible and singing songs during church service (Father: 371-72, 394).  And after defendant arrived in America three years prior, the father had welcomed defendant into his home (Father:

6

372-73).   Since that time, defendant had been accepted as family and had very close relations with the two boys, with whom he would often play in the yard or park (Father: 381-83).   Defendant was sometimes home alone with the boys, taking them off the school bus and watching over them in the afternoon (Father: 543-54; Mother: 910).

After the victim's mother told her husband what had happened, they immediately went home.  Bringing his son with him, the father went up to the second floor to confront defendant (Father: 387-89; Mother: 917-19).   The mother joined them soon after (Mother: 920).  When defendant came to the door, the father asked him if he wanted his girlfriend, Flor Sosa, to overhear what he was about to say.  At that, defendant's face changed color, "like he was frightened" (Father: 389-90).   The victim then pointed at defendant and said, "You, Artemio, did something bad to me in this chair," referring to a chair located in defendant's room (Father: 390, 392; Mother: 922).  The victim also said to defendant:  "You put me on the chair and you put your penis in my ass.  There was a roll of paper . . . [t]hat's the paper that you were cleaning me with" (Mother: 921-22). After initially responding with a question, "You're going to believe him?" (Father: 390-91), defendant became quiet and non-responsive to the boy's series of accusations.

The next day, the victim's parents took their son to see his pediatrician, Dr. LUIS HERRERA.  After the victim informed Dr. Herrera that his pants had been pulled down and a penis had been inserted into his rectum, Dr. Herrera physically examined the boy (Herrera: 609-11).  Because Dr. Herrera lacked the equipment necessary to conduct a complete diagnostic examination of the boy's condition, only a visual examination of the boy's rectum could be performed.  Therefore, although Dr. Herrera did not see any

7

discharge or fissures at the external rectal region of the victim,[5] he instructed the parents to take their son to a hospital where he could be examined with a colposcope and other instruments to properly diagnose his internal condition. Dr. Herrera also called the police (Herrera: 611-14, 618-19).

The victim was later examined at a hospital by Dr. DIANE LOMBARDY, a Board-Certified pediatrician. Specially trained to perform forensic evaluations in sexual assault matters, she had previously performed approximately a thousand such examinations (Lombardy: 504-10, 514).[6] When examining the victim in this case, Dr. Lombardy first read the boy's case history and then examined the victim's penis and scrotum, both of which she found to be essentially normal (Lombardy: 527-28). She then examined the victim's anal and rectal area using a colposcope.[7] Her examination revealed an absence of natural folds along the boy's anal ridges, indicating that they had been subjected to an "abnormal" and asymmetrical smoothing out by an external penetration (Lombardy: 544-45, 549). According to Dr. Lombardy, this smoothing of the natural folds and ridges was likely not caused by the internal passing of stool, but instead

---

5  Sometime around the beginning of June, 2005 -- about a month prior to Dr. Herrera's visual examination -- the victim had complained to his mother that he had a "burning sensation" in his rectum. Upon examination, Mother found the boy's rectum region to be red, "like a burning area" (Mother: 927). Thinking nothing of it, she applied Nivea cream to the region (Mother: 928).

6  Dr. Lombardy was also a member of the American Academy of Pediatrics and of a subgroup of the American Academy of Pediatrics focusing on child abuse and neglect (Lombardy: 508-09).

7  A colposcope is a free-standing microscope with a movable arm and an attached camera which can capture images with a magnification rate up to 25X (Lombardy: 506, 543).

8

indicative of repetitive penetration from an external source on multiple occasions (Lombardy: 548-49, 569). She further found that the tissue in the rectal vault was stretched out and abnormally protruding into the rectal wall, also indicative of trauma (Lombardy: 549-50, 582). The only other possible explanation for these findings would be a case of "severe [and] chronic" constipation over a period of months and years -- a condition the victim never had (Lombardy: 555-56, 582-83; Mother: 928-29). Based on her visual and colposcopic examinations, Dr. Lombardy concluded that the findings were consistent with repeated sexual assaults over an extended period (Lombardy: 555, 582).

Sometime in mid-July, 2005, Detective EDWIN TRUJILLO spoke with Detective Diane Barbieri about a sexual abuse involving a young victim who spoke predominantly Spanish (Trujillo: 645-46, 652). Detective Barbieri, who did not speak Spanish, asked Trujillo to interview the victim; Trujillo was bilingual in Spanish and English, and had experience interviewing young victims of sex crimes (Trujillo: 643-46, 648, 651).

On July 20, 2005, Detective Trujillo interviewed the victim at the office of the Coalition Against Child Abuse and Neglect. Over the course of an hour, the victim told Detective Trujillo what had happened and who had done it to him (Trujillo: 652-56). As a result of that interview, Trujillo and Barbieri met the next night to arrest defendant (Trujillo: 659).

The detectives located defendant with his girlfriend, Flor Sosa, on a street corner in Freeport at around 9:30 p.m. on July 21, 2005. Detective Trujillo asked defendant to

9

come back to his office for the purpose of completing his investigation of defendant. Defendant complied, with Flor Sosa accompanying him (Trujillo: 660-61).

After arriving at the Special Victim's Squad, defendant was brought into a squad room where he was seated -- unrestrained -- in front of a desk while Flor Sosa was escorted to another room. Also present in the room were Detective Barbieri and Detective Birdsall, who stayed for the entire period but did not actively participate in the interview (Trujillo: 663, 666-69). Detective Trujillo then read to defendant in Spanish his rights from a Miranda card. Defendant wrote "si" and signed his name in two places on the Miranda card, indicating that he understood the rights being read to him and that he was willing to answer questions. Detective Trujillo then signed his name and wrote down his shield number, his command, and the date and time on the card (Trujillo: 670-76).

After Detective Trujillo questioned defendant with regard to the allegations made by the victim, including the fact that there was medical evidence of repetitive penetration of the child's anus, defendant initially denied -- in subdued manner -- any wrongdoing, claiming that both the doctor and the child were lying (Trujillo: 677-78, 696). Trujillo then fabricated a claim about a laboratory located just down the hall which was equipped to take an impression of defendant's penis. This impression, Trujillo claimed, could then be compared with the penis impressions left on the child's anus. Apparently believing Trujillo's account of this made-up scientific test, defendant did not jump at this opportunity to prove his innocence. Rather, he suddenly put his head down and said that he had made "a mistake" (Trujillo: 680-81, 760). Upon further questioning by

10

Trujillo, defendant elaborated.   He admitted to penetrating the boy's anus on three separate occasions on a tan-colored chair in defendant's room (Trujillo: 681-82, 772).

At around 10:30 p.m., Detective Trujillo began to memorialize the conversation by typing up a statement in Spanish, with defendant contemporaneously furnishing him with the information.   Once the statement was completed, Detective Trujillo read it to defendant in Spanish and then asked if there was anything that needed to be changed. Defendant answered no, and Trujillo printed out the statement and gave it to defendant (Trujillo: 682-84).

After defendant read the first few sentences of the statement aloud, Detective Trujillo asked him to read the remainder of it silently to himself; finding no issue with the statement, defendant signed the two-page statement at the bottom of each page, shortly before midnight (Trujillo: 683-84).

Throughout the whole duration of the proceedings, defendant was never restrained in any manner.   His demeanor was subdued, quiet, still, and he never raised his voice.   None of the detectives in the room touched, yelled, threatened, or promised anything to defendant (Trujillo: 695).

Defendant's Case

ARTEMIO CASTELLANOS was born and raised in Guatemala.   Other than a three-week period when he was seven, he did not attend school and instead he worked with his father in menial jobs.   He claimed that as a result of his lack of formal education, he never learned to read or write.   He admitted attending church and singing

11

songs, but he said he did so from memory and never read aloud from the Bible (Castellanos: 1122-23).

When he was nineteen, defendant moved to America and settled with the victim's family in Freeport.  The victim's father was his best friend, and the whole family treated defendant like a family member (Castellanos: 1178-79).  He initially worked low-level, menial construction jobs; in 2005, he was employed as a window installer on the weekdays, and as a truck washer on weekends.  In May and June of 2005, he never missed a day of work, including weekdays when he would return home between five and six p.m.  Whenever he returned home, the victim and his brother were being supervised by their mother and uncles (Castellanos: 1124-26, 1133-35).[8]

According to defendant, he was not very close with the boys.  He never played with them, and never took them to the park.  In fact, the only interaction he had with them was when he would "respectfully" say hello to them (Castellanos: 1179-80).[9]

---

8  Flor Sosa testified that defendant returned home from work at seven p.m. everyday of the week during that period (Sosa: 1032-33).

9  Later in his testimony, defendant stated that he had, in fact, played on occasion with the boys in the front yard.  He explained his earlier inconsistent testimony as referring to a different time period (Castellanos: 1205-08). Defendant's girlfriend, Sosa, however, testified that she <u>never</u> saw defendant playing with the two boys, and rarely saw him even speaking to them (Sosa: 1116).

On June 30, 2005, while he was asleep with his girlfriend, FLOR SOSA,[10] he was awakened by the victim's father knocking on the door. Standing next to the father was the boy who accused defendant -- without further elaboration -- of having done "something bad" to him (Castellanos: 1136). When defendant denied any wrongdoing, and after the young victim allegedly refused to elaborate, the father apologized to defendant and left. Defendant did not seek out further information from the father or the boy regarding the accusation, but simply went back to bed (Castellanos: 1135-40, 1182). Sometime later, during July 2005, defendant and Sosa left the victim's residence and moved to Rockville Centre (Sosa: 1053, 1120; Castellanos: 1144).[11]

When Detective Trujillo brought defendant to the station for questioning, on July 21, 2005, Trujillo -- who was polite, spoke like a gentleman, and never put handcuffs on defendant throughout the proceedings (Castellanos: 1208-09) -- told defendant that he had a few questions pertaining to an investigation involving defendant. In response, defendant claimed complete ignorance as to what Detective Trujillo was referring to. When Trujillo stated more specifically that he was investigating

---

10  Although never married to defendant, Flor Sosa claimed that she was defendant's wife. Her relationship with defendant began in Guatemala when she was fifteen; about a year later, she moved in with him. In 2003, a few months after defendant left Guatemala, Sosa followed him to America where they lived together in a room in the victim's home. At the time of trial, they had a seven-month-old baby girl. Sosa was financially dependent on defendant (Sosa: 1021, 1029, 1095-96, 1100). Sosa further claimed that her relationship with the victim's father was complicated by his sudden disclosure of his strong feelings for her. In addition, Sosa claimed that the victim's mother had on one occasion, while Sosa was pregnant with child, deliberately pushed her down the stairs, causing Sosa to slip and fall (Sosa: 1042).

11  When asked if she remembered the circumstances of her moving out of the victim's residence, i.e., after Child Protective Services and the police intervened, Sosa equivocated (Sosa: 1119-20).

an allegation that defendant had sexually abused the victim, defendant claimed innocence (Castellanos: 1143-46).

Defendant was shortly thereafter asked by Trujillo to sign a card which enumerated his <u>Miranda</u> rights. According to defendant (who claimed to be completely illiterate), defendant signed his name[12] on the <u>Miranda</u> card despite the fact that he had not been read any of the rights written on it (Castellanos: 1148). Defendant further claimed that after Trujillo read a statement to him, which allegedly detailed little more than mere pedigree information, Trujillo asked defendant to sign it. Defendant refused to do so, citing his inability to read it (Castellanos: 1151-57). Only after Detective Trujillo purportedly threatened to put defendant's penis into a mold in order to extract an impression from it -- a procedure which Trujillo told him would be very painful and could even effect permanent urological damage -- did defendant relent and sign the statement (Castellanos: 1156-58).

Doctor STEPHEN AJL, director of Pediatric Ambulatory Care at the Brooklyn Hospital Center, testified that after examining the medical records and slides

---

12  Defendant claimed that he could not read and, other than his name, was also unable to write (Castellanos: 1149). On cross-examination, he was confronted with questions about his attainment of a driver's license despite his claims of illiteracy. Defendant stated that he never took the written component of the driver's test, never took a vision test, and that an interpreter sat with him during the road test (Castellanos: 1174-77, 1221). In addition, when asked about how he had been paid at a job, defendant claimed that although he was paid by check, he never filled out deposit slips at the bank, and, indeed, had never deposited a single check at the bank (Castellanos: 1192, 1201-02). Defendant further claimed that when he opened an account with Washington Mutual Bank, a Spanish-speaking bank manager filled in all the paperwork for him (Castellanos: 1193). And, although the bank promised to mail him an ATM card — with which defendant would be able to withdraw money by following directions on the ATM screen -- defendant claimed never to have received it (Castellanos: 1201).

14

of the victim, he found that the findings were not "diagnostic" of chronic anal penetration (Ajl: 1081-82).   Dr. Ajl disagreed with the conclusions drawn by Dr. Lombardy, and instead opined that the findings in the instant case -- the smoothing and flattening of the rugae, the dilation of the anus -- were not diagnostic of chronic penetration, but rather "could be normal findings . . . findings which could result from irritation or unspecific infection" (Ajl: 1082-83).

Dr. Ajl had not personally examined or spoken to the victim, and admitted that there were cases involving children who are sexually abused for which there are no clinical findings of sexual abuse (Ajl: 1087).   He further conceded that he could not state, with any degree of medical certainty, that the victim had not been sexually abused (Ajl: 1093).

### The People's Rebuttal Case

Dr. Lombardy explained that Dr. Ajl's conclusion was erroneous for two reasons. First, Dr. Ajl had based his conclusion at least partially on the lack of dilatation of the victim's rectum.  Dr. Lombardy explained that the level of dilatation in the victim, which she had personally observed during her internal examination of the victim, could not be accurately captured on a medical slide because dilatation involves motion.[13]  Therefore, according to Dr. Lombardy, the failure by Dr. Ajl to personally examine the victim adversely affected the latter's conclusion (Lombardy: 1233-34).  Second, Dr. Lombardy highlighted the fact that Dr. Ajl had centered his conclusion upon a "diagnostic" standard

---

13  Most children have very tightly-shut rectums, while sexually-abused children often tend to have rectums which dilate widely and rapidly (Lombardy: 1233-34).

15

-- a high and rigid standard of diagnosis based on "very clear-cut" and conclusive medical findings (Lombardy: 1234-35). Dr. Lombardy stated, "[v]ery few findings actually . . . are diagnostic" and that in sexual abuse cases in particular, "no finding in sexual abuse is [diagnostic]" (Lombardy: 1234). Dr. Lombardy stated that in light of the totality of the circumstances, including the smoothing of the rugae, the level of dilatation, the asymmetry of the rectal wall, the protrusion of rectal tissues from the wall of the rectum into the rectal vault, and the victim's disclosure of being rectally penetrated, there was sufficient indicia to support her finding of sexual abuse upon the child (Lombardy: 1235).

### The Verdict and Sentence

The jury found defendant guilty of criminal sexual act in the first degree and sexual abuse in the first degree (1490). On July 10, 2006, the court sentenced defendant. The trial judge stated his opinion that the evidence at trial was "overwhelming." He further pronounced "ridiculous" the defense theory of a "grand conspiracy, initiated by a five-year-old boy, joined in by his parents, joined in by an experienced detective and joined in by a doctor." The court then sentenced defendant to a determinate term of imprisonment of twenty-five years and a five-year period of post-release supervision for his conviction of criminal sexual act, and a concurrent determinate term of imprisonment of seven years and a three-year period of post-release supervision for the sexual abuse conviction (Sentencing Minutes at 70-72).

16

Defendant's Appeal from his Judgment of Conviction

On direct appeal to the Appellate Division, Second Department, defendant raised six claims: (1) his conviction was against the weight of the evidence; (2) defendant's statement was coerced and should have been suppressed; (3) the trial court abused its discretion when it permitted a six-year-old child to testify; (4) the trial court erred in either permitting or obstructing the testimony of various witnesses; (5) the trial court failed to issue certain charges to the jury; and (6) defendant was arrested without probable cause.

On August 4, 2009, the Appellate Division, Second Department, unanimously affirmed petitioner's conviction. See People v. Castellanos, 65 A.D.3d at 555 (2d Dept. 2009). It held that the hearing court properly found that the evidence presented by the People demonstrated that the police had probable cause to arrest him. Id. at 556. Additionally, it held that the hearing court properly determined that defendant's statements to law enforcement officials were voluntarily made. Although the police used a ruse, there was no credible evidence that the detectives threatened or coerced defendant. The court found that in making this claim, defendant improperly relied upon his own trial testimony in support of his contention that his statements were involuntarily made and the product of threats of physical harm. Id. Next, the court found that the verdict of guilt was not against the weight of the evidence. To the extent defendant claimed that the evidence was insufficient, the court found the claim unpreserved for appellate review, and, in any event, without merit. Id. at 557. The court also found the

17

trial court providently exercised its discretion in determining that the six-year-old victim was competent to give unsworn testimony. Id.

Also, the court determined that the trial court properly permitted the victim's father to testify as to the victim's accusations against the defendant and the defendant's response, as those statements were admissible as an admission against interest. And, any error in permitting the victim's mother to testify as to the victim's accusations were harmless, in light of "the overwhelming evidence of the defendant's guilt," and no significant probability that the error contributed to his convictions. Id. at 557-58. Lastly, it found that the trial court properly curtailed defense counsel's cross-examination of Detective Trujillo and Dr. Lombardy (the People's medical expert). Stating that curtailment of cross-examination is improper when it keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony, the state appellate court found that the trial court's ruling "was proper in all respects." Id. at 557.

In his subsequent application for leave to appeal to the New York Court of Appeals, defendant disputed the ruling of the Appellate Division, Second Department. Defendant took issue with the court's rejection of all his claims on the merits, and asked the New York Court of Appeals to review all of the arguments (except the weight-of-evidence claim) he had raised on direct appeal (see defendant's leave letter dated August 17, 2009). Respondent opposed defendant's application for leave on both procedural grounds and on the merits (see Respondent's September 30, 2009, letter opposing leave), and leave for further appeal was denied on November 5, 2009. See People v. Castellanos, 13 N.Y.3d 858 (2009).

18

The Petition for a Writ of Habeas Corpus

In the instant application for a writ of habeas corpus, dated November 3, 2010, defendant raises three of the claims he raised before the Appellate Division and in seeking leave to the New York Court of Appeals: (1) the trial court erred in obstructing the cross-examination of Dr. Lombardy and Detective Trujillo (Defendant's Memorandum at 39-65); (2) defendant's statement was coerced and should have been suppressed (Defendant's Memorandum at 66-90); and (3) defendant was arrested without probable cause (Defendant's Memorandum at 91-104). Additionally, for the first time, defendant now makes an actual innocence claim (Defendant's Memorandum at 104-114).

Because his claims are meritless, the petition should be denied in its entirety. The trial court's curtailment of the cross-examination of two witnesses for the prosecution was a provident exercise of its discretion because the excluded evidence was irrelevant, speculative, and confusing for the jury. In any event, error, if any, was harmless in light of the significant evidence of defendant's guilt. Also, defendant's claim that his confession was involuntary is procedurally precluded because of an adequate and independent state procedural rule, relied on by the state court. Further, his claim is without merit because the police used a permissible ruse that did not cause defendant's will to be overborne. In addition, defendant's claim that he was arrested without probable cause is procedurally barred and, in any event, meritless. Finally, defendant's claim of actual innocence does not come remotely close to meeting the high standard required for relief on this basis.

<u>POINT I</u>

THE APPELLATE DIVISION DID NOT UNREASONABLY APPLY CLEARLY ESTABLISHED FEDERAL LAW IN REJECTING DEFENDANT'S CONFRONTATION CLAUSE CLAIM. IN ANY EVENT, ANY VIOLATION OF THE CONFRONTATION CLAUSE WAS HARMLESS ERROR (responding to Ground One of the Petition).

This Court should reject defendant's contention that he is entitled to habeas corpus relief on the ground that the trial court's limitation of defense counsel's cross-examination of two prosecution witnesses – Dr. Lombardy and Detective Trujillo – violated his Sixth Amendment rights to confront witnesses against him. Specifically, with respect to Dr. Lombardy, defendant claims that the precluded line of questioning – which related to an alleged recantation in a separate medical case – would have impeached Dr. Lombardy's credibility. With respect to Detective Trujillo, defendant claims that he was improperly prevented from cross-examining the detective about a separate criminal case in which a suspect who confessed to Detective Trujillo was later exonerated of that crime. The precluded line of questioning would have, according to defendant, harmed the detective's credibility in the eyes of the jury. Defendant's Memorandum at 39.

Defendant raised this claim when he directly appealed his conviction and it was dismissed by the appellate court. The appellate court, stating that curtailment of cross-examination "will be judged improper when it keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony" (quoting People v. Ashner, 190 A.D.2d 238, 247 [2d Dept. 1993]), held that the trial court's limitation of defense counsel's attempts to impeach the witnesses was "proper in all respects." People v.

<u>Castellanos</u>, 65 A.D.3d at 557.   The trial court's ruling, and the Appellate Division's holding that the trial court providently exercised its discretion in precluding cross-examination of the two prosecution witnesses, were not contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

Clearly Established Law

Under the provisions of 28 U.S.C. § 2254(d)(1), a habeas corpus application must be denied unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 254(d)(1).   Here, defendant has not made such a showing.   Nor can he.

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution to cross-examine witnesses.  <u>Davis v. Alaska</u>, 415 U.S. 308 (1974).   It requires that the defense have the opportunity to inquire about a witness's credibility and reliability.  <u>Id.</u> at 315-17.   The right to cross-examine, however, is not unlimited.  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986).   The Confrontation Clause "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985).   Trial judges retain wide latitude to impose reasonable limits on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or

21

interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679; see also United States v. Flaharty, 295 F.3d 182, 190-91 (2d Cir. 2002).

The Confrontation Clause is unlikely to be violated when judges apply traditional rules of evidence that, for example, limit inquiry into collateral matters or prevent the introduction, in the guise of cross-examination, of hearsay or opinion evidence not otherwise admissible. Jeffries v. Nix, 912 F.2d 982, 987 (8th Cir.1990) (citing United States v. Nixon, 418 U.S. 683, 711 [1974]). See also Michigan v. Lucas, 500 U.S. 145, 149 (1991); Davis v. Alaska, 415 U.S. 308, 315-17 (1974); Douglas v. Alabama, 380 U.S. 415, 418 (1965); People v. Magrigor, 281 A.D.2d 561, 562 (2001).


Curtailment of Dr. Lombardy's Cross-Examination

In a separate and prior case, Dr. Lombardy, after conducting an initial examination of the victim in that case, made preliminary findings of sexual abuse. After she conducted a subsequent examination and made visual findings different from the initial examination, Dr. Lombardy, on her own volition, reassessed her opinion publically. At trial, defendant sought to cross-examine about that change of opinion in the previous case.

The trial court's curtailment of any questioning related to this separate and unrelated case was not contrary to, nor an unreasonable application of, clearly established federal law because the excluded line of questioning, by which defendant would have attempted to impeach Dr. Lombardy's level of expertise, was too speculative. As noted by the prosecutor, who was very familiar with the facts of this

22

prior case (1252), Dr. Lombardy had, in that prior case, made only _preliminary_ findings of sexual abuse during her _initial_ examination of the victim in that case.  Notably, her findings of sexual abuse in that previous case were "nowhere near the type of findings" of the instant case, and, furthermore, her preliminary opinion was merely that "the child _may_ have been anally penetrated" (1249) (emphasis added).  Thus, in that separate matter involving a different victim and different suspect, her professional opinion was initially tentative only, inasmuch as it was based on less than dispositive clinical findings.  The earlier finding in a distinct case stands in sharp contrast to the instant case in which her unwavering opinion was based on substantially more evidence.

Then, following a subsequent examination in the previous case in which she made visual findings different from the initial examination, Dr. Lombardy, on her own volition, decided to reassess her opinion.  Not only did she make this reassessment free of outside pressure or contrary testimony, but she alone decided to disclose her reassessment to the public (1249-50).  In allowing only the clinical evidence to guide her to her final medical conclusion, and in forthrightly disclosing this reassessment to the public on her own volition, Dr. Lombardy's actions underscore, rather than undermine, her level of medical ethics and expertise.  In other words, her credibility is enhanced, and not impeached, by her handling of the previous case.

Of course, to have introduced all this information to the jury would have ushered a multiplication and confusion of issues, an undesirable outcome that courts have long been sensitive to.  Indeed, "the rules relating to impeachment by prior self-contradiction, which provided that such contradiction may be shown only on a matter material to the

substantive issues of the trial, contain within themselves a guarantee against multiplication and confusion of issues." Gordon v. United States, 344 U.S. 417, 420 n. 13 (1953); see also Michigan v. Lucas, 500 U.S. 145, 149 (1991). Thus, given the extremely dubious nature of the alleged impeachment material, its reliance on speculation, and the risk of confusion and multiplication of issues, the trial court did no more than "keep the cross-examination within reasonable bounds." United States v. Movley, 462 F.2d 69, 71 (2d Cir. 1972); see also Felix v. Ercole, 2010 WL 2606341 at *7 (E.D.N.Y. 2010); People v. Gugino, 229 A.D.2d 968 (4th Dept. 1996); People v. Benson, 225 A.D.2d 557, 558 (2d Dept. 1996); People v. Delcarpio, 221 A.D.2d 359, 360 (2d Dept. 1995).[14]

### Curtailment of Detective Trujillo's Cross-Examination

Defendant also contends that the trial court improperly curtailed his cross-examination of Detective Trujillo with regard to a separate case previously handled by Trujillo. The suspect in that prior case had signed a confession but was apparently later released when another person confessed to the same crime. Here, the trial court permitted defense counsel to examine Trujillo on this matter, but only in the context of whether or not Trujillo "framed" the aforementioned perpetrator (700).

---

14 Although defendant claims that this curtailment of his cross-examination denied him a full and fair opportunity to probe the reliability and credibility of an expert witness, no such denial occurred. Defendant, in fact, was permitted to cross-examine at length about Dr. Lombardy's qualifications. Moreover, defense expert witness, Dr. Ajl, proffered his opinion of the findings that largely disagreed with Dr. Lombardy's opinion. Thus, in no way was the jury prevented from assessing Dr. Lombardy's reliability or credibility.

Although granted this opportunity to cross-examine Trujillo, defendant in his state brief claimed that the trial court should not have so restricted his cross-examination. "The court below was <u>mistakenly focused</u> on prior bad or immoral acts, and specifically whether Trujillo intentionally framed an innocent defendant in the prior case." Defendant's State Brief at 66 (emphasis added).   However, defendant's objection at trial, in fact, was explicitly premised on classifying the alleged act as immoral.   In objecting to the court's limiting instruction, counsel characterized Trujillo's act as "clearly immoral" and then stated: "To make somebody sign a statement of admission, that's immoral . . ." (704-05).   In light of defendant's reversal of position, the state appellate court, not surprisingly, dismissed his cross-examination claim in a paragraph, and noted too that the trial court's relevant rulings were "proper in all respects."   <u>People v. Castellanos</u>, 65 A.D.3d at 557.

In any event, defendant's claim is meritless.  A trial court may, in the exercise of its discretion, properly exclude proof where it is too remote or speculative, or lacks a good-faith basis. <u>See</u> <u>Michigan v. Lucas</u>, 500 U.S. at 149; <u>People v. Olden</u>, 173 A.D.2d 867, 868 (2d Dept. 1991) (court acted within its discretion in precluding line of questioning where defense failed to present sufficient offer of proof and matter was collateral to issues at trial); <u>see also</u> <u>Walker v. Goord</u>, 427 F. Supp.2d 272, 277 (W.D.N.Y. 2006); <u>People v. Billups</u>, 132 A.D.2d 612, 613 (2d Dept. 1987) (proponent of challenged evidence must "make an offer of proof in order to demonstrate the relevance of the disputed evidence;" counsel failed, despite "unlimited opportunity to make an offer of proof" to show that witness could offer anything more than speculation).

25

Here, defendant completely failed to present an offer of proof that this isolated incident somehow demonstrated that Trujillo "repeatedly coerced confessions from defendants" (Defendant's Brief at 66), or that he was somehow partial and motivated to coerce false confessions habitually, or that he had done so in the prior case defendant speculated about. Indeed, far from presenting an offer of proof, counsel admitted at trial that he lacked information, and asked the prosecutor to turn over paperwork related to the previous case so as "not [to] operate in a vacuum" (701). Even now, defendant offers nothing more than blanket statements about how this previous incident -- of which Trujillo was apparently exonerated of any wrongdoing after an investigation (639) -- would impeach Trujillo's credibility in terms of motive or partiality.

Here, as correctly noted by the trial court, "the mere taking of a statement which later turns out to be false, even though the statement inures to the detriment of the one giving the statement" (700), is not an action that demonstrates the moral turpitude relevant to the credibility issue. Only if such an action is done intentionally, i.e., to frame someone, does it show the moral turpitude necessary to be relevant on the credibility issue. Badr v. Hogan, 75 N.Y.2d at 634. Absent such intention, the act targeted by defendant's desired line of cross-examination cannot be characterized as base, vile, or depraved, and therefore is not indicative of moral turpitude on the part of the witness, and consequently has no bearing on the issue of Trujillo's credibility. See People v. McNally, 200 A.D.2d 769 (2d Dept. 1994). As such, the court properly focused defendant's cross-examination in a reasonable manner that would have bearing on Trujillo's credibility.

26

Because defendant failed to show a plain abuse of discretion by the trial court, the court's proper ruling on the scope of cross-examination was upheld on appeal. Defendant has provided no basis, other than gross speculation, to support his habeas cross-examination claim. That is not enough. See Michigan v. Lucas, 500 U.S. at 149; Walker v. Goord, 427 F. Supp.2d at 277; People v. Sorge, 301 N.Y. 198 (1950).

Harmless Error Analysis

In any event, even if the trial court had mistakenly limited defendant's cross-examination, the supposed error would not be per se reversible. Even if this court were to find that the trial court improperly curtailed cross-examination – and it did not – in violation of the defendant's confrontation rights, it should not grant the petition but should instead apply harmless-error analysis. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless . . ." Delaware v. Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438; see also Tinsley v. Kuhlmann, 973 F.2d 163, 165-66 (2d Cir.1992), cert. denied, 506 U.S. 1081, 113 S.Ct. 1050, 122 L.Ed.2d 358 (1993); Harper v. Kelly, 916 F.2d at 57. On collateral review of a state court conviction, an error of constitutional magnitude is to be considered harmless unless it had a "'substantial and injurious effect or influence in determining the jury's verdict,'" Brecht v. Abrahamson, 507 U.S. 619, 627 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 [1946]). An error may be found to have had such an effect even if, absent the

27

error, the evidence was sufficient to support the conviction.   <u>Moore v. United States</u>, 429 U.S. 20, 22, 97 S.Ct. 29, 30, 50 L.Ed.2d 25 (1976).

The principal factors to be considered in assessing the effect of the confrontation error are (1) the importance of the witness's testimony, (2) whether that testimony was cumulative, (3) the presence of contradictory evidence on material points, (4) the extent of cross-examination otherwise permitted, and (5) the strength of the evidence against the defendant. <u>See, e.g.</u>, <u>Delaware v. Van Arsdall</u>, 475 U.S. at 684, 106 S.Ct. at 1438; <u>Tinsley v. Kuhlmann</u>, 973 F.2d at 166.

Here, any error was inconsequential and harmless.   <u>See People v. Crimmins</u>, 36 N.Y.2d at 242; <u>People v. Ashner</u>, 190 A.D. 238, 246 (2d Dept. 2006).   The evidence of defendant's guilt of the crime of which he was convicted was overwhelming, precisely as determined by the state court. <u>People v. Castellanos</u>, 65 A.D.3d at 557.   Specifically, the victim's account of the crime was consistent and corroborated by the medical findings of an expert, and defendant confessed to the crimes.   Several ancillary pieces of evidence support the confession, medical testimony, and victim's testimony.

First, consistent with the indictments charging the sexual crimes occurring in May and June of 2005, in June 2005, the victim had complained of a burning sensation in his rectal area.   His mother observed a redness in that area and attempted to treat it with Nivea cream (Mother: 927-28).

Second, when the victim's father went to speak with defendant about the victim's accusation, but before defendant was advised of what the child had said, the victim's father asked if defendant wanted his girlfriend, Flor, "to hear this."   Defendant "changed

28

color" and appeared "frightened" (390).   The jury was surely entitled to view this apparent preemptive display of shame as an indication of a consciousness of guilt.

Third, defendant emphatically testified that he was unable to read or write (except of his signature) (1122-23).   Three witnesses demonstrated that defendant was in fact able to read (394-95; 683-84; 926-27).   Defendant's obtaining of a driver's license and opening a bank account are at least consistent with, if not confirmation of, his being able to read.   Again, the jury was entitled to interpret defendant's untruthfulness about his literacy as evidence of a consciousness of guilt.

Fourth, defendant testified that Detective Trujillo was polite and spoke to defendant like a gentleman (1208).   The jury might have found that testimony hard to reconcile with defendant's other testimony, that Trujillo allegedly threatened to put defendant's penis in a mold and "hurt [him] a lot," perhaps even "ruin [his] penis" so that he could not subsequently use it (1157).   The jury could easily have concluded (particularly when comparing defendant's testimony with Trujillo's) that defendant was lying about Trujillo's statements (as well as defendant's alleged illiteracy).   Such repeated lies in his testimony surely provided the jury with additional consciousness of guilt evidence.   See In re Terrorist Bombings, 552 F.3d 93 (2d Cir. 2008) (recognizing that false exculpatory statements may constitute consciousness of guilt); United States v. Triumph Capital Group, 544 F.3d 149, 160 (2d Cir. 2008) (consciousness of guilt evidence supports jury's verdict).

Finally, because defendant was able to ask several questions of Detective Trujillo during cross-examination concerning this prior incident, and was able to comment freely

on his credibility during summation (1315-29), any alleged error was undoubtedly harmless.  See People v. Crimmins, 36 N.Y.2d at 242.

POINT II

THE STATE HEARING COURT PROPERLY DENIED DEFENDANT'S SUPPRESSION MOTION WITH RESPECT TO ADMISSION OF HIS WRITTEN CONFESSION (responding to Ground Two of the Petition).

Defendant's claim concerning the alleged involuntariness of his oral and written signed confession is both procedurally barred and meritless. It is procedurally barred because the state court, in rejecting his voluntariness contention, specifically relied on an adequate, independent (and long-standing) New York procedural rule: involuntariness determinations, based on pretrial hearings, may not be impeached by the use of trial testimony. It is also meritless because the ruse employed by the detectives (not the gruesome procedure defendant has imagined) was permissible.

Procedural Bar

"It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, __ U.S. __, 129 S. Ct. 1769, 1780 (2009), quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991).

Here, in rejecting defendant's involuntariness claim, the state court found that "defendant improperly relies upon his own trial testimony in support of his contention that his statements were involuntarily made and the product of threats of physical harm. See Matter of Felix D., 30 A.D.3d 598, 594 (2006); People of Kocowicz, 281 A.D.2d

31

643, 643 [2001])."  People v. Castellanos, 65 A.D.3d at 556.  Felix D. unambiguously states that an appellant's "attempt to use the trial testimony to challenge the pretrial suppression ruling is impermissible."  Felix D., 30 A.D.3d at 599.  Similarly, Kocowicz articulates the rule that "the propriety of the ruling to deny suppression must be determined only in light of the evidence that was before the hearing court."  People v. Kocowicz, 281 A.D.2d at 643 (emphasis added; citations omitted).

The Appellate Division's citation to cases in support of its refusal to consider defendant's trial testimony was virtually superfluous; said rule is well-established, long-standing, and uniformly observed.  Any deviation from said rule would be "contrary to established precedent."[15]  People v. Millan, 69 N.Y.2d 514, 518 n. 4 (1987); see also People v. Giles, 73 N.Y.2d 666, 671 (1989); People v. Gonzalez, 55 N.Y.2d 720, 721-22 (1981); People v. Boynton, 35 A.D.3d 875, 875-76 (2d Dept. 2006); People v. Douglas, 8 A.D.3d 980 (4th Dept. 2004); People v. Akin, 270 A.D.2d 142, 143 (1st Dept. 2000); People v. Davis, 220 A.D.2d 445, 445 (2d Dept. 1995); People v. Weeks, 176 A.D.2d 836, 836 (2d Dept. 1991).

---

15  Defendant attempts to evade this rule by asserting an authority of Blackburn v. Alabama, 361 U.S. 199, 209-10 (1960), that "where the involuntariness of a confession is conclusively demonstrated at any stage of a trial, defendant is deprived of due process."  Defendant's Petition at 85 (emphasis added).  If, leaving aside the observation that the cited language applied to a pre-Miranda criminal justice system and pre-AEDPA world, this Court wishes to apply that language, the indisputable fact is that it was never persuasively suggested, much less "conclusively demonstrated," that defendant's confessions were involuntary.  Defendant's contrary claim rests on his own self-serving testimony which, as already noted, was riddled with falsehoods (particularly concerning his alleged, but very much disputed, illiteracy).  In any case, the trial jury was fully instructed on the issue of the voluntariness of his confessions and evidently was not persuaded by defendant's claims.

On this petition, defendant relies virtually exclusively on his trial testimony concerning oral and written confessions -- precisely the material the state appellate court, under well-established New York law, deemed improper for it to consider. Accordingly, this Court should recognize that defendant's involuntariness claim is procedurally barred. In any case, as demonstrated below, it is also meritless.

### Procedural Bar Aside, Defendant's Claim Is Meritless

Defendant is not entitled to federal habeas corpus relief based on his claim that the admission of his post-arrest confessions to police were involuntary and unknowing. Improperly relying on material never presented to the hearing court, and specifically deemed improper by the appellate court, defendant specifically asserts that Detective Trujillo unfairly coerced him into confessing to the charged crimes when he allegedly threatened to put defendant's penis into a mold in order to get an impression of his penis, a supposedly painful procedure which allegedly could cause permanent loss of function.

Although Detective Trujillo used a ruse (telling defendant an impression could be taken of defendant's penis and that impression would be compared with impressions supposedly left in the child's anus), nothing in the hearing record remotely suggests that defendant's penis would be put in a mold, that defendant would be required to submit to any procedure, or that defendant was in any way threatened. Moreover, the statement itself establishes that defendant gave the statement, not because of any fear of genital mutilation, but because of a well-grounded, if tardy, desire to accept responsibility for

33

what defendant called his "mistake" with the five-year-old victim (H. 29). In any case, defendant gave his statement during a relatively brief (approximately two-hour) interview. During that time, defendant was <u>Mirandized</u>, he was not handcuffed or otherwise restrained, and was not yelled at or otherwise threatened. He was given a drink and appeared cooperative. A second detective (Detective Barbieri) was always present in the room, and defendant's girlfriend was present in a lounge in the building (H. 20, 22 , 26, 28, 36-37, 45-46).

Defendant fails to establish that the hearing-based Appellate Division's conclusion -- that defendant's oral and written confession were not involuntary and, thus, were admissible at trial -- resulted in a decision that was contrary to, or involved an unreasonable application of, Supreme Court precedent. <u>See</u> 22 U.S.C. § 2254(d)(1); <u>Williams v. Taylor</u>, 592 U.S. 362, 411-13 (2000).

The Supreme Court has held that to determine the voluntariness of a confession, a court should look to the totality of all the surrounding circumstances, including both the characteristics of the accused and the details of the interrogation. <u>See</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 285-89 (1991); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>United States v. Kaba</u>, 999 F.2d 47, 51 (2d Cir. 1993). Some of the factors considered have included the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, the conduct of law enforcement officials, and the use of physical punishment such as the deprivation of food or sleep. <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. at 226; <u>United States v. Ruggles</u>, 70 F.3d 262, 265 (2d Cir. 1995).

Judged by these standards, defendant's claim that his post-<u>Miranda</u> confession was involuntarily made is devoid of merit. The uncontroverted evidence adduced at the hearing demonstrates that, from the moment defendant was asked by Trujillo to accompany him back to his office, defendant was not so emotionally overwrought that his will was overborne. Rather, defendant's actions and words demonstrate that he voluntarily went with Trujillo to the police facility (accompanied during the car ride by his girlfriend, Flor Sosa) (H. 14-18) and remained there of his own free will. As defendant does not here dispute, he was read his <u>Miranda</u> warnings in Spanish before being questioned. He stated that he understood those rights, expressly waived them, and voluntarily answered Trujillo's questions (H. 25-26).

Shortly after Trujillo read defendant his <u>Miranda</u> rights and defendant waived same, Trujillo informed defendant that a laboratory could take an impression of his penis to be compared with a penis impression left in the victim's anus (a ruse fabricated by Trujillo). The hearing testimony made plain, Trujillo's ruse was offered as a hypothetical suggestion or possibility, not as a threat:

> Defendant continued to tell me that the [accusation of the victim] wasn't true. I then told him, I said, if this is not true, that's fine. I said, you watch TV, you know about police . . . scientific investigations. There's tests that can be done. I said we have an office, kind of like a laboratory, where there's people who collect evidence for us. We <u>can</u> go down there, will take an impression of your penis and then will compare it to what was found in the child's anus and then when it's compared and found to be a match, you can explain to the Court how it is that the impression of your penis is in the child's anus.

(H. 27-28). Thus, Trujillo's ruse or bluff was not only the invention of a non-existent procedure, but also a prediction of what that non-existent procedure would likely show.

35

This type of ruse, trickery, or deception is not the type of activity that any decision by the Supreme Court indicates is sufficiently egregious to render a confession involuntary. The police may lie to a defendant as to their actual possession of highly incriminating evidence. Such outright lies about allegedly existing (but actually non-existent) evidence does not necessarily render a confession involuntary. See Green v. Scully, 850 F.2d 894, 897, 903-04 (2d Cir. 1988) ("chicanery" by police, including falsely telling him his palm prints had already been identified in the murder victim's apartment, threatening him with electric chair, and offering psychiatric help, collectively, did not render defendant's confession involuntary); Ortiz v. Kelly, 687 F.Supp. 64, 64-65 (E.D.N.Y. 1988) ("The fact . . . that the police lie to a suspect to elicit his confession does not necessarily render it involuntary." [Police falsely told defendant that murder victim was alive and could identify him]). See also United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991) ("trickery does not make it impossible per se to find that a defendant voluntarily waived his rights."); Ledbetter v. Edwards, 35 F.3d 1062, 1066 (6th Cir. 1994) (confession voluntary even though police falsely told defendant three witnesses had identified him, and falsely told defendant his fingerprints had been found in victim's van).

If deliberate lies about an existing state of facts is insufficient to negate an otherwise voluntary statement, surely a detective's speculation about the likely results of an imaginary test is insufficient to render a confession less than voluntary.

Clearly, while defendant may have been subjected to a clever ruse employed by Trujillo, he was certainly not subjected to coercive tactics by Trujillo or any of the other

36

detectives present in the squad room.  Rather, during the relatively short two hours that he was in the room, he was given something to drink, treated well, and was never threatened, yelled at, or restrained in handcuffs.   Throughout the proceedings, defendant was "cooperative," "quiet," not "vociferous" or "loud"; "[h]e just kind of sat very . . . subdued" (H. 36).  He was accompanied to the police office by his girlfriend, who waited in the lounge, presumably within earshot (H. 16, 20, 86).  Based on this evidence, the hearing court properly found that defendant's statement was voluntarily made free from force, coercion, duress, or threats.

Defendant, however, complained in state court that his confession was rendered involuntary because Trujillo allegedly "threatened to use a mold or device on his penis, after which [defendant's penis] would never work again."  Defendant's claim here is without merit in part because he improperly relies almost exclusively on his own self-serving <u>trial</u> testimony as the basis of his argument.[16]  Defendant's reliance on the trial evidence to support his suppression claim, though improper, is not surprising.  There was simply no evidence at the hearing that defendant was ever told by anyone that the procedure would be painful or that the scientific test could have any adverse side-

---

16  Specifically, defendant points to a portion of his own trial testimony in which he testified:

> [Trujillo] says, if you do not sign, I will take you to a place where they're going to put a mold on your penis and that's going to hurt a lot.  And that mold they're going to put on your penis can even ruin your penis.  I have experience with this.  There are people that they can not use their penis afterwards.

(Castellanos: T. 1157)

effects. Nor was there the slightest evidence that defendant would be forced or compelled against his wishes to submit to any such (non-existent) test.

The evidence adduced at the hearing is, in fact, wholly bereft of any indication that Trujillo did anything more than suggest an impression of defendant's penis could be made. No further elaboration or description of the methodology was ever conveyed to defendant, nor did Trujillo ever indicate that any level of pain or damage would be inflicted.[17] To the contrary, Trujillo testified he did <u>not</u> threaten defendant to obtain his cooperation (H. 37). That denial surely encompasses a denial of a threat to damage defendant's genitalia.

When asked on cross-examination if he had described the process as one involving "a plaster of Paris impression (sic)," Trujillo denied it and reiterated that he had simply "told [defendant] we would take an impression of his penis" (H. 128). No further elaboration as to the imaginary procedure was ever needed because, shortly thereafter, defendant hung his head down and confessed to the crimes (H. 28). Contrary to defendant's claim, therefore, Trujillo did not inject his ruse with threats of pain and permanent injury, or threats of any kind. Trujillo's ruse was bare-bones, free of description, and very generalized.

In this case, the ruse used by Trujillo was reasonable and there is no basis to conclude that it induced defendant to falsely incriminate himself. Trujillo's made-up

---

17 Defendant claims in his brief that Trujillo testified, at the suppression hearing, that he would "take a plaster impression of appellant's penis" (Defendant's Brief at 47). This is simply incorrect. Trujillo never testified -- at trial or the hearing -- that he threatened to take a plaster impression; in fact, Trujillo expressly denied this at the hearing (H. 128).

claim about the police ability to both take and compare defendant's penis impression was not of the sort that created "a substantial risk that defendant might falsely incriminate himself." C.P.L. § 60.45(2)(b)(i). Trujillo never got beyond a brief suggestion of the possible impression-taking -- he never, contrary to defendant's claim, delved into the actual methodology of the impression-taking, much less the alleged pain it would cause -- when defendant almost immediately confessed to the crimes. Nor was defendant confronted with false information that the scientific procedure had already been performed and had linked him to the crime. Thus, if defendant were truly innocent, he had no reason at that point to falsely incriminate himself.

In fact, far from creating a risk of false incrimination, the ruse actually offered defendant a chance, if he was indeed innocent, of true exoneration. Such an opportunity of exoneration can hardly be construed as creating a risk of false incrimination. Thus, Trujillo's fabrication clearly did not render defendant's confession involuntary. See People v. Hasty, 25 A.D.3d 740, 741-42 (2d Dept. 2006); People v. Joseph, 309 A.D.2d 946, 947 (2d Dept. 2003); People v. Bush, 278 A.D.2d 334 (2d Dept. 2000); People v. Cannady, 243 A.D.2d 642, 642-43 (2d Dept. 1997); People v. Ingram, 208 A.D.2d 561 (2d Dept. 1994); People v. Foster, 193 A.D.2d 692, 693 (2d Dept. 1993).

While the record does not support any conclusion that Detective Trujillo's ruse overbore defendant's will, the record does supply defendant's actual reason for confessing. Defendant confessed, not because of the ruse, but "for an entirely different reason, as revealed in a significant statement [defendant] made" in his written

39

confession.  United States v. Green, 85 F.2d 894, 903 (2d Cir. 1988).  In his signed confession, defendant said "During the month [June, 2005], I did something of which I am sorry, but also I have to assume responsibility for my actions, because I am a man" (H. 38-39).  Thus, a fair conclusion is that the "motivation for [defendant's] confession" resulted not from a police ruse but from defendant's own belated desire to assume responsibility for his actions.  Id. at 903.[18]

Under these circumstances, the Appellate Division's decision -- that defendant's written confession was voluntary and not coerced -- was not an unreasonable application of Supreme Court precedent.  Accordingly, defendant is not entitled to federal habeas corpus relief on this basis.  See 28 U.S.C. § 2254(d)(1).

---

18  Defendant further contended in his state brief that his confession was involuntary because, being allegedly illiterate, he was unable to read the statement he signed. Defendant's Brief at 51-52.  Defendant's meritless claim was wholly refuted by the hearing record which clearly and incontrovertibly demonstrates that defendant could, and did, read the statement he signed.  To whatever extent defendant may continue to rely on an assertion of illiteracy (e.g., see Petition at 91), Detective Trujillo testified that when he asked defendant if he could read and write, defendant responded that he could (H. 108).  Defendant then demonstrated his ability to read and write in following Trujillo's directions and signing his name next to the word "comprende" on the Miranda card (H. 109).  Defendant's literacy was further demonstrated when he read his whole statement, at least the first couple of sentences aloud, and then, after informing Trujillo that the statement was correct, by signing each page of the statement (H. 31-32, 39-40, 112-17).  Defendant's claim of illiteracy is based solely on his own self-serving trial testimony.  As previously discussed, this is improper because trial testimony may not be considered in reviewing a hearing court's denial of a defendant's motion to suppress evidence.  People v. Davis, 220 A.D.2d at 445.  In any event, defendant's claim of illiteracy was clearly refuted at trial.  Contrary to defendant's contention here that the "People's only evidence to the contrary came from [the father]" (Defendant's Brief at 52), there was a multitude of other evidence which demonstrated the fact that defendant could read and write (Mother: 926-27; Father: 947-95; Trujillo: 683).

POINT III

THE APPELLATE DIVISION DID NOT UNREASONABLY APPLY CLEARLY ESTABLISHED FEDERAL LAW IN REJECTING DEFENDANT'S PROBABLE CAUSE CLAIM; DEFENDANT'S CONTRARY CLAIM IS PROCEDURALLY BARRED (responding to Ground Three of the Petition).

As a third ground for habeas relief, defendant argues that the hearing court should have suppressed defendant's statement as a fruit of his supposedly unlawful arrest. Defendant states that the hearing court's decision was contrary to clearly established federal law, as determined by the exclusionary rule pronounced in Dunaway v. New York, 442 U.S. 200 (1979) (statements given by a suspect who was arrested without probable cause must be suppressed). Defendant's claim is procedurally barred and without merit.

Under Stone v. Powell, defendant is precluded from raising exclusionary rule claims; there was no unconscionable breakdown with the state mechanism for evaluating probable cause

The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 481-82 (1976). The United States Supreme Court has further made plain that in most circumstances, "under Stone v. Powell, [federal courts] should not consider [defendant's] argument that Dunaway required exclusion of his

41

statements." <u>Cardwell v. Taylor</u>, 461 U.S. 571, 573 (1983).   Thus, absent special circumstances, this Court ought not reach defendant's <u>Dunaway</u> claim.

To be sure, Fourth Amendment claims may be raised in the context of a habeas petition "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." <u>Capellan v. Riley</u>, 975 F.2d 67, 70 (2d Cir.1992).

However, this case presents neither of those situations. First, New York has a corrective procedure for redressing Fourth Amendment violations of the sort defendant alleges. Second, defendant was not precluded from using that mechanism; he was granted a <u>Dunaway-Huntley</u> hearing, at which he was given a full opportunity to argue that he was arrested without probable cause and that the statements he made thereafter at the police precinct should have been dismissed as fruits of his unlawful arrest.

Notwithstanding the fact that defendant was given a pre-trial <u>Dunaway-Huntley</u> hearing, defendant contends that there was an unconscionable breakdown in the hearing thereby, according to defendant, entitling him to an examination of his otherwise unreviewable Fourth Amendment claim.   Specifically, defendant claims that an unconscionable breakdown occurred when the People, having established all the proof necessary for the purposes of the pretrial hearing, elected not to call the second witness – Detective Barbieri – to the stand.   Defendant is wrong; there was no unconscionable

42

breakdown in the hearing proceeding because defendant failed to show that Detective Barbieri possessed non-cumulative and material evidence.

At the suppression hearing, the People called Detective Trujillo as a witness. Trujillo testified that, based on his personal interview with the victim and on corroborating medical evidence demonstrating that the victim had been repeatedly and anally penetrated, he decided to take defendant into custody. Trujillo further testified that although Detective Barbieri was in the squad room during his interview with defendant, she did not actively participate in the proceedings at all (H. 28). After Trujillo's testimony at the hearing, defendant requested an opportunity to produce Barbieri. Although the hearing court asked defense counsel for an offer of proof demonstrating that Barbieri possessed material and non-cumulative evidence on an issue relevant to the hearing, counsel repeatedly failed to offer one (H. 152-60, 164). The hearing court also elicited that defendant had not prepared a subpoena for Barbieri (H. 156-57). Defendant now claims that the hearing court erred in not permitting him to call Detective Barbieri and that this purported error constituted an unconscionable breakdown in the hearing process.

The People have the initial burden of demonstrating probable cause, but they are not required to produce each and every police officer who might possess some knowledge of the matter. See People v. Witherspoon, 66 N.Y.2d 973 (1975); People v. Earley, 244 A.D.2d 769 (3d Dept. 1997); People v. Rosado, 222 A.D.2d 617 (2d Dept. 1995); People v. Hucks, 175 A.D.2d 213, 214-15 (2d Dept. 1991). In the instant case, as the state courts concluded, Detective Trujillo's testimony alone sufficiently

43

demonstrated that there was probable cause to place defendant into custody, and that defendant's subsequent confession was not procured through improper police procedures.  Trujillo testified that sometime in July 2007, Barbieri asked him to interview a child victim of an alleged sexual assault.  Barbieri enlisted Trujillo's help specifically because of Trujillo's fluency in Spanish and his experience in interviewing victims of sex crimes (H. 13).  Trujillo personally interviewed the child alone shortly thereafter, during which the victim gave detailed facts incriminating defendant.  In the same interview, Trujillo also determined that the boy understood the difference between a lie and the truth.  Based solely on his own personal interview with the victim[19] and on the corroborating medical findings of repeated anal penetration of the victim, Trujillo had probable cause to support taking defendant into custody (H. 56, 69).  Given the clarity and breadth of Trujillo's testimony establishing probable cause, defendant's failure to give a satisfactory offer of proof, and defendant's failure to subpoena Barbieri, the hearing court properly denied defendant's request to call Detective Barbieri; there was no unconscionable breakdown.

Moreover, although C.P.L. § 60.15(1) provides defendant the option to call and examine witnesses in "any criminal proceeding," under state law a suppression hearing is not a discovery device, and defendant has no absolute right to the testimony of a particular witness at such a hearing.  See People v. Chipp, 75 N.Y.2d 307, 337 (1990); People v. Anderson, 69 N.Y.2d 651 (1986); People v. Petralia, 62 N.Y.2d 47, 52 (1984). Federal law also recognizes that a defendant's right to call witnesses at a hearing is not

---

19  In fact, Trujillo had not even read Barbieri's case report prior to interviewing the victim (H. 60).

equivalent to his right to call witnesses at trial.  In any case, the United States "Supreme Court has not definitively decided whether that right (to compulsory process to obtain witnesses at trial) extends to presenting witnesses at a pretrial suppression hearing." Ortiz v. Artuz, 2010 WL 3290962 *7 (S.D.N.Y. 2010).   Defendant certainly "has not pointed to any clearly established Supreme Court precedent recognizing a constitutional requirement that the prosecutor must call all witnesses involved in a defendant's arrest and interrogation at a hearing litigating the voluntariness of a confession."  Caballero v. Conway, 2010 WL 4878956 *5 (W.D.N.Y. 2010).   Thus, at most, defendant may be claiming "an alleged violation of State Law, for which habeas review is unavailable." Mitchell v. Herbert, 2008 WL 342975 *9 (W.D.N.Y. 2008), citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

In any case, under New York law, in a pretrial hearing, defendant's request for production of a witness must be supported by a bona fide factual predicate which demonstrates that such witness possessed non-cumulative material evidence on the question of whether the challenged evidence was lawfully obtained.  See People v. Witherspoon, 66 N.Y.2d at 974.  Despite the fact that the hearing court asked counsel for a factual predicate demonstrating that Barbieri possessed non-cumulative and material evidence, defendant failed to provide one (H. 159-60, 164).  For example, one of defendant's purported reasons for calling Barbieri was to examine her on what occurred in the squad room when defendant was being interviewed.   Defendant, however, wholly failed to demonstrate how this evidence was non-cumulative or how it related to probable cause.  The arrest occurred before the taking of the statement

45

(H. 178).  Thus, Barbieri's possible testimony about what occurred during the interview would have been cumulative and irrelevant to the probable cause issue.

Barbieri was not the only detective in the room, nor did she take the lead in conducting the interview.  Trujillo was also in the room, and it was he who took charge of the proceedings and he alone who conducted the interview with defendant in Spanish.  In fact, Barbieri -- who did not speak Spanish, and had previously asked Trujillo to interview the victim for that very reason -- merely sat at a desk about seven to ten feet from defendant, and did not actively participate in the conversation (in Spanish) in any meaningful manner (H. 13, 19, 22, 28, 43, 44, 46).  Because defendant provided the court with no basis for concluding that Barbieri's testimony would be anything but repetitive and cumulative of the testimony already rendered by Trujillo, the hearing court correctly found defendant's request to be lacking.  See Holmes v. South Carolina, 547 U.S. 319, 326-27 (2006) (even at trial, court may exclude evidence that is repetitive or only marginally relevant).

Defendant also contends that Barbieri's production would have afforded him an opportunity to question Barbieri about an alleged notation she had made in a case report.  This notation, made before Barbieri asked Trujillo to participate in the case and to interview the victim, purportedly reflected Barbieri's opinion that the victim did not know the difference between the truth and a lie.[20]  Defendant's claim, however, is

---

20 Of course, Barbieri's opinion (or state of mind) regarding the five-year-old's ability to distinguish truth from falsehood would not seem relevant in a probable cause context. Devenpeck v. Alford, 543 U.S. 146, 153 (2004).  In any case, it is difficult to understand how (non-Spanish speaking) Barbieri's alleged opinion of the (predominantly Spanish-speaking) victim's ability to distinguish truth from falsity of any value.

46

unavailing because it fails to establish how Barbieri's testimony would have been material to the issue of probable cause.  Probable cause in this case, after all, was established through Trujillo's independent investigation of the case, not Barbieri's.  It was Trujillo who personally interviewed the victim on July 20, 2006, and it was solely on the basis of this interview (and the corroborating expert medical finding) that Trujillo had probable cause to support taking defendant into custody (H. 56, 69).[21]

Equally unavailing is defendant's claim that because Barbieri had knowledge of medical findings from the victim's family pediatrician, which purportedly "undermined" the victim's claim of sexual abuse, defendant should have been able to examine her at the pretrial hearing.[22]  Defendant specifically refers to a sentence in Barbieri's case report (which was read into the record but never admitted into evidence) which stated: "[Pediatrician] found no evidence of sexual abuse" (H. 83).

Defendant's claim here fails because Barbieri's testimony on this matter would have been cumulative and immaterial.  First, Barbieri was not the only person who knew of the pediatrician's finding; Trujillo, too, was well aware of the pediatrician's findings

---

21 Indeed, other than the barest of background facts, such as the general allegations of sexual assault and the corroborating medical findings, the information conveyed by Barbieri to Trujillo was bare-bones at best (H. 61-62).  In fact, Trujillo, who did not read the case report before interviewing the victim, never even knew of the alleged notation regarding the victim's ability to distinguish between the truth and a lie (H. 58-59).  Tellingly, Trujillo conducted his own test, and found that the victim was able to comprehend the difference between the truth and a lie (H. 58).  Thus, Barbieri's purported opinion on this matter is irrelevant for the simple reason that it did not factor into Trujillo's probable-cause analysis.  Again, Barbieri did not speak Spanish (H. 19, 43, 44) and the victim was "predominantly" a Spanish speaker (H. 52).

22  This claim is ironic in that the trial evidence established that the family pediatrician felt compelled to report the accusation of sexual abuse to the authorities and recommend further medical testing (612-14).  Had the initial physician concluded nothing was wrong, he would not have done either (623).

47

and was, in fact, fully questioned about it at the hearing (H. 69-71). Accordingly, because Barbieri's knowledge paralleled Trujillo's on this matter, her testimony would (once again) have merely been cumulative.

Second, defendant's claim is immaterial because it misconstrues the findings of the pediatrician's preliminary examination. Initially, it must be noted, the exact (hearsay) terminology of the pediatrician's finding does not support defendant's contention that the finding necessarily contradicts or undermines the expert clinical finding of sexual abuse thereafter (upon more thorough examination) rendered by Dr. Lombardy. The earlier report merely stated that the pediatrician had "found no evidence of sexual abuse." Far from being a definitive statement contradicting the expert finding, it is a statement that merely underscores the limits of the pediatrician's ability to make a dispositive finding without the necessary equipment to conduct a more probing internal examination of the child. "He found no evidence of sexual abuse" is, after all, far different from "He found evidence of no sexual abuse."[23] Defendant bases his argument from the standpoint of the second sentence here, even though that sentence was not the sentence in Barbieri's report.

Barbieri's testimony regarding the pediatrician's finding would also have been immaterial. As already noted, the very preliminary findings of the pediatrician did not undermine the subsequent expert findings of Dr. Lombardy. The pediatrician had not performed an in-depth examination of the child. Dr. Lombardy, who was an expert used by both the Police Department and the Coalition Against Child Abuse and Neglect to

---

23  As the physician in question repeatedly made plain at trial (611-13, 610-16, 623, 627-28).

examine child sex victims, positively found, after conducting her own expert examination, that the victim in this case had been anally penetrated. In contrast, the pediatrician, who, because he self-admittedly lacked the requisite level of expertise and was "not qualified to conduct these examinations," never even conducted an examination at a depth or level necessary to undermine or contradict Dr. Lombardy's expert findings. The pediatric physician's preliminary examination, conducted as a "regular pediatrician," merely led him to vaguely opine that he "couldn't say for sure that there were findings" of sexual abuse (H. 69-70). Tellingly, the pediatrician called the police and Social Services after his examination of the victim (H. 132) and recommended further examination, specifically of the type Lombardy conducted, moves which, at the very least, underscore the inconclusiveness of his findings, and, more likely, demonstrate the pediatrician's own suspicions of sexual abuse. Accordingly, because Barbieri's testimony on this issue would have been cumulative and immaterial, the court properly denied defendant's request to examine Barbieri.[24]

In sum, defendant's claim that he was improperly denied the right to call Detective Barbieri at the suppression hearing is without merit. Defendant failed to show that the proposed testimony would give rise to any evidence undermining the legality of his arrest or the voluntariness of his confession. Therefore, the court properly exercised

---

24   To the extent defendant also claims that the medical findings which evinced repeated anal penetration were improperly admitted as hearsay at the pretrial hearing (see Defendant's Brief at 98-99), his claim is meritless. Because C.P.L. § 710.60(4) provides that hearsay evidence is admissible at a pretrial suppression hearing "to establish any material fact," the People's burden of going forward to show the legality of police conduct may be, and frequently is, satisfied through hearsay evidence. See People v. Gonzalez, 68 N.Y.2d 950, 951 (1985); People v. Adler, 50 N.Y.2d 730, 745 (1980); People v. Riviezzo, 124 A.D.2d 837, 838 (2d Dept. 1986).

its discretion by denying defendant's request to compel the testimony of that witness. As such, because the court's denial was not an unconscionable breakdown in the proceedings, under Stone v. Powell, defendant is barred from making a Fourth Amendment claim in his petition for a writ of habeas corpus.   Capellan v. Riley, 975 F.2d at 70.

Probable Cause Analysis

Even if this Court were to find that there was an unconscionable breakdown in the proceedings – and there was none – defendant errs in his claim that the state appellate court improperly agreed with the hearing court's probable cause determination.

Under New York law, whether the police had probable cause to arrest is an objective determination to be based on "what was reasonably and objectively in the mind of law enforcement authorities." People v. Jennings, 54 N.Y.2d 518, 525 (N.Y. 1981).   Probable cause to arrest "does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been or is being committed" and that the person being arrested committed the crime (People v. Francis, 44 A.D.3d 788, 789 (2d Dept. 2007) (quoting People v. Bigelow, 66 N.Y.2d 417, 423, [1985]); see also People v. McRay, 51 N.Y.2d 594, 602 (1980).   That legal conclusion is to be made after considering "all of the facts and circumstances together." People v. Bigelow, 66 N.Y.2d

50

at 423.  This is indistinguishable from the federal standard.  <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152 (2004).

The police unquestionably had probable cause to take defendant into custody. On July 20, 2005, Detective Trujillo interviewed the victim, who disclosed to Detective Trujillo that defendant had anally penetrated him on numerous occasions on a chair in defendant's room  (H. 14-15, 57-58, 63), that defendant had "put his bicho [penis] in his nalgas [ass] . . . mucho, mucho, mucho" (H. 39, 58).  The victim, who knew defendant from the time he had lived in the boy's home, identified defendant by name. Thus, identity was never an issue.  Trujillo also asked the boy if he knew the difference between telling the truth and telling a lie, and he responded that telling a lie would get a person in trouble (H. 57-58).

Probable cause to support taking defendant into custody was thus arguably established by the victim -- who understood not only the difference between telling a lie and telling the truth but also the serious consequences of the latter -- when he stated to the police that he had been sexually violated by defendant.  <u>See Panetta v. Crowley</u>, 460 F.3d 388, 395-96 (2d Cir. 2006); <u>People v. Mendoza</u>, 49 A.D.3d 559 (2d Dept. 2008) (where an identified citizen accuses another individual of a specific crime, the police possess probable cause to arrest); <u>see also People v. Griffin</u>, 15 A.D.3d 502 (2d Dept. 2005); <u>People v. Green</u>, 154 A.D.2d 548, (2d Dept. 1989).

The police, however, did not act precipitously by relying solely on the accusations of the child.  <u>See Stoot v. City of Everett</u>, 582 F.3d 910, 920 (9th Cir. 2009) (in cases involving "very young children" [in <u>Stoot</u>, a four year old describing events that occurred

51

when she was three] "courts have repeatedly emphasized the need for some evidence . . . to corroborate" the allegations of the victim and establish probable cause).   The police also possessed corroborative medical evidence.   Specifically, the victim's statements were supported by the corroborating findings of the sexual-abuse medical expert who had physically examined the child.   Dr. Lombardy, an expert used by the Nassau County Police Department and the Coalition Against Child Abuse and Neglect to investigate cases of sexual abuse, made positive medical findings of repeated anal penetration of the victim, findings which Trujillo possessed and relied on in establishing probable cause (H. 66, 69).   Clearly, therefore, the victim's accusation combined with the corroborating expert medical findings would certainly lead "a reasonable person who possesses the same expertise as the officer to conclude, under the same circumstances, that a crime is being or was committed" by a particular individual. People v. McRay, 51 N.Y.2d at 602; accord People v. Miner, 42 N.Y.2d 937, 938 (1977).[25]

Accordingly, the New York appellate court was correct in upholding the probable cause determination of the hearing court, which had the advantage of hearing and seeing the witness firsthand, and was clearly supported by the record (see People v. Francis, 44 A.D.3d at 789; People v. Stevens, 43 A.D.3d 1088, 1089 (2d Dept. 2007); People v. Rios, 11 A.D.3d 641, 642 (2d Dept. 2004).   Moreover, because the police so clearly possessed probable cause to bring defendant into custody, the hearing court

---

25  In addition, it is not disputed that defendant lived in the same house as the victim and thus had the opportunity to interact with the victim.

properly refused to suppress defendant's confession on this ground.   See People v. Mendoza, 49 A.D.3d at 560.

In sum, defendant's Fourth Amendment claim is not only barred from review because defendant failed to show any unconscionable breakdown in the hearing proceeding (Capellan v. Riley, 975 F.2d at 70) but is, in any event, also without merit because the police clearly had probable cause to arrest defendant.

POINT IV

PETITIONER'S MERITLESS CLAIM OF NEWLY DISCOVERED EVIDENCE
DOES NOT ESTABLISH A GROUND FOR HABEAS CORPUS RELIEF (responding to
Ground Four of the Petition).

Despite the state court's finding of "overwhelming" proof of guilt" (People v.

Castellanos, 65 A.D.3d at 557-58), defendant claims that he is entitled to habeas corpus

relief on the ground that he is actually innocent of the crime.  Although defendant

correctly admits that the Supreme Court has never held that a freestanding claim of

innocence may alone suffice, he argues that the facts of the instant case demand such

an unprecedented and novel habeas relief.  Defendant is wrong: because he does not

proffer any new evidence of innocence, he cannot – and does not – even come close to

meeting the high standard required for relief on this basis.

Under existing law, newly discovered evidence of innocence permits a federal

court to consider an inmate's claim (otherwise barred) that his conviction or sentence

was the product of constitutional error (constitutional error plus innocence).  The

Supreme Court, however, has never held that a freestanding claim of innocence may

alone suffice.  "Whether such a federal right exists is an open question. We have

struggled with it over the years, in some cases assuming, arguendo, that it exists while

also noting the difficult questions such a right would pose and the high standard any

claimant would have to meet." District Attorney's Office v. Osborne, 129 S.Ct. 2308,

2321 (2009).

The exact parameters of "the high standard" that would govern a showing of

actual innocence have not been spelled out by the Supreme Court in detail.  However,

54

in Herrera v. Collins, 506 U.S. 390 (1993), the Supreme Court stated that the "the threshold for showing such an assumed right would necessarily be extraordinarily high." Id. at 417.  The Supreme Court, in House v. Bell, 547 U.S. 518 (2006), later elaborated on this language when it stated that the "sequence of the Court's decisions in Herrera and Schlup[26] first leaving unresolved the status of freestanding claims and then establishing the gateway standard – implies at the least that Herrera requires more convincing proof of innocence than Schlup." House at 555.

Therefore, the standard of proof appears extraordinarily high, even more so than the already onerous standard pronounced in Schlup.  The Schlup case stated that a petitioner "does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup at 329 (emphasis added).

Thus, even if the possibility of habeas relief actually lies for a defendant making an actual innocence claim – an issue far from settled by the Supreme Court – defendant must, at minimum demonstrate that the newly discovered evidence carries such an exculpatory effect that no reasonable juror would have found him guilty beyond a reasonable doubt.  Defendant's argument here is academic because he does not even proffer any new evidence, much less any evidence that would necessarily lead a reasonable juror to find him not guilty.

---

26  The Supreme Court in Schlup v. Delo, 513 U.S. 298 (1995) held that a defendant who was otherwise foreclosed from a review of a constitutional claim could obtain review if he could demonstrate that, in light of newly discovered evidence, "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup at 329.

Although defendant admits that there is "no evidence available to affirmatively prove his innocence" and that "he presents no evidence here which is 'newly discovered' in the traditional sense," defendant grounds his actual innocence claim on the novel position that the evidence is new in the sense that although it was "known to the court and parties [at the time of trial], it was not known to the jury." Defendant claims that because evidence was precluded, the jury was prevented from hearing a complete and uncorrupted body of evidence. See Petition at 107.

In making this claim, defendant merely repeats his meritless arguments concerning the admissibility of the confession (Point II), and the properly curtailed cross-examinations of Dr. Lombardy and Detective Trujillo (Point I). Defendant's unprecedented belief that the properly precluded evidence somehow satisfies the legal definition of "newly-discovered evidence" is without merit, as is his belief that the precluded evidence – already found by the trial court and the appellate court to be tangential and irrelevant – would carry such exculpatory force that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup at 329 (emphasis added).

In sum, defendant's freestanding claim of actual innocence is one that has never been explicitly held by the Supreme Court to suffice for habeas relief. Moreover, although the Supreme Court has postulated that such relief might be available where newly discovered evidence is of such nature that no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt" (Schlup at 329), defendant

56

self-admittedly presents no new evidence at all.   The state court finding of overwhelming evidence was correct, notwithstanding defendant's contentions.

## CONCLUSION

### THE PETITION FOR A WRIT OF HABEAS CORPUS SHOULD BE DENIED.

Dated:  Mineola, New York
February 9, 2011

Respectfully submitted,

Kathleen M. Rice
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

By:  _____
ANDREW FUKUDA

Douglas Noll
Andrew Fukuda
  Assistant District Attorneys
    of Counsel

58

**Certificate of Service**

I hereby certify that, on February 9, 2011, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon:

> David A. Bernstein, Esq.
> Attorney for Petitioner
> Legal Aid Society of Nassau County
> One Helen Keller Way
> Hempstead, New York 11550

> Kathleen M. Rice
> District Attorney, Nassau County
> Attorney for Respondent
> 262 Old Country Road
> Mineola, New York 11501
> (516) 571-3800

> By:   Andrew Fukuda

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ARTEMIO CASTELLANOS,

                                    Petitioner,

                                                        CV-10-5075 (JFB)
            -against-


ROBERT KIRKPATRICK, SUPERINTENDENT,

                                    Respondent.
-----------------------------------------------------------------x

### Notice Regarding the Filing of Exhibits in Paper Form

Exhibits in support of Respondent's Affidavit and Memorandum of Law in Opposition to Petition For A Writ of Habeas Corpus, which was filed electronically on February 9, 2011, are being filed in hard copy.


                                    Kathleen M. Rice


                                    District Attorney, Nassau County
                                    Attorney for Respondent
                                    262 Old Country Road
                                    Mineola, New York 11501
                                    (516) 571-3800


                        By:    Andrew Fukuda

Date:  February 9, 2011