*To Be Argued By:*
DAVID A. BERNSTEIN

*Argument Time:* 20 Minutes

# New York Supreme Court

## Appellate Division: Second Department

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

- *against* -

TO BE HEARD ON
THE ORIGINAL
PAPERS

ARTEMIO CASTELLANOS,

*A.D.* # 2006-7203

Defendant-Appellant.

## BRIEF FOR DEFENDANT-APPELLANT

KENT V. MOSTON
Attorney for Defendant-Appellant
Attorney-in-Chief
Legal Aid Society of Nassau County
One Helen Keller Way, 3rd Floor
Hempstead, NY 11550
(516) 560-6400

**OF COUNSEL:**
JEREMY L. GOLDBERG
DAVID A. BERNSTEIN

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
----------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

                            Respondent,

            - against -                                  A.D. No.  2006-7203

ARTEMIO CASTELLANOS,

                      Defendant-Appellant.

----------------------------------------------------------------------x

## STATEMENT PURSUANT TO C.P.L.R. SECTION 5531

1.   The indictment number in the Court below was 2349N/2005.

2.   The full names of the parties were The People of the State of New York -
     against – Artemio Castellanos.

3.   This action was commenced in County Court, Nassau County.

4.   This action was commenced by the filing of Indictment Number 2349/05 on
     November 1, 2005.

5.   This is an appeal from a judgment of conviction of the County Court,
     Nassau County (Peck, J.), rendered July 10, 2006, convicting appellant of
     one count of Criminal Sexual Act in the First Degree [P.L. § 130.50] and
     one count of Sexual Abuse in the First Degree [P.L. § 130.65].  Appellant
     was sentenced to a determinate term of twenty-five years plus five years of
     post-release supervision on the first charge, and seven years plus three years
     of post-release supervision on the second charge.  The sentences were
     ordered to run concurrently.  Appellant was ordered to pay a two hundred
     and fifty ($250) dollar mandatory surcharge, a twenty ($20) dollar crime
     victim's assistance fee, a fifty ($50) dollar Sex Offenders Registration Act

i

fee, a fifty ($50) dollar DNA charge, and a mandatory supplemental Sex Offender Victims' Fee of one thousand ($1,000) dollars.

6.   This appeal is on the original record pursuant to permission granted by this Court on October 3, 2006.  There were no co-defendants below.

# TABLE OF CONTENTS

STATEMENT PURSUANT TO C.P.L.R. SECTION 5531 ................... i

QUESTIONS INVOLVED ............................................... vi

PRELIMINARY STATEMENT.............................................. 1

INTRODUCTION....................................................... 2

STATEMENT OF FACTS ............................................... 3
    Huntley/Dunaway Hearing............................................ 3
    Pretrial Motions .................................................. 9
    The Trial ......................................................... 10
        The People's Case .................................................. 10
        Defendant's Motion to Dismiss...... ............................. 22
        Defendant's Case .................................................. 23
        People's Rebuttal.................................................. 30
        Motions, Charges, and Verdict .................................... 31
        Sentencing Proceeding ............................................. 33

ARGUMENT ........................................................... 36

    INTRODUCTION....................................................... 36

    POINT ONE
        Appellant's Conviction Was Against the Weight of the
        Evidence.......................................................... 38

    POINT TWO
        Appellant's Statement Was Coerced and Should Have Been
        Suppressed........................................................ 46

    POINT THREE
        The Trial Court Abused its Discretion When It Permitted
        a Six-year-old Child To Testify .................................. 54

    POINT FOUR
        The Court Erroneously Obstructed Testimony of Multiple

Witnesses............................................................... 59

    A. The Court Obstructed Defense Counsel's Cross-
       Examination of Key Prosecution Witnesses
         1. Defense Counsel Should Have Been Allowed
            to Question Trujillo About a False Confession
            He Took in Another Case ...................... 63
         2. Defense Counsel Should Have Been Allowed
            To Question Lombardy About a Previous
            Case in Which Her Mistaken Diagnosis of
            Sexual Penetration Led to a Suspect's
            Prosecution ...................................... 67
         3. The Court Erroneously Denied Counsel
            Robust Cross-Examination of Osvaldo
            Lopez.............................................. 69
    B. The Court Erroneously Prevented Defense Counsel
       From Questioning Flor About Christian's Prior
       False Accusations Against Appellant............... 71
    C. The Court Erred in Allowing Lombardy to Testify
       in Rebuttal, Denying Ajl the Chance to Observe
       That Rebuttal, and Preventing Counsel From
       Calling Ajl on Surrebuttal........................... 72

POINT FIVE
    The Court's Erroneous Instructions and Failure to Issue
    Necessary Charges to the Jury Individually and Cumulatively
    Influenced the Verdict...................................... 77

    A. The Court Gave an Improper Missing Witness
       Charge............................................... 77
    B. The Court Erred in Denying Counsel's Request
       for a Charge About the Medical Hearsay
       Evidence............................................ 80
    C. The Court Should Have Given Instructions About
       Inappropriate Comments Made by the Prosecutor
       In Summation........................................ 82

POINT SIX

The Court Erred in Allowing Testimony About the
Complainant's Statements as Any Hearsay Exceptions
Were Inapposite.................................................. 85

A. The Court Erroneously Permitted Osvaldo Lopez to
Testify About Inadmissible Hearsay....................... 86
B. The Court Erroneously Permitted Ana Lopez to
Testify About Inadmissible Hearsay....................... 90

POINT SEVEN

Appellant Was Denied His Right to a Showing of Probable
Cause for his Arrest............................................ 94

A. The Court Obstructed Appellant's Inquiry Into the
Probable Cause for his Arrest.......................... 94
B. There was Insufficient Proof of Probable Cause and
Therefore Appellant's Statement Should Have Been
Suppressed................................................. 100

CONCLUSION

For The Forgoing Reasons, Appellant's Judgment Of
Conviction For Criminal Sexual Act in the First Degree and
Sexual Abuse in the First Degree Should Be Reversed And
The Accusatory Instrument Dismissed or a New Trial Ordered
With the Statement Suppressed; In the Alternative, a Hearing
Should Be Ordered on the Issue of Probable Cause............. 104

CERTIFICATE OF COMPLIANCE .............................................. 105

## QUESTIONS INVOLVED

1.   Is a conviction based upon a coerced "confession," an accusation of a young impressionable child, and medical testimony unsupported by modern standards against the weight of the evidence?

2.   Can a confession taken under threat of harm to a suspect's genitals be considered voluntary?

3.   Should a six-year-old child be permitted to testify at a criminal trial on the basis of sparse and incomplete voir dire?

4.   Was appellant denied a fair trial when the court prevented appellant from cross-examining key witnesses against him on issues related to their credibility?

5.   Is a defendant assured of a fair trial when the jury is not provided all of the charges necessary to give it a complete and fair comprehension of the law?

6.   Did the court below err in allowing two witnesses to testify about the complainant's statements to them when the statements were inadmissible hearsay?

7.   Was there sufficient probable cause to support appellant's arrest and if not must his subsequent confession be suppressed?

# PRELIMINARY STATEMENT

This is an appeal from a judgment of conviction following a jury trial in the County Court of Nassau, State of New York, before the Honorable George R. Peck, rendered July 10, 2006, convicting appellant of one count of Criminal Sexual Act in the First Degree (P.L. §130.50) and one count of Sexual Abuse in the First Degree (P.L. §130.65), and sentencing him to a determinate term of imprisonment of twenty-five years plus five years of post-release supervision on the first charge, and seven years plus three years of post-release supervision on the second charge. The sentences were ordered to run concurrently. Appellant was ordered to pay a two hundred and fifty dollar mandatory surcharge, a twenty dollar crime victim's assistance fee, a fifty dollar Sex Offenders Registration Act fee, a fifty dollar DNA charge, and a mandatory supplemental Sex Offender Victims' Fee of one thousand dollars.

Timely notice of appeal was served and filed, and, on October 3, 2006, this Court granted appellant leave to appeal as a poor person. Kent Moston was assigned as attorney-in-chief of the Legal Aid Society of Nassau County.

There were no co-defendants at the trial below and no stay of judgment pending appeal has been ordered.

## **INTRODUCTION**

It would be understandable if, upon reading the exposition of the People's evidence in this case, the facts seem devoid of controversy: a child complains of sexual molestation, the named culprit confesses to the police, and a doctor backs the child's account. What is ultimately revealed, however, is that there is little reason to believe the child at all, and no reason to believe that what he alleged occurred actually happened; that there is ample reason to disbelieve the detective who attests to the confession; and that the doctor reached her conclusions based on methodology so flawed that it has been authoritatively found to constitute the ineffective assistance of counsel for a lawyer to leave the use of this methodology unchallenged. Furthermore, the court below made rulings which effectively prevented the jury from finding out the truth of these assertions. In short, the likelihood of appellant's innocence is so great that the possibility of his guilt approaches the miraculous. It is asked that this larger perspective be kept in mind when reading this Statement of Facts.

## STATEMENT OF FACTS

<u>Huntley/Dunaway Hearing</u>

On April 4-6, 2006, a *Huntley/Dunaway* hearing was held before Judge Ayres to assess the voluntariness of appellant's statement and probable cause sufficiency for his arrest. The People presented *Rosario* material pertaining to Detectives Edwin Trujillo and Diane Barbieri, suggesting their intent to call both detectives. (H[1]:3-4). Instead, only Trujillo testified at the hearing. Detective EDWIN TRUJILLO was a member of the Special Victims' Squad of the Nassau County Police Department who spoke fluent Spanish. (H:11). His squad investigated cases involving sex crimes, occasionally including those committed against children. (H:12).

Sometime between July 7 and July 20, 2005, Trujillo received a call from Detective Barbieri, from the Child Abuse Squad, who asked for his help on a case involving a young boy who primarily spoke Spanish, which she did not speak. (H:13). Although another detective had previously interviewed the child, Barbieri requested Trujillo's assistance because of his expertise in questioning sex crime victims in Spanish. (H:13,52-54). She told him little about the case, except that it involved a five-year-old boy who claimed he had been sodomized. Before

---

[1] Numbers in parenthesis preceded by "H" refer to the Minutes of the *Huntley/Dunaway* hearing held on April 4-6, 2006, before the Honorable David Ayres.

3

interviewing the child, Trujillo reviewed the "Q&A" document prepared by the prior questioner, Detective Mercado.[2] (H:52-53).

On July 20, 2005, the child told Trujillo that appellant, referred to as "Temio," had put his penis in the child's anus on numerous occasions. (H:14,57). The boy also told Trujillo that "telling a lie would get you in trouble," described where the alleged acts occurred, and said it happened "mucho, mucho, mucho" times. (H:58). Nobody else was present at the interview, and Trujillo did not take any notes or write down any of the child's answers. (H:66-67).

The carrying detective, Barbieri, told Trujillo that medical records compiled by Dr. Lombardy, a medical expert, indicated that the boy had suffered from repeated instances of penetration, the most recent of which on June 29.[3] (H:69). She also told Trujillo that the child was initially examined by a pediatrician who found no signs of abuse, but who was unable to conduct the necessary tests. (H:69-70).

Trujillo believed that the results of the interview with the child, in conjunction with the "positive medical findings," were sufficient to arrest

---

[2] Defense counsel requested production of this document, but the court denied the request, stating that it was not considered *Rosario* material for Trujillo. (H:54-55).

[3] There is no further testimony anywhere in the record supporting the allegation of penetration on this date, nor does anything indicate how Barbieri or Lombardy reached this conclusion. It appears to be the only specific date alleged in the entire record, as the indictment refers only to a general period of two months in which abuse may have occurred, and nobody at trial ever pinpointed a specific date. Had Barbieri been called to testify at either the hearing or trial, perhaps she could have explained the source of this date. Lombardy's trial testimony did not suggest any possible date of penetration, and in fact she said it could have happened as much as a year prior to her examination of the child.

4

appellant. (H:69). On July 21, 2005, Trujillo and Barbieri located appellant and told him they wanted to continue an investigation involving a child's allegations against him.[4] (H:15-17,74). Appellant and his girlfriend, Flor Sosa, were driven to the Special Victims' Squad, where she was asked to sit in a lounge while appellant was taken to a different office. (H:20).

Appellant was seated at a table in the squad room across from Detectives Trujillo, Barbieri, and Birdsall. They asked appellant for "pedigree" information, but did not then memorialize his answers. (H:23,101). Trujillo read appellant the Miranda rights card (PDCN form 233) in Spanish, and asked if appellant understood that he had the right to remain silent. Appellant allegedly wrote "sí" (meaning yes) and signed his name next to that question and the next one asking if he was willing to answer questions. Trujillo then signed the bottom of the card; Barbieri and Birdsall, who were present the entire time, did not. (H:26,45,111). Trujillo did not at any point invite appellant to read the card, nor did he explain what the card meant with any detail, since he believed it to be self-explanatory. (H:109-110).

Once the rights card was signed, Trujillo told appellant he wanted to finish the investigation[5] by talking about the child's allegations. (H:27,121). Appellant denied doing anything to the child, and Trujillo asked "is there some reason why

---

[4] Although Trujillo had no first-hand knowledge as to what appellant was told previously, he believed that Child Protective Services had informed appellant of the allegations. (H:74-75,77).
[5] Trujillo did not, however, tell appellant the specific details of the investigation other than referring broadly to a child's accusations. (H:121).

the child would be making this up?"  Appellant answered that he did not know why a child would make this up.  (H:27).  Trujillo told appellant there was medical evidence that "there had been some activity with this child," a somewhat vague reference to sexual abuse, and appellant replied "that it was a lie."  (H:27).  Trujillo responded that there would be no reason for anyone to "make this stuff up," and appellant "continued to tell [Trujillo] that it wasn't true."  (H:27).  At one point, Trujillo turned to Barbieri and said "can you believe this? He's saying that everybody's lying, everybody's lying but him."  (H:28-29).

Finally, Trujillo tried a different tack, and asked if appellant was familiar with television shows that depict scientific tests in criminal investigations.  Just like in those shows, Trujillo said, the police

> have an office, kind of a laboratory, where there's people who collect evidence for us.  We can go down there, we'll take an impression of your penis and then we'll compare it to what was found in the child's anus and then when it's compared and found to be a match, you can explain to the Court how it is that the impression of your penis is in the child's anus.

(H:28).  After that, appellant put his head down and "confessed."  (H:28).  Trujillo admitted at the hearing that he had completely fabricated the "penis impression" test, and had lied because he wanted appellant "to be forthcoming and tell the truth."  (H:129).

First, appellant said that he had "made a mistake" and "only done it one time."  (H:29).  Trujillo told him that the medical evidence showed and the child

6

stated that it happened more than one time, and appellant asked "how many time[s] did the doctor say?" (H:119). Trujillo responded that the medical evidence showed it happened more than once, and appellant said it happened twice. Then, Trujillo said "you remember the first time, you remember the last time, that's two. Were there any other times in between?" (H:119). Appellant then indicated that it had happened three times. (H:119).

Trujillo did not ask how long the acts took, whether appellant observed the boy's reaction, whether appellant had ever engaged in such acts with a child before, or what he was thinking at the time. (H:130,134).

The detective did not take notes while appellant was speaking, and at around 10:30 p.m. he began to re-ask some questions and type up a statement, in Spanish, reflecting the contents of the conversation. (H:30-32,45). He read the statement to appellant and offered to make modifications. (H:31-32). Appellant refused, and Trujillo printed the statement and handed it to him. Trujillo asked appellant to read the first couple of lines out loud, which he did, and then the detective told him to read the remainder of the statement to himself.[6] (H:32,112-13). Trujillo was unable to pinpoint how long it took appellant to read the remainder of the

---

[6] Defense counsel repeatedly asked Trujillo to clarify which sentences appellant read aloud, and the witness was unable or unwilling to answer. (H:112-16). When counsel tried to refresh his recollection by reading specific sentences from the statement, the court sustained objections and told counsel "You've gotten all you're going to get out of this area, Mr. Berger, so you can't keep asking the same question over and over." (H:116-18).

7

statement, and in fact refused to give an estimate about the length of time.[7]
(H:145). After purportedly reading it to himself, appellant signed the statement at
the bottom of both pages in the presence of Trujillo, Barbieri, and Birdsall.
(H:33,39). Neither Barbieri nor Birdsall signed the statement as a witness.
(H:112).

Once the statement was signed, shortly before midnight, Barbieri and
Birdsall asked Trujillo to translate questions about pedigree information.
(H:95,100). The answers were then entered into the computer and an arrest card
was generated. (H:93,95). In the course of this preparation, Trujillo did not ask
appellant any questions about his level of education, and such fields were left
blank on the arrest report. (H:107). However, Trujillo testified that he did ask if
appellant could read or write, and appellant responded that he could. (H:108). The
interrogation was not recorded on video or audio tape. (H:110).

The People rested at the end of Trujillo's testimony, and failed to call
Barbieri, despite having served *Rosario* material regarding her. (H:152). Defense
counsel tried to call her as a witness and was repeatedly denied. See infra Point
VII.

The court ultimately ruled that since Trujillo "was in possession of
information directly from the victim indicating that the defendant had committed a

---

[7] Trujillo responded "If I estimate that it was a certain time, I could be wrong. I'd rather not do
that." (H:145). When counsel pressed him, asking for a range of time, the court sustained
several objections by the prosecutor.

8

crime against him and the police were also in possession of corroborative medical findings," there was sufficient probable cause for the arrest. (H:177-78). The custodial statement was excluded from the probable cause analysis. (H:178). The court found that the statement was voluntary.

Counsel objected to the ruling, noting that the story of a five-year-old child whose credibility was in doubt[8] should not have been considered, leaving only medical evidence to support the probable cause determination. (H:179-80). Furthermore, the only testimony about the medical evidence came from Trujillo, who did not see the reports firsthand, but rather was told about them by Barbieri. (H:179).

Pretrial Motions

Prior to commencement of the trial, the prosecutor indicated that no *Sandoval* hearing was necessary because there was only "one prior act," which occurred outside the country, and she did not intend to bring it up at trial.[9] (T[10]:2-3).

---

[8] Counsel noted several times that *Rosario* material on Barbieri revealed that the detective questioned whether the child understood the difference between truth and lie. (H:59,165). Since she was not permitted to testify, however, and Trujillo claimed he was never told about her opinion on this, counsel was not able to further probe the child's credibility. See infra Point VII.
[9] The prosecutor apparently ignored or forgot this pledge, and later mentioned prior bad acts in front of the jury on two separate occasions. See T:1098-1100;1168-1171.
[10] Numbers in parenthesis preceded by "T" refer to the Minutes of the Trial held before Hon. George R. Peck from May 4-24, 2006.

9

The Trial

Before any witnesses testified, the parties addressed the admissibility of any potential hearsay testimony of Ana and Osvaldo Lopez, mother and father of the victim. (T:346-66). The facts regarding this issue are discussed in Point VI.

The People's Case

OSVALDO LOPEZ first met appellant when they were children growing up in Guatemala. (T:370). The boys were approximately four years apart in age, and never attended school at the same time. (T:396). When they were in church together, Osvaldo, who was "president of the youth," gave appellant "privileges to read the readings of the Bible or to sing songs." (T:394). Based on this and the fact that he believed appellant went to elementary school, Lopez testified that appellant knew how to read and write.[11] (T:395).

In 2003, Osvaldo invited appellant to come live with him in Freeport, New York. (T:369,372). Shortly after appellant arrived, they all moved, including appellant, to a new house in Freeport. (T:375). There, Osvaldo and his family lived on the first floor while appellant lived on the second floor with his girlfriend, Flor Sosa. (T:376). In May and June of 2005, two other men also lived on the second floor: Elias, a friend of the Lopez family, and Dimas Ramirez, who was related to appellant. (T:378-80). Ramirez, who lived there for only a month around the time of the allegations, slept on a mattress in the second floor hallway

---

[11] Defense counsel was prevented from clarifying Osvaldo's knowledge of appellant's literacy. See infra Point IV.

where some of the children's toys were kept. (T:380,420-21). Ana Lopez's brother, Minor Rivas, also lived in the house at the time, and slept in a section of the living room on the first floor.[12] (T:438). Everyone living there had access to the entire house. (T:380-81).

At that time, Osvaldo's son Christian was five years old and had known appellant for approximately one year. (T:381). Christian and his brother Nelson treated appellant as a member of the family. It was common, according to Osvaldo, for appellant to play outside with the children. (T:382-83). He did not remember how many times he saw appellant playing with the boys during that period of time. (T:446). Occasionally, when the boys played soccer outside with appellant, Osvaldo would join them. (T:450). This was always on a Monday, which was the only day of the week Osvaldo did not work regularly in May and June of 2005. (T:450).

Around that time period, Osvaldo worked at a restaurant six days a week from approximately 10:30 a.m. to 10:00 p.m. with a short break mid-afternoon. (T:383-84). His wife worked an irregular schedule cleaning houses, sometimes until 3:00 or 4:00 p.m., and also worked at a 99-cent store some evenings until 9:00 p.m.. (T:384,460). If both Osvaldo and his wife were at work, various people cared for the children after school, including Osvaldo's sister, appellant's girlfriend Flor, or sometimes appellant. (T:384-85). When appellant was home in the

---

[12] By this count, there were five men living in the house during the months in question.

11

afternoons, he occasionally offered to take the boys off the bus.  (T:454).  During May and June of 2005, appellant could have been alone with Christian for two or three hours on several occasions.  (T:385).

After a brief hearing on the issue of competency, the court determined that the complainant, Christian, had "sufficient intelligence, capacity, memory, understanding of language" to give unsworn testimony.[13]  (T:837-38). CHRISTIAN LOPEZ then testified that appellant "did bad things" to him and "put his dick in [Christian's] ass."  (T:879).  He alleged that this happened "many times" in appellant's room, always at night and always on a brown chair. (T:879,883).  Although the child could not tell time, he testified that "at night" meant when it was dark outside.  (T:887-88).  When asked how many times, Christian said "until 20" and counted to the number twenty.  (T:882).  The child described the act with perplexing detail, stating that he was sitting on a chair while appellant knelt on the ground to commit the penetration.  (T:892-93).

Christian was unable to identify the first or last time this had occurred, and was not certain when or how many times he told his parents about it.  (T:884-85). When asked if he told his parents about what happened after the first incident, Christian said "yes."  (T:883).  He then said "I forgot when I told my mom." (T:883).  Finally, when asked by counsel if he told his parents after each time it had happened, he responded "To my father, and my mother also."  (T:884).

---

[13] The erroneous decision to permit this testimony is challenged in Point III.

12

Christian testified that the first time he was abused, his brother and uncle were present in the house. (T:889). Appellant called him upstairs, but Christian was unable to remember what exactly was said.[14] (T:896). When initially asked if he saw appellant in the courtroom, Christian responded that he did not. (T:880). Later, after the prosecutor asked him to stand up and walk around the railing of the bench, he identified appellant as "Temio," the man who abused him. (T:898-99).

In May and June of 2005, ANA LOPEZ was working part-time in a 99-cent store from either 9:00 a.m. to 3:30 p.m. or 3:30 to 7 p.m. several days per week. (T:909). When she and Osvaldo were both at work, appellant, appellant's girlfriend Flor, or Ana's brother would watch the boys.[15] (T:910). She, like her husband, testified that appellant frequently played with her sons. (T:910). In that two-month period, appellant was alone with the boys once or twice for the entire day. (T:952). At some point in April or May of 2005, Christian complained to Ana that he had a "burning sensation" in his rectum and she noticed some irritation there. (T:927-28). In response, she put some Nivea cream on the area, but never took any further steps or saw any additional irritations or side effects. (T:928).

On June 30, 2005, Ana's brother Cesare was playing with the Lopez children when he picked up Christian. (T:913-14). At the time, Christian was

---

[14] The court subsequently asked Christian if he knew "what the word 'remember' means," to which the child responded by shaking his head no. (T:896). However, it was the boy himself who had used the word appropriately several times previously. (T:894,896).

[15] When asked before the grand jury who watched the children if she and Osvaldo were at work, Ana responded "My sister-in-law sometimes, Artemio's wife." (T:937). In that statement, she never mentioned appellant as an occasional babysitter for the children.

13

wearing only underwear, or "little shorts" with no pants over them.  (T:965).
According to Ana, Cesare noticed that Christian's penis was erect and said to the
boy "you shouldn't have an erect penis."  (T:914-15,965-66).  Ana walked over to
Christian and asked "why is this?" and before he could respond, her other son
Nelson said "I'm going to tell you why it is that Christian has his pee-pee erected."
(T:915).  Nelson then told her that Christian had said that his penis gets erect when
he sees appellant.  (T:968).  Ana grabbed Christian and took him into another
room, asking "Why did you say that?"  (T:916).  She then threatened to hit him
with a belt if he didn't tell her the truth.  (T:971).  Christian replied "I can't" and
began to tremble, and then told her that he was being abused.  (T:916-17).

    At first, Christian said to her, "Artemio told me that I should put my dick,
my penis, my dick, in his ass. In that man's ass."  (T:971)(emphasis added).  After
this bizarre statement, he then told her that appellant made him sit on a chair,
removed his pants, and "put his dick in my ass."  (T:972).

    Later that night, she told Osvaldo what Christian had alleged, and he said "I
can't believe that."  (T:918).  Upon returning home, Osvaldo grabbed Christian and
took him upstairs to address appellant.  (T:388-89).  Ana stood by the bottom of
the stairs watching the confrontation.  (T:919).  Osvaldo knocked on appellant's
bedroom door, and when appellant appeared, Osvaldo asked "Do you want Flor to
listen to this?" and appellant "changed color" as if he was frightened.  (T:390).
Appellant said "tell me" and Osvaldo asked Christian "what did [appellant] do to

you?" (T:390). According to Osvaldo, the child pointed at appellant and said "You, Artemio, did something bad to me in this chair"[16] and appellant responded "You're going to believe him?" (T:390-91). Osvaldo replied "It's my son. I don't want to believe it" and then told appellant he planned to bring Christian to a doctor. (T:391).

It is questionable whether Osvaldo actually believed the allegation, because several days afterwards he asked appellant for upcoming rent money. (T:394,470).

According to Ana, Christian's statement was different. For her testimony, see infra pp.90-91. On cross-examination, she testified that she and Osvaldo got in the car after the confrontation to take Christian to the hospital, but eventually they went home because he kept changing his story. (T:974-75).

The next day, they took Christian to see his pediatrician. (T:398). DR. LUIS HERRERA was Christian's doctor since he was four years old. (T:605). On July 1, 2005, Herrera spoke with Christian in front of his parents, and learned that they were there because the boy's "pants had been pulled down and a penis was inserted in his rectum."[17] (T:609-10). Herrera then performed a visual examination of the anal area. (T:611).

---

[16] Defense counsel objected to admission of the statement and moved to strike, but the record does not reflect any ruling on the objection. (T:390). Counsel again moved to strike the statement, along with the remainder of Osvaldo's testimony, the following day as inadmissible hearsay. (T:429-34). See infra Point VI.

[17] Prior to Herrera's testimony, the parties addressed the admissibility of any statements Christian made to the doctor. Defense counsel suggested that, as with the court's ruling on medical records taken by Lombardy (T:497-98), the witness should only testify that Christian said that

He saw no discharge or fissures which would indicate penetration, and everything that he observed was "normal." (T:611,618-20). However, Herrera did not have tools necessary to look inside the child's rectum and therefore he recommended Christian be taken to an emergency room for a more thorough exam. (T:611-12). According to Osvaldo, Herrera said "Thank God, nothing serious has happened, but if the child needs a special exam, I don't have the instruments."[18] (T:400). Although he saw nothing physical out of the ordinary, the doctor called the police and "started making the arrangements for Social Services and for the psychologist" because the child described things which sounded like sexual abuse. (T:613,624).

Later that day, Christian's parents were questioned by several police officers. (T:400-02). Ana told them that the boys had been alone with appellant once or twice during the previous months, but at trial she was not certain whether this was included in the statement she signed. (T:955-57). The statement was typed in English, which she does not speak, and it was read to her in Spanish. Ana did not read it to confirm its accuracy. (T:990). She was uncertain at trial whether she had told the police about the irritation in Christian's rectum; the court refused to let her read the statement to refresh her recollection. (T:978-79). While they

---

his anus had been penetrated. (T:594). The court rejected this request, saying that Herrera would be allowed to testify that Christian had specifically said that a penis was inserted into his rectum. (T:594). Counsel's request for reconsideration was denied. (T:596-98). The court further refused to give a jury instruction that the testimony should be considered as necessary for treatment, but not for it's veracity. (T:598-99). See Point V.

[18] Herrera denied making this statement. (T:623).

16

were at the hospital, Osvaldo told a nurse that somebody touched his son's "private part."[19] (T:562). This comment was memorialized in a triage assessment sheet from the same date. (T:562-64).

On July 7, 2005, Christian was examined by DR. DIANE LOMBARDY at the Nassau University Medical Center ("NUMC"). (T:505,524). Dr. Lombardy is a Board-certified physician who specializes in pediatrics and generally examines children who are brought to the hospital in an emergency, including those brought in because of allegations of sexual abuse. (T:505-06). She was trained to conduct forensic examinations for sexual abuse by Dr. Bella Silecchia, who developed the program for evaluating children at the NUMC.[20] (T:508). After a brief voir dire, the court qualified Lombardy as an expert witness. (T:515).

Lombardy testified that she did not ask Christian about the details of the incident, and did not know if anyone else at the hospital did either. (T:566-67).

First, Lombardy conducted a general physical examination. (T:525). Next, she conducted a genital exam, which involved the use of a colposcope, or a microscope with a movable arm and a camera attached at the end. (T:506,526). The colposcope was used to take approximately 26 slides of photographs in this examination. (T:533).

---

[19] At no other point in the trial does anyone, including Christian, assert that appellant touched the boy's penis.

[20] Questions about Silecchia's qualifications are discussed infra FN 43. The court refused to let defense counsel question Lombardy in voir dire about a federal case in which Silecchia was discredited for reaching conclusions not supported by modern scientific standards. (T:513).

In court, Lombardy described each of the slides as they were shown on a video screen. (T:543-555). Some of the slides revealed that there was dilation of Christian's anal and rectal area, and stretching and smoothing of tissue which indicated repetitive penetration from the outside of the body. (T:544-45). Folds of tissue which would typically be present were not there and the smoothing of the anal ridges was caused by "penetration on multiple events of the anal and rectal cavity." (T:549). Furthermore, there was increased redness indicating "trauma inside the rectal vault." (T:550).

Lombardy concluded that Christian had suffered "sexual assault over an extended period of time." (T:555). However, she admitted that she couldn't determine the nature or instrumentality of the penetration.[21] (T:566). The only other possible explanation for the boy's condition was chronic constipation over an extended period of time. (T:555-56,568). Ana told Lombardy that there was no history of such constipation. (T:556-58). Lombardy later admitted that certain genetic disorders could cause "laxity in that area in general. Whether they cause smoothing per se, I'm not sure." (T:587). She did not believe that Christian suffered from any such disorders based on the medical history she received from Ana and the lack of additional symptoms. (T:587-88).

Although Lombardy could not pinpoint an exact number of instances, she said "this doesn't happen with three, four episodes of penetration. This happens

---

[21] In other words, Lombardy testified, the penetration could have been caused by a penis or could have been caused by some other object. (T:568).

18

with multiple episodes of penetration." (T:569).  When asked to elaborate, she

explained that it likely happened over a longer period of time which could have

been weeks, months, or even years.  (T:573).  It could have happened anywhere

from ten to a hundred times, meaning different temporal events and not

penetrations on the same day.  (T:576).  Although Lombardy observed no scars,

the anal area is one that "heals easily without scarring."[22]  (T:578).  Defense

counsel later requested an opportunity to re-call Lombardy for the purpose of

impeachment, but the court denied the request.[23]  (T:823).

DETECTIVE EDWIN TRUJILLO's testimony was similar to that from the

pretrial hearing.  Although he had previously testified that the first time he heard

about the case was when Detective Barbieri called him, at trial Trujillo testified

that a supervisor in the Child Abuse Section first made contact with him in July,

2005.  (T:645).  Barbieri later gave him some basic information about the nature of

the allegations, including a summary of the medical reports.  (T:712,732,849).  The

court refused to allow questions about whether Barbieri had told Trujillo that she

did not believe the child knew the difference between the truth and a lie.  (T:712-

13,849-50).  Trujillo described his interview of Christian in greater detail than at

the pretrial hearing,[24] and explained how it led to appellant's arrest.  (T:652-

---

[22] Counsel was precluded from asking if chronic damage would have produced bleeding.
(T:579).
[23] See infra Point IV.
[24] Despite Trujillo's greater recall of detail at trial than at the hearing, he claimed he did not take
any notes when he interviewed Christian. (T:720).

56,659).  When he and Barbieri found appellant the following evening, they arrested him.  (T:659-60).

Appellant was taken to the police facility and put in a room with Barbieri and Trujillo.  (T:663-66).  Detective Birdsall, another member of the Special Victims Squad, was present when they arrived and did not participate in the interview, but assisted with the arrest paperwork.  (T:663-67).  Neither Birdsall nor Barbieri spoke Spanish; Trujillo and appellant were the only ones in the room who did.  (T:726).  Trujillo was the only detective to ask questions leading to appellant's statement; Barbieri and Birdsall merely asked pedigree questions.  (T:668-69,729).  Trujillo read appellant the rights card and obtained his signature, but did not ask appellant to read the card first.  (T:666-671,774).

As in the pretrial hearing, Trujillo described his conversation with appellant leading up to the statement.  (T:677-82).  When he told appellant that medical findings supported the allegation of penetration, Trujillo "knew what the doctor had indicated in her medical findings with respect to the child."[25]  (T:686).  At least three times, appellant denied doing anything to Christian.  (T:730-31).  The detective then told appellant that the police could take an "impression" of appellant's penis and "compare it to what's found inside the child's behind."  (T:757).  Trujillo admitted at trial that this was a lie; it could not be done and did

---

[25] In cross-examination, as at the pretrial hearing, Trujillo testified that he did not look at the medical records before interviewing the child, and his knowledge of the records was based solely on what Barbieri told him.  (T:731;H:66).

not make sense, but he said it does "make sense to tell somebody" if there's a chance they'll believe it and then tell "the truth." (T:757-63).

Trujillo failed to ask about specific dates on which the penetration had occurred, when it first started, the circumstances under which the boy entered appellant's room, the child's reaction, whether appellant had ever done this with other children before, whether the boy bled when it happened, whether anybody else was in the house at the time, whether appellant had done it with Christian's brother Nelson, or whether he used a condom. (T:768-71).

It took Trujillo approximately ninety minutes to type the statement. (T:684). In the statement, read into the record by Trujillo, appellant began with his name, date and place of birth, and current address. [26] (T:693). Next, it said that appellant had been read his *Miranda* rights, and explained that the statement was being made "freely and voluntarily" and without the presence of an attorney. (T:693). The statement then described appellant's relationship with the Lopez family, as well as the conditions under which he lived with them. (T:694). It continued:

> During this month I did something of which I am sorry, but also I have to assume responsibility for my actions because I am a man. On three occasions this month I told Christian to come to my room, and when he came in I pulled down his shorts and underpants and sat him on the tan-colored chair. I opened my pants and took out my penis and penetrated the anus of the boy with my penis. I did this, that I remember, three times.

---

[26] The statement read into the record was an English translation of the original, which was in Spanish. The translation was done by Trujillo and confirmed at trial by the court interpreter. (T:688-90).

21

(T:694). The statement went on to describe the confrontation with Osvaldo and circumstances leading up to his arrest, and concluded by reiterating that the statement was made voluntarily. (T:694).

Trujillo read the statement to appellant and offered to make any necessary changes. (T:682-83). He printed the statement and handed it to appellant, asking him to read it aloud. (T:683). After appellant read the "first few sentences or so," Trujillo ordered him to read the remainder to himself and offered to make changes. (T:683). The detective was unable to pinpoint how much of the statement appellant read aloud, but he believed appellant did not read the details of the alleged incident aloud.[27] (T:777). Trujillo was also unable to estimate how long it took appellant to read a portion of the statement aloud.[28] (T:777-78). Appellant then signed both pages of the statement, as did Trujillo. (T:683). Neither Birdsall nor Barbieri, who had been present the entire time, signed as a witness. (T:778-79).

### Defendant's Motion to Dismiss

At the close of the People's case, defense counsel made a motion to dismiss on the grounds that no prima facie case was made. (T:1016). The only evidence consisted of unsworn testimony of a child and appellant's statement, which was

---

[27] This is noteworthy because Trujillo admitted that for this reason, he was uncertain if appellant read the entire statement before signing it. (T:782).

[28] When counsel tried to press Trujillo for an answer, the court prevented him from answering, commenting "he said four times he doesn't know, counsel." (T:778). This was only the second time counsel had asked Trujillo for an estimate. (T:777-78).

taken under coercive circumstances. (T:1016). Together, these items should not be the basis for a conviction. (T:1016). The court did not rule on this motion in the record.

Defendant's Case

ARTEMIO CASTELLANOS was born in Guatemala and moved to the United States when he was nineteen years old. (T:1122-23). As a child, he attended church where he learned songs by rote because he was unable to read. (T:1123). He attended school briefly around the age of seven before going to work for his father on a farm. (T:1122). One of appellant's friends in Guatemala was Osvaldo Lopez. (T:1179).

In 2003, appellant moved to the United States to live with Osvaldo's family in Freeport. (T:1123). They treated him like family, and he considered them to be very good friends. (T:1178-79). When they lived at the first address in Freeport, appellant occasionally played with the boys, Christian and Nelson, in front of the house. (T:1205). However, once they all moved to the second residence, appellant was too busy working to play with the boys. (T:1205-08).

After doing unskilled labor, Artemio learned some skills and worked in window installation and home repair. (T:1124,1190). He was paid in cash, and worked Monday through Friday, from 6:30 a.m. to 5:00 or 6:00 p.m.. (T:1124). On weekends, he worked for a company that washed vehicles. (T:1126).

During May and June 2005, appellant worked every day except for one when he took his girlfriend Flor to the medical clinic. (T:1126-27). In those two months, appellant never returned home to find the Lopez children alone; their mother or uncles were always home with them. (T:1135).

On June 30, 2005, appellant and Flor were sleeping when they heard a knock at the door. (T:1135). Osvaldo entered the room and said "Look, I want to talk to you about something." (T:1135). Appellant told him to proceed, and that Flor was welcome to listen. (T:1135-36). Osvaldo said "Okay, my wife just told me something that the boy said some things, and she said that she hit him so he would say here in front of you what he said to her." (T:1136). Appellant asked what the child had said, and Osvaldo responded by asking Christian, who was with him, to speak. Appellant asked the boy what happened, and Christian said "You did something bad to me." (T:1136).

Confused, appellant asked "what did I do to you that was bad?" and when Christian did not respond, he asked Osvaldo "what is this bad thing about?" (T:1136). Osvaldo responded "I don't know. This is what he only told the mother" and appellant asked "Just because he says that I did something bad to him without saying what this bad thing was about, you're going to believe him?" (T:1136). Osvaldo then responded that he did not believe the child, but his wife had sent him to ask appellant directly. (T:1137). Appellant asked him to describe what the bad thing was, but "no one gave me an explanation." (T:1137). Osvaldo said that

because his son had made an allegation, he felt obligated to confront appellant, but if nothing happened, they should just leave it alone. (T:1137). He concluded "If you say nothing happened, okay, we'll leave it like that. Nothing happened." (T:1137).

At some point in the conversation, Osvaldo said "I have always seen that the child gets an erected penis" and appellant responded that perhaps it is not unusual for a child. (T:1139). Appellant then asked what it had to do with him that the child had gotten an erection, and Osvaldo told him not to worry and apologized for waking him up. (T:1140).

During the entire time that appellant lived with the Lopez family, he never sexually touched or assaulted Christian, nor did he ever hurt him in any way. (T:1141).

Before appellant was arrested, people from social services asked him about Christian. (T:1141). Appellant's description of his initial meeting with Trujillo and trip to the police station was substantially similar to Trujillo's testimony. (T:1142-43). From that point on, however, appellant told a different story.

After appellant was seated in the police station, Trujillo described a report that appellant had hurt one of Osvaldo's children. (T:1144). Not having been told the details of the allegations, appellant asked what was supposedly done to the boy,

and Trujillo said it involved sexual abuse.[29]  (T:1145).  "At no time have I done that," responded appellant.  (T:1145).  Trujillo then described a medical report showing that Christian had been sexually abused.  Appellant was surprised, and expressed disgust that anyone would think he had done that to a little boy and his friend's son.  (T:1145).  Again, he denied doing anything to Christian.  (T:1146).

Trujillo then asked appellant to sign a written statement.  Appellant responded that he did not know how to read, and asked the detective to read him the statement.  (T:1147).  Trujillo agreed to read it to him, but said if appellant did not sign the statement, his penis would be placed in a mold "that's going to hurt you a lot.  And that mold... can even ruin your penis... There are people that they can not use their penis afterwards."  (T:1157).  Appellant was scared, and Trujillo told him that he could sign the statement and avoid such treatment.  (T:1157).  Furthermore, the detective told him that the statement would help appellant with any judge because it denied his involvement.  (T:1157).  Trujillo tried to convince appellant that it would be in his best interest to sign it, and then "behaved very friendly" in his efforts to persuade appellant.  (T:1159).

Appellant, who only knew how to sign his name, eventually signed both the rights card and the statement.[30]  (T:1148-49,1227).  Trujillo did not read him the

---

[29] Trujillo did not initially explain the specific allegation that appellant had put his penis in Christian's anus.  (T:1147).

[30] Although he never learned how to read or write, appellant's father taught him how to sign his name at an early age by writing it for him on a piece of paper and asking him to copy it repeatedly.  (T:1166).

rights card, but did read selectively from the statement. (T:1150-51). The portions

of the statement which were read to appellant did not include any reiteration of

rights or the details of the allegations, but instead mentioned that he lived with the

Lopez family and described the CPS investigation and the arrest preceding the

interview with Trujillo. (T:1152-54). Appellant himself never read anything out

loud. (T:1150-51). At some point during the course of the evening, he also signed

a document denying any need for medical attention. (T:1165). Although this

paper indicates it was signed at nearly 2:00 a.m., Trujillo testified that he left

immediately after getting the "confession" signed at midnight. It is unclear,

therefore, who would have read or translated the medical document for appellant at

2:00 a.m.. (T:1217).

FLOR SOSA, appellant's girlfriend, dated him for five years and had known

him for five more prior to that time. (T:1021). Their relationship began when she

was fifteen years old. (T:1098). She and appellant had a child together who was

seven months old at the time of the trial. (T:1021). According to Flor, while she

and appellant lived with the Lopez family at the first address, there was an incident

involving appellant, Christian, and a "scratch."[31] (T:1022). When the Lopez

family moved to the second residence, she and appellant lived upstairs along with

the aforementioned Dimas and Elias. (T:1027).

---

[31] Despite defense counsel's offer of proof explaining how this prior accusation was relevant and appropriate, the court erroneously refused to let counsel ask Flor any further questions on the subject. (T:1023-26). See infra Point IV.

27

In March, 2005, Flor became aware that Osvaldo had romantic feelings for her. (T:1028). She resisted his advances, but was under the impression that Ana got jealous and attempted to push her down the stairs. (T:1028-31,1041-43). At one point, Ana told Flor it was legal to have an abortion in this country. (T:1118).

In May and June of 2005, Flor usually worked Monday through Friday from 7:00 a.m. to 4:00 p.m. in a deli near the house. (T:1031-32). Around the same time, appellant regularly worked seven days per week from approximately 6:30 a.m. to 7:00 p.m.. (T:1032). Flor testified that he worked every day in those two months except for one Monday on which he took her to the clinic. (T:1033,1102-03). She never returned home from work in that two-month span and found appellant at home. (T:1037).

During the same period of time, there were several people who baby-sat for the boys when their parents were at work, including Ana's brothers, Osvaldo's sister, and a neighbor who sometimes took the kids off the bus. (T:1034-36). Once, Flor took care of the children for a few hours before Ana arrived home. (T:1037). According to Flor, in ten years together, she never saw appellant read and never saw him write anything other than his name. (T:1039).

On June 30, 2005, Osvaldo knocked on the door to the room Flor and appellant shared. Ana had told him that appellant was "bothering, molesting the child." (T:1044). Appellant asked Osvaldo what he was talking about, and got no response. (T:1044). He then asked the child "how was I bothering you?" and

28

Christian "just stayed, remained, looking at Osvaldo." (T:1044-45). Nobody said anything after that. (T:1045). There was a conversation between appellant and Osvaldo the following day, but defense counsel was prevented from eliciting any more detail about it. (T:1045-50).

In the entire time Flor had known appellant, she never saw him do anything of a sexual nature to a child, and she never saw him harm a child in any way. (T:1051-52).

DR. STEPHEN AJL, a pediatrician for more than thirty years with a stellar resume, was called to dispute Lombardy's testimony.[32] (T:1068-74). Ajl had been qualified as an expert in various courts approximately 150 times, and he testified for the prosecution in 148 of those appearances. (T:1074-75).

After examining the medical records and slides in this case, Ajl testified that "there is no evidence that there has been any penetration." (T:1080). He disagreed with Lombardy's conclusion that there was anal penetration, saying that the "smoothing of the rugae and flattening of the rugae and dilatation of the anus" are not currently recognized as diagnostic of penetration. (T:1082). Rather, Ajl explained, they "are findings which could be normal findings... which could result from irritation or unspecific infection." (T:1082). The current standards in the

---

[32] Dr. Ajl had extensive experience as a pediatrician, medical administrator, professor, member of the American Board of Pediatrics, and author of numerous published articles including one about children who suffered from sexual abuse. (T:1069-71). He was also a member of the mayor's task force on child abuse. (T:1072-74).

medical and scientific community do not specify what the findings are necessarily diagnostic of, but "we do know that it is not diagnostic of penetration." (T:1083).

Ajl noted that he did not personally examine Christian, and that obtaining a history of the injury would be useful in making a diagnosis. (T:1092). He cautioned that he was not denying that Christian was sexually abused, but merely noting that the findings were not independently diagnostic of penetration. (T:1084, 1093). Ajl also agreed that some children who are sexually abused may experience examinations which result in no clinical findings. (T:1087).

People's Rebuttal

The People recalled Lombardy as a rebuttal witness to testify about Ajl's testimony. (T:1230-31). The court rejected defense counsel's request for an adjournment until Ajl could be present in the courtroom to hear the rebuttal testimony.[33] (T:1232).

Lombardy testified that "very few findings... are diagnostic" and diagnoses are made when there are "clear-cut" findings, but "most things in medicine are not clear cut." (T:1234-35). With Christian's case, there were four suspicious findings, including smoothing of the rugae, easy dilatation, an asymmetry to the rectum, and protrusion of rectal tissues from the wall of the rectum into the rectal vault. (T:1235). These, combined with a "disclosure of having been penetrated

---

[33] See infra Point IV.

30

rectally," were all she needed to diagnose sexual abuse. (T:1235). As a result, Lombardy believed that Ajl was incorrect in his assessment. (T:1235).

After the People's rebuttal, defense counsel requested the opportunity to call Ajl in surrebuttal. Since Ajl was not present, the request to call him and request for a continuance to bring him in were denied. (T:1244); see infra Point IV.

Motions, Charges, and Verdict

In light of the court's ruling on this issue and other rulings involving cross-examination of witnesses and other facets of the trial, defense counsel requested that a mistrial be declared. (T:1245-48). Counsel also cited the court's refusal to allow him to ask questions of Lombardy about prior cases or examinations. (T:1246-47). The court denied the request for a mistrial. (T:1252).

At the close of all evidence, defense counsel renewed his motion for a trial order of dismissal. (T:1255). The People's case was insufficient because it relied on a "so-called confession" which must be corroborated, the testimony of an unsworn witness, and testimony by Lombardy that there was penetration, but not necessarily penile penetration. (T:1255-56). The court denied the motion. (T:1256).

Defense counsel requested a jury charge that the medical records offered into evidence regarding the child's statement be considered only for the diagnosis

31

and treatment of the patient and not for their truthfulness.[34]  (T:1257).  The court rejected this request, suggesting instead that defense counsel could address the medical records in summation.  (T:1264).  Counsel also requested a missing witness charge with respect to Detective Barbieri.  <u>See</u> Point V.

After closing arguments, defense counsel asked the judge to recuse himself and requested that another judge read the charges to the jury.  (T:1417-19).  In addition to objections to the jury charges the court planned to issue,[35] counsel challenged the judge's activities during summation.  (T:1417-18).  During defense counsel's summation, the judge stood up and walked around, which likely distracted the jury.  (T:1417-18).  In contrast, the judge did not move at all during the prosecutor's summation.  (T:1418).  The court denied the recusal request.

Upon completion of the judge's charge to the jury, defense counsel made several objections, one of which was a renewed objection to the missing witness charge.  (T:1461).

On May 24, 2006, the jury convicted appellant of criminal sexual act in the first degree and sexual abuse in the first degree.  (T:1490).  The jurors were individually polled and removed from the courtroom.  (T:1491-93).  Defense counsel reserved motions for the sentencing hearing.  (T:1493).

---

[34] <u>See</u> <u>infra</u> Point V.
[35] Beyond the previously discussed charges and objections, counsel raised a question about the prosecutor's comments about voluntariness and requested an appropriate charge.  (T:1416).  <u>See</u> Point V.

32

Sentencing Proceeding

At the sentencing hearing on July 10, 2006, the court and parties focused initially on the pre-sentence report and a page attached to the report labeled "Addendum 1." (S[36]:3). Defense counsel objected to a section of the addendum reflecting Trujillo's statements to the Probation Department about appellant's prior "kidnapping" of Flor and other crimes committed in Guatemala. (S:3-17). The statements, according to counsel, would show that Trujillo committed perjury at trial and gave untrue statements to the Probation Department. (S:4). The court agreed to exclude the addendum from the pre-sentence report. (S:6,8).

However, counsel wanted a full hearing so that Trujillo's credibility and trustworthiness could be examined more closely. (S:5,8-9). Since Trujillo provided false information to the probation officer, there were questions about his trial testimony which might require a new trial. (S:9-12). Trujillo took the statement which provided "corroboration" to the unsworn testimony of the child, and therefore his testimony about that statement and the circumstances under which it was obtained were critical evidence in appellant's conviction. (S:10-12). The court commented that "we are having a hearing on it" and noted that exclusion of the addendum was the only remedy available, and since it had granted that, there was no reason to conduct any further hearing. (S:16-17,52).

---

[36] Numbers preceded by "S" refer to the minutes from the sentencing proceeding held before Judge Peck.

Defense counsel also made a motion to set aside the verdict pursuant to CPL §330.30. Appellant deserved a new trial because he was convicted based largely on the confession, which was corroborated only by the unsworn testimony of a six-year-old and a doctor's assessment that rectal penetration by an unknown object occurred. (S:20-21). Counsel made additional points about prosecutorial misconduct, judicial obstruction of cross-examination and other improprieties, and a lack of evidence supporting the conviction. (S:23-46).

The court denied counsel's motion to set aside the verdict. (S:52). The prosecutor then asked for the maximum sentence. (S:53-57). Defense counsel objected again to the use of anything from the addendum in calculating a sentence, and then listed mitigating factors including appellant's innocence, his relationship with Flor and his young child, his hard-working demeanor, and his intelligence. (S:58-69). In addition, counsel mentioned that the People previously offered appellant five years to plead guilty to one charge, and he should not receive the maximum and be punished so severely for exercising his right to trial. (S:63).

Given the "overwhelming evidence" in the case and relying only on the "crimes themselves" and not any past behavior, the court found no mitigating factors and ordered a determinate sentence of twenty-five years and five years of post-release supervision for the criminal sexual act in the first degree. (S:70-71). For the charge of sexual abuse in the first degree, the court ordered a determinate

34

sentence of seven years and five years of post-release supervision to run

concurrent.

# ARGUMENT

## INTRODUCTION

The result reached in the instant case was an abomination, a disgrace of which every person associated with New York's criminal justice system should be ashamed. Appellant is serving a 25-year sentence because a five-year-old child accused him of sexual molestation. The account provided by the boy was so far-fetched as to approach impossibility, and the boy had made a demonstrably false allegation against appellant before. Furthermore, if the boy was molested in any form, there were other individuals who were far more credible suspects than appellant. Together, these elemental uncertainties create not just reasonable doubt, but an overwhelming likelihood that an innocent man has been convicted.

The question then arises as to how such a calamity could occur. A police detective, so skilled in obtaining confessions that he had previously elicited a confession from a man later proven innocent, obtains from appellant, who is illiterate, a statement which lacks any details which would bolster its credibility. A medical "expert" for the People, who insists that no medical diagnosis in this area is infallible, reaches an idiosyncratic diagnosis of anal penetration based on methodology which had been authoritatively rejected by the United States Second Circuit Court of Appeals. The child's accusation, the detective's elicited "confession," and the highly questionable conclusions of the doctor, are the entire evidentiary basis for appellant's conviction.

36

The inculpatory impact of these dubious profferings is then exacerbated by a trial process flawed in myriad regards. The jury is considerably protected from being able to fairly assess the boy's account and is instead inundated with hearsay. Defense counsel is precluded from making the jury properly aware of the very real reasons that both the "confession" detective and the medical "expert" should be viewed as less than credible. The trial court gives a flawed missing witness charge which in effect negates any impact favorable to the defense. This list is hardly exhaustive.

This case casts the cornerstone of our criminal justice system, the presumption of innocence, aside and is permeated instead by an abhorrent presumption of guilt. This Court must rectify the injustice done lest our criminal trials, particularly where sexual molestation of children is involved, degenerate into little more than witch hunts wherein accusations, regardless of their incredibility, are sufficient to damn the accused.

In order to strive for minimum compliance with the court's limits on brief length, both the facts and law related to these assertions will be recounted in as concise a form as may properly be employed.

## POINT ONE

## APPELLANT'S CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE

The People's case consisted of three components: a signed "confession" taken by Trujillo, the accusation of then six-year-old Christian, and testimony from medical "expert" Lombardy. Although this would appear to be sufficient evidence in some cases, each component here was fatally flawed. The "confession" was taken by a detective who was skilled at coercing statements and believed from the beginning that appellant was guilty, and it was supposedly read and signed by a man who was illiterate. The accusation came from a child whose testimony was blatantly prone to leading and who was unable to provide any details with clarity or comprehension. And Lombardy's "expert" testimony was directly disputed by Dr. Ajl, prompting her to admit that very little is actually "diagnostic" with this type of sexual abuse. It is startlingly unclear whether any abuse happened at all, and if such abuse did happen, whether appellant had anything to do with it. The jury's verdict on the basis of this evidence was completely unreasonable, and this Court must rectify this travesty of justice.

A verdict is not supported by the weight of the evidence unless, based on all the credible evidence, the finding is not unreasonable. Bleakley, 69 NY2d 490,495 (1987). This Court, sitting as a "thirteenth juror," must engage in its own de novo review of the evidence. Rayam, 94 NY2d 557,560 (2000). The reviewing court

38

may draw inferences "contrary to those implicitly drawn by the jury" and may

conclude that, even though the verdict is legally valid, it should be set aside as

against the weight of the evidence. Acosta, 80 NY2d 665,672 (1993). While the

jury's determination should typically be accorded great weight on appeal, here, for

the reasons set forth below, the jury's determination of guilt was wholly

unsupported by the record and should not remain undisturbed. Garafolo, 44 AD2d

86,88 (2d Dept. 1974).

The Statement

The value of the "confession" is directly and incontrovertibly tied to the

credibility of Detective Trujillo, which is itself undermined by the circumstances

of the interrogation and Trujillo's presumptuous behavior and dubious professional

history.

Detectives Trujillo, Barbieri, and Birdsall were all present when appellant

was interrogated, but Trujillo was the only one who spoke appellant's language:

Spanish. The jury was thus asked to balance his version of the events against

appellant's version, which was different in several crucial aspects. Trujillo

allegedly asked appellant to read the statement back to him, but no other witness

testified that appellant read anything out loud. Appellant, on the other hand,

denied reading anything aloud, owing to the crucial fact that he does not know how

to read. The People provided no evidence to the contrary other than Osvaldo's

vague recollection of appellant reading from the Bible in church when they were children.

Trujillo conceded that appellant did not read the rights card aloud to confirm his comprehension, and Trujillo's testimony about the inculpatory statement was less than credible. Although he testified that appellant read "the first couple of sentences" from the statement aloud, Trujillo did not recall him reading the section containing the actual details of the "confession." Appellant denied reading anything aloud; instead, he testified, Trujillo read him a statement which was similar to the one presented at trial, absent the three sentences in which he actually "confessed." Afterwards, appellant signed the statement on the basis of what Trujillo told him it said.

Aside from the fact that appellant did not know what he was signing, there are two other particulars which undermine the reliability of the statement. First of all, it contains no details which would in any way bolster its credibility. Trujillo did not ask appellant, or include in the resulting statement, anything about the circumstances surrounding the abuse which would support its authenticity.[37] There were no details about the dates or times when this supposedly happened, the circumstances under which appellant and Christian were alone together, the boy's

---

[37] The only detail, which seemed out of place in the "confession," was the color of the chair on which the acts supposedly occurred. Coincidentally, this was really the only detail provided by Christian. (T:879).

40

reaction both physically and emotionally, or appellant's behavior or mindset at the time.

Also, Trujillo clearly believed that appellant was guilty from the very beginning, and intended to get a confession at any cost. He admitted at trial, in the context of the fictitious "penis impression" test, that he said whatever it took to get appellant to "admit" what Trujillo believed he had done. After the trial, Trujillo further demonstrated his bias when he told the Probation Department additional stories about appellant which were completely unsubstantiated.

Although the jury never learned it, additional colloquy revealed Trujillo's history as a skillful questioner; he had previously elicited a false confession from a man who turned out to be innocent.

Finally, it is worth noting that appellant never admitted guilt at any time other than this written "confession" which he never read. Throughout the remainder of the voluminous record, appellant always maintained his innocence.

Considering appellant's illiteracy, the vagueries of the statement, and Trujillo's pattern of dishonesty and steadfast belief in appellant's guilt, the statement was not reliable evidence.

<u>The Accuser</u>

Six-year-old accuser Christian Lopez was simply not credible in his trial testimony. He testified that appellant was "bad" and "did bad things" to him, but was vague and provided little detail about any alleged incidents. Furthermore, he

41

did not initially identify appellant in court, and he changed some of his answers on cross-examination. Christian initially testified that he told his parents what had happened after the first incident. Then, when asked if he told his parents after each act of abuse, he responded affirmatively. Later, however, he testified that he did not remember the first time he was abused.

Finally, he was unable to explain the abuse physiologically. When defense counsel asked if appellant was facing him at the time of the abuse, Christian responded "I don't know what you're saying." (T:889). Later, Christian told counsel that he was sitting on a chair, with his back to appellant, when the abuse occurred and that appellant was kneeling on the ground while "putting his dick in [Christian's] ass." (T:892-93). The physical improbability of this positioning further undermines Christian's accusations.

Testimony of Ana Lopez revealed that Christian had previously falsely accused appellant of scratching his arm, causing injury. The red marks on Christian's arm turned out to be paint, thus revealing the child's comfort and motivation in falsely accusing appellant.

Although the jury never learned about it, the trial court and parties were well aware that Barbieri, the first detective on the case, did not believe Christian understood the difference between the truth and a lie. Such information could only have helped the jury weigh Christian's credibility.

42

The "Expert"

Lombardy, the People's medical "expert," examined Christian and diagnosed him as a likely victim of physical abuse. Incredibly, she said that the lack of anal tearing or other bleeding was not unusual in cases of penetration, and therefore Christian's lack of superficial damage in that area was not determinative. She then asserted that while there was no tearing or other superficial harm, the internal pictures taken by the colposcope revealed "smoothing of the rugae" which indicated repeated penetration.

Defense expert Dr. Ajl disputed this, noting that such smoothing could be physically normal, or could be the result of some irritation or non-specific infection. When Lombardy was called on rebuttal to respond, she modified her opinion to reflect that smoothing alone was not necessarily diagnostic, but that in conjunction with dilatation, asymmetry, and protrusion of rectal tissue, there was sufficient evidence to diagnose penetration. This was shortly after she observed, "the smoothing in and of itself is not diagnostic; no finding in sexual abuse is. Very few findings actually, I should say, are diagnostic." (T:1234).

Therefore, the jury was left with testimony of two medical experts, one of whom changed her conclusion and disclaimed the certainty of medical diagnosis.

The jury was not, however, able to learn about several significant flaws in her credibility. Lombardy had previously diagnosed penetration in a case leading to a suspect's arrest, before she ultimately retracted her opinion that any abuse had

occurred. See infra p.68. Second, her mentor, Dr. Silecchia, was discredited by the Second Circuit Court of Appeals for startlingly similar analysis; that Court held that defense counsel's failure to challenge such unreliable methods constituted ineffective assistance of counsel. See infra FN 43.

### Remainder of People's Case

There was no other evidence that any penetration occurred, nor was there additional evidence inculpating appellant. Nobody saw or heard Christian get assaulted, and there were no prior conclusive indications of sexual abuse observed by any of the eight people living in the house around that time. Furthermore, nobody testified about seeing appellant do anything to the boy other than play soccer with him and there was no biological evidence, such as blood or semen stains, recovered from the Lopez house. There was no reasonable timeline as to when this allegedly happened, nor was there reliable evidence as to when it ever could have happened, given appellant's incessant work schedule and the fact that Christian's parents and others were in the house every evening. Finally, there is the fact that Christian had previously accused appellant of harming him, an accusation which turned out to be completely false. If anything, this told the jury that Christian was comfortable in accusing appellant, that he felt safe doing so.

### Additional Facts

During the time Christian claims he was abused, there were at least three other men, aside from Osvaldo Lopez and appellant, who lived in the same house.

44

Ana's brother Minor slept in the living room on the same level as the Lopez family. (T:437-38). Another man named Elias, about whom little is known, lived upstairs on the same floor as appellant and Flor. (T:418). Finally, there was a man named Dimas, who lived in the second floor hallway for a short time. Although the exact time of Dimas's residence is not clear, the approximate time frame was identical to the period of Christian's alleged abuse: May and/or June of 2005. (T:419-20). Although there was no reliable evidence of abuse, if something of that nature did occur, the existence of three other men who should have been suspects further weighs against any finding of appellant's guilt.

Considering the fatal flaws in each component of the People's evidence, and the additional circumstances undermining the idea that any abuse occurred, much less was perpetrated by appellant, the jury's verdict was unreasonable. The remainder of this Brief will detail the court's errors which deprived the jury of having a greater picture of appellant's innocence.

## POINT TWO

## APPELLANT'S STATEMENT WAS COERCED AND SHOULD HAVE BEEN SUPPRESSED

Detective Trujillo threatened to do something to appellant's penis if no confession were forthcoming and appellant subsequently gave an inculpatory statement. Appellant claims Trujillo threatened to use a mold or device on his penis, after which it would never work again. Trujillo says he threatened to run some kind of imaginary test which could make a mold of appellant's penis and compare it to the inside of the victim's anus. Both men described a threat involving appellant's penis. The signed statement should be rendered involuntary on that basis alone. There is also the absence of any proof that appellant knew how to read or write other than signing his name, which further undermines the voluntariness of the written statement. The totality of these circumstances invalidated the "confession," and the court below erred in failing to suppress it.

During the interrogation, Trujillo ignored appellant's repeated denials because he wanted appellant "to be forthcoming and tell the truth." (H:129). Trujillo pushed for a confession because he believed that the "truth" was that appellant "put his penis in [victim's] anus repeatedly." (H:129). Trujillo was therefore not "merely trying to solve a crime, or even absolve a suspect," but rather sought only to extort a confession from appellant. Spano v. New York, 360 US 315,323 (1959). When a police officer's "undeviating intent" is to extract a

confession, the "confession obtained must be examined with the most careful scrutiny." Id. at 324.

Applying such scrutiny, the "confession" was clearly involuntary. Trujillo testified that he told appellant the police would take a plaster impression of appellant's penis and compare it to the child's anus. (H:28;T:680). Appellant would then have to "explain to the Court" why the impression from his penis matched Christian's anus. (T:680). At trial, Trujillo conceded that the threat did not make sense because there is no such test. (T:763).

However, appellant understood Trujillo's statement to be even more threatening. According to appellant, Trujillo said he would put appellant's penis into a mold which would "hurt [appellant] a lot" and which "can even ruin your penis... There are people that they can not use their penis afterwards." (T:1157). Although the hearing court did not observe this testimony, it is the appellate court's responsibility to consider all facts brought out at trial which might be relevant to the voluntariness of the confession. Davis v. North Carolina, 384 US 737,741-42 (1966).

Since the threats were made in Spanish, only appellant and Trujillo understood what was being said. Whether the comments conformed more closely to Trujillo's version or appellant's version, the ultimate result is the same. Trujillo made a statement either expressly or implicitly threatening to do something to appellant's penis. In the entire period of interrogation leading up to the statement

47

about his penis, appellant had made at least three insistent denials.[38] (H:27).

Furthermore, the statement lacked any detail which would support its

truthfulness.[39]

Involuntary confessions, i.e. those which are the product of a will that was

overborne, are inadmissible in criminal trials. <u>Jackson v. Denno</u>, 378 US 368

(1964). Confessions must be "given freely and voluntarily without any compelling

influences" in order to satisfy due process. <u>Miranda v. Arizona</u>, 384 US 436, 478

(1966). CPL §60.45 codifies this rule by providing that a confession "involuntarily

made" is precluded from introduction in a criminal proceeding. An "involuntary"

statement is one obtained in violation of constitutional mandates or by improper

conduct or pressure which "... undermine [the] ability to make a choice whether or

not to make a statement." CPL §60.45.

The "abhorrence of society to the use of involuntary confessions" revolves,

at least in part, around the idea that police who use illegal methods and abuse their

power are as harmful to "life and liberty" as the criminals themselves. <u>Spano,</u>

<u>supra</u> at 320. It is "difficult to conceive of methods more revolting to the sense of

justice" than coercion of a confession by the physical abuse or threats of police

officers. <u>Brown v. Mississippi</u>, 297 US 278,286 (1936).

---

[38] At trial, Trujillo did not recall a fourth denial which he had previously described to the grand jury. (T:736-39).
[39] Only three sentences in the two-page statement admitted any guilt, and they did so with a startling lack of detail. <u>Supra</u> p.21.

48

In assessing voluntariness, a court must consider the "totality of the circumstances" involved in obtaining the statement. Blackburn v. Alabama, 361 US 199,206 (1960). The most obvious factor creating an involuntary statement is provocation by physical coercion or duress. CPL §60.45(2)(a);Brown, supra at 285-86. Additional factors include promises, threats, or other statements that create a "substantial risk the defendant might falsely incriminate himself" (see CPL §60.45(2)(b)(i)); official misconduct amounting to abuse (Spano, supra at 323); and statements which were obtained through "police overreaching" (Colorado v. Connelly, 479 US 157,170 (1986)). Whether a defendant was advised of his *Miranda* rights or not will also be an important, though not dispositive, factor. Davis, supra at 740-42. Although any of these "circumstances may each be alone insufficient to cause a confession to be deemed involuntary... in combination they may have that qualitative or quantitative effect." Anderson, 42 NY2d 35,38 (1977).

The hearing court below held that "the People satisfied their burden of proving that the statement was voluntary and not the result of constitutional violation of force, coercion, duress, or threats" and noted that the signed Miranda waiver further supported statement's admissibility. (H:178). An appellate court must "examine the entire record and make an independent determination of the ultimate issue of voluntariness" in cases where the question of an involuntary confession has been raised. Davis, supra at 741-42. If the "involuntariness of a

49

confession is conclusively demonstrated at any stage of a trial, the defendant is deprived of due process by entry of judgment of conviction without exclusion of the confession." Blackburn, supra at 210. Considering the aforementioned threats to appellant's penis, it is clear that the confession should have been excluded; the failure to do so violated appellant's due process rights.

Physical or mental coercion are not the exclusive coercive catalysts for an involuntary statement. Other "more subtle methods, though sometimes harder to perceive, are equally to be condemned when they trammel on the rights of those in custody." Tarsia, 50 NY2d 1,10 (1980). One such method is the use of polygraph tests and other voice stress tests. This Court has held that a polygraph test was abused when it was "misused as a sophisticated tool for attempting to extract a confession." Leonard, 59 AD2d 1,15 (2d Dept. 1977).

Even if there was no "threat of bodily harm" when Trujillo discussed obtaining an "impression" of appellant's penis, he still used guile to coerce a false confession. See Tarsia, supra at 11. The instant case involved no polygraph, but the detective did threaten to use a test in order to induce a confession. The test, which would supposedly compare appellant's penis to the inside of Christian's anus, does not exist. However, Trujillo used the specter of such a test to "overbear defendant's will and impair his capacity for self-determination." Leonard, supra at 15.

50

In <u>Tarsia</u>, the Court of Appeals noted that one reason false results of a voice stress test would not be admitted was because "there was no misrepresentation made that the test could be admissible in a trial." <u>Tarsia</u>, <u>supra</u> at 11-12. Unlike <u>Tarsia</u>, however, Trujillo told appellant that the potentially inculpatory results of such a test would be used against him in a court.[40] (H:28).

It is difficult to imagine a threat of bodily harm more intimidating to any individual than a threat to damage the person's genitals. Such a threat would be scary and coercive to anybody, and there is little doubt that it had such effect on appellant. Furthermore, appellant was told that an imaginary test would match his penis to the child's anus, and that the results would be given to a judge. No such test exists. These false statements and threats led his will to be "overborne and his capacity for self-determination critically impaired" such that due process was violated. <u>Culombe v. Connecticut</u>, 367 US 568, 602 (1961).

There are other factors which undermine the voluntariness of appellant's signed statement. It is not clear that appellant actually read the statement containing his confession. Appellant testified he does not know how to read, and that he told Trujillo this during his interrogation. (T:1123,1147). Flor Sosa verified at trial that she never had any indication that appellant could read or write anything other than his name. (T:1038-39).

---

[40] Trujillo told appellant that when the impression of his penis was compared against the inside of the child's anus and "it's found to be a match, you can explain to the Court how it is that the impression of your penis is in the child's anus." (H:28).

The People's only evidence to the contrary came from Osvaldo, whose account is hardly conclusive.[41]  Trujillo testified that appellant read back part of the statement during the interrogation, but was intentionally vague about what was read.  (T:683).  If Detectives Barbieri or Birdsall, who were present the entire time, had seen appellant reading aloud from the statement, even if they didn't speak Spanish, why were they not called to testify that he appeared to be reading from the paper?

If appellant was illiterate, it seems more likely that Trujillo read him the statement and he signed based on what he believed it said.  In fact, appellant testified that Trujillo read him much of the statement in evidence, yet left out the *Miranda* rights and the incriminating passage.

Appellant's statement was clearly involuntary as a result of duress, coercion, and deception and its admission at trial was therefore highly inappropriate and deeply harmful.  There are some "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error."  Chapman v. California, 386 US 18,23 (1967).  A due process violation resulting from an involuntary coerced confession is one such right.  Id. at n.8.  In this case, the "confession" is the only strong piece of evidence corroborating the testimony of a six-year-old child.  There were no witnesses, no biological evidence tying appellant to the crime, and no specific details of the alleged acts.  It simply cannot be said that

---

[41] Osvaldo merely testified that he remembered appellant reading from a Bible or singing Church songs many years earlier when they were children.

admission of the "confession" was harmless, and this Court must reverse

appellant's conviction and remand for a new trial.

## POINT THREE

## THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED A SIX-YEAR-OLD CHILD TO TESTIFY

The court conducted a preliminary inquiry into whether Christian Lopez should be allowed to testify at trial.  The result of this inquiry was that the boy, only six years old, was deemed competent to give unsworn testimony.  Although a trial court has tremendous discretion in deciding whether a child witness may testify, the ruling must be based on facts about the child's capacity and intelligence.  The questions asked by the trial court below were insufficient to make such an inquiry, and the court refused to ask additional questions suggested by defense counsel which would be integral to this decision.  The court erred in so doing, and in finding the child competent to testify, and this abuse of discretion had a significant impact on appellant's case.

The court began testing Christian's capacity to testify by asking his name, his mother's name, and whether he knew where he was.  (T:826).  Next, the court asked the child to identify some colors, and questioned him about where he went to school.  (T:827-28).  When the court proceeded to inquire about the importance of telling the truth, the child's answers were vague.

> Q:Do you know what it means to tell the truth?
> A:Yes.
> Q:What does that mean?
> A:That you have to tell the truth.
> Q:And what does that mean?
> A:That you can't tell a lie, you have to tell the truth.

54

Q: Is it bad to tell lies?
A: Yes.
Q: Is it good to tell the truth?
A: Yes.
Q: What happens if you tell a lie?
A: It's bad.
Q: Are you punished for lying?
A: Yes.
Q: Who does that?
A: My mom.
Q: Do you believe in God?
A: Yes.
Q: Will God punish you if you tell a lie?
A: Yes.
Q: Do you know what it means to swear to God to tell the truth?
A: You have to say the truth.

(T:828-29). No further questions were asked. (T:829).

After the child left the room, the court asked if counsel had additional

questions. (T:829-30). The prosecutor declined and defense counsel suggested the

following questions:

> Whether or not he was asked questions like this before he was brought
> into the courtroom and by whom. Have you ever told a lie? Have you
> ever done anything wrong? Have you ever told your parents
> something that wasn't the truth, that wasn't true? Do you know what
> happens to people that you tell a lie about? Has anyone ever lied to
> you? What kind of punishment happens if you tell a lie?

(T:830). He noted that these questions were important, particularly when the

child's answers were "superficial responses that don't really help the Court or

anybody in determining whether or not the child actually knows the significance of

being truthful." (T:831). Defense counsel also suggested the question "Do you

understand the consequences to testify in court in this kind of a case?" (T:831).

55

The court ignored counsel's suggestions and moved on, requesting arguments as to whether the child should be sworn based on the record already created. (T:833).

A trial court is expected to conduct voir dire of an infant witness to ascertain whether the child "possesses sufficient intelligence and capacity" to testify. CPL §60.20(2). In this determination, the court may look at whether the child's "responses demonstrate[d] a degree of intelligence, comprehension, memory, logic, and appropriateness sufficient to satisfy the statutory requirements." Rivers, 149 AD2d 544 (2d Dept. 1989). This inquiry, as well as whether the child is competent to be sworn, are "necessarily individualistic in nature." Nisoff, 36 NY2d 560,566 (1975). Since it relies heavily on firsthand observations as to the child's intelligence and capacity, the trial court's decision "will not be disturbed on review unless from that which is preserved it is clear that it was erroneous." Id.

Although counsel for both sides are not entitled to question the witness on the issue of mental capacity, "there is nothing to preclude the court from permitting defense counsel to participate in the examination of the prospective witness by submitting questions or, for that matter, by cross-examining". Byrnes, 33 NY2d 343,351 (1974). In fact, such direct questioning is not uncommon. See e.g. Rivers, supra at 544;Johnston, 273 AD2d 514,517 (3d Dept. 2000).

Here, the court's voir dire of Christian takes up less than 4 pages in the record. In this brief set of questions, the court asked mostly superficial and irrelevant questions, followed by several about his understanding of the truth.

(T:826-29). The answers about truthfulness were such that the court refused to let him take an oath. It can hardly be said that the remaining colloquy revealed anything resembling sufficient intelligence or capacity to testify at a criminal trial with such dramatic stakes.

The erroneous decision to allow the child to testify was devastating to appellant given the evidentiary deficiencies in the People's case. In considering whether a non-constitutional error will be harmless, the court must look first at the "quantum and nature of the proof of the defendant's guilt if the error in question were to be wholly excised." Crimmins, 36 NY2d 230,240 (1975). Absent the child's own testimony, the People presented numerous hearsay statements (Point VI), a medical expert whose credibility was damaged (Point IV), and a "confession" which was factually suspect and likely coerced (Point II). It is clear that the People's remaining case was deeply flawed.

The second element required by Crimmins is an inquiry into the causal effect which the error may have had on the actual verdict. Crimmins, supra at 240. The court's error allowed a six-year-old child to testify in front of the jury. His subsequent testimony should never have been admitted, and his appearance alone was likely prejudicial to appellant. Had he not testified, the jury would have been more focused on the other flawed evidence presented by the People and less focused on associating the image of the child with a repugnant crime. As a result,

57

"this error cannot be deemed harmless under the circumstances of this case" and

reversal and a new trial are necessary.  <u>Negron</u>, 280 AD2d 557 (2d Dept. 2001).

## POINT FOUR

## THE COURT ERRONEOUSLY OBSTRUCTED TESTIMONY OF MULTIPLE WITNESSES

Juries reach verdicts based on the evidence before them, most of which is either tendered as or qualified with witness testimony.  Witness testimony is, for better and worse, nothing more than a person swearing to tell the truth about facts with which he is familiar.  In order to best filter truth from lie and facts from opinions, therefore, witnesses must be questioned vigorously.  It is inexplicable that a court could prevent crucial prosecution witnesses such as Trujillo and Lombardy from being thoroughly questioned about their relevant professional histories.  It is incomprehensible that Osvaldo and Flor, two witnesses who lived with both appellant and complainant, could be shielded from questions which would clearly reflect upon important issues in this case.  And it is inexcusable that all of these witnesses, as well as Dr. Ajl (whose testimony undermined key prosecution evidence) were shielded from the very questioning necessary for any jury to reach a fair verdict.

### A. The Court Obstructed Defense Counsel's Cross-Examination of Key Prosecution Witnesses

Throughout appellant's trial, his attorney was prevented from asking relevant and important questions of prosecution witnesses.  Counsel was precluded from questioning the interrogating detective about a prior case in which he secured a false confession and from questioning the examining doctor about a prior case in

which she diagnosed sexual abuse and later recanted. These were key witnesses against appellant, and as such, should have been subject to broad and thorough cross-examination. The trial court abused its discretion in denying proper questions.

The People's evidence in this case was far from overwhelming. There is initial and substantial doubt as to whether any crime was committed. The first doctor to examine Christian saw no indication of abuse, and the second doctor's findings to the contrary were disputed at trial by a habitually pro-prosecution witness. Defense counsel's attempts to confront the only doctor who diagnosed anal penetration, Lombardy, on her credibility were obstructed by the court's erroneous ruling.

Second, if the child actually was abused, there is indeed doubt as to whether appellant was the aggressor. There were no witnesses, no video or photo evidence, and no DNA or other biological evidence tying appellant to such acts. There were, however, numerous other suspects who the police never investigated. The only evidence inculpating appellant consisted of the questionable testimony of a six-year-old child, and a "confession" which was coerced. When defense counsel attempted to ask the detective who gathered this vital piece of evidence about a prior false confession that he had secured in another case, the court refused to allow proper questions.

Lombardy and Trujillo were key witnesses, the only two who could arguably support the child's accusation that he had indeed been abused by appellant. Their testimony was a crucial part of the People's case. As such, defense counsel should have been permitted to ask questions about their professional histories which would indisputably reflect upon their credibility. The court's failure to allow adequate cross-examination of both witnesses was detrimental to appellant's case, and considering the materiality of the subject matter and the lack of overwhelming evidence of guilt, it cannot be rightly said that the errors were harmless beyond a reasonable doubt.

Cross-examination is necessary to allow one party to test the credibility of the other's witnesses and attempt to reveal any relevant prejudices. Davis v. Alaska, 415 US 308,316 (1974). The trial judge has discretion to impose limits on cross-examination in order to prevent "harassment, prejudice, confusion of the issues... or interrogation that [would be] repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 US 673,679 (1986).

The defendant's ability to cross-examine a prosecution witness is not just a logical necessity, it is a Constitutional right. The Sixth Amendment protects a defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Questions relating to a witness's partiality are "always relevant" for discrediting and "affecting the weight" of his testimony. Davis, supra at 316.

61

The Court has noted that some trial errors, even those of constitutional dimension, may be harmless in "terms of their effect on the factfinding process at trial." Van Arsdall, supra at 681. The appellate courts should thus engage in a review to determine if the constitutional error did not, beyond a reasonable doubt, "contribute to the verdict obtained." Chapman, supra at 24.

Harmless error analysis is appropriate when the issue involves a defendant's right to confront witnesses against him. Van Arsdall, supra at 684. Whether an error is harmless depends on the "importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id. Where a witness's testimony was "crucial" to the prosecution case and the evidence was "far from overwhelming," it is "impossible to conclude 'beyond a reasonable doubt' that the restriction on petitioner's right to confrontation was harmless." Olden v. Kentucky, 488 US 227,233 (1988). Trujillo and Lombardy were indeed crucial to the prosecution case, and as mentioned previously, the evidence was far from overwhelming. It is therefore impossible to conclude that the court's restrictions were harmless.

### 1. Defense Counsel Should Have Been Allowed to Question Trujillo about a False Confession He Took in Another Case

Trujillo extracted a "confession" which was one of only two pieces of evidence directly inculpating appellant. The only other evidence tying appellant to any crime was the factually tenuous story of a young child who may not have been credible and should never have been permitted to testify.[42] There were no witnesses who identified appellant as the perpetrator other than the child, and there was no biological evidence linking him to any sexual assault. Therefore, the circumstances surrounding the statement and Trujillo's credibility are monumental issues in this case.

Prior to the cross-examination of Detective Trujillo, the People made a motion to prevent defense counsel from asking questions about "irrelevant" or "collateral" matters. (T:639). Specifically, they sought to preclude any questions about a prior false confession taken by Trujillo on the grounds that the matter was investigated and Trujillo was cleared of wrongdoing. (T:639). The prosecutor suggested that the only question legally allowed on the issue should be "Have you knowingly taken a false confession?" (T:640).

The court gave defense counsel permission to question the witness on any "vicious, immoral or illegal act" that he did or may have done. (T:699). Although any detective could take a statement which later turns out to be false, the court

---

[42] See supra Point III.

63

said, that "in and of itself is not a criminal act" or an immoral one. (T:699).

Therefore, such a scenario would not be a proper subject of cross-examination

unless defense counsel is precise in asking whether Trujillo had a "simultaneous

guilty mind... so that he's framing someone." (T:700).

Defense counsel objected to this narrow view, arguing that the false

confession in the prior case suggested that "undue pressure" was put on that

defendant, prompting a false statement. (T:701). The court responded that defense

counsel would not be allowed to "retry in this particular court another case," and

therefore the only question allowed would be a "precise" one of "whether or not

this detective did a vicious and immoral act in framing someone... framing an

innocent person." (T:703).

Again counsel objected, reiterating that he was not alleging "framing" but

rather coercion of a confession as it is defined under the CPL and *Miranda*.

(T:704-05). The inquiry was whether this detective had previously focused "on a

particular suspect" in a case and proceeded to obtain "a confession from him where

apparently it was untrue." (T:704). The court repeated the initial ruling that any

questions be precise as to Trujillo's state of mind in knowingly taking a false

confession. (T:706).

When cross-examination began, defense counsel asked Trujillo:

> have you ever had at least one or more cases in which
> you obtained a confession from a suspect admitting to the

crime when later it turned out that somebody else had actually committed the crime?

(T:710). The court was unwilling to allow foundation for the so-called framing question, and the People's objection to this background inquiry was sustained. Counsel tried to repeat the question, but was again rebuffed by the court. (T:710).

Later, counsel again sought to ask about the prior case.

> Q:Detective, you are aware of an investigation that was conducted in a case in which you took a statement from a suspect in which he confessed to the crime and later somebody else acknowledged his guilt to the crime, are you not?

(T:754). The court struck the question from the record, but allowed the follow-up "Did you frame the person who gave the statement?" (T:755). The court inexplicably permitted a follow-up which could only be understood by reference to a question stricken from the record; and it did so merely because counsel used the word "frame" in the second question. (T:755). Trujillo denied framing the previous defendant. (T:755). The court was later equally precise when counsel tried to refer to the exchange on the record. (T:860-61). Ultimately, he was precluded from asking any questions about whether the prior false confession was coerced.

A defendant is constitutionally entitled to impeach a witness with questions that reflect upon his credibility. Here, defense counsel sought to ask Trujillo questions about a prior false confession in order to show "motive or bias."

(T:756). Although Trujillo may have been cleared of wrongdoing in the prior case, the fact remains that he took a confession from an innocent man. The circumstances of that confession and Trujillo's involvement therein would shed light on his own behavior generally in such interrogations, and more specifically, in appellant's interrogation.

The court below was mistakenly focused on prior bad or immoral acts, and specifically whether Trujillo intentionally framed an innocent defendant in the prior case. But defense counsel was looking to address the detective's overall credibility, particularly his skill and methods of coercion; counsel was not alleging a prior bad act. The court's obstruction prevented counsel from asking relevant questions which went directly to Trujillo's impartiality, his motives, and his routine behavior in interrogation settings. If he repeatedly coerced confessions from defendants who were factually or potentially innocent, the jury had every right to know about this tendency when it was expected to assess his credibility.

In a case where a "confession" and the accusation of a young child were the only indicia of appellant's guilt, the "confession" clearly held great weight. The circumstances surrounding it, including the credibility of the police officer who secured it, were not only relevant but critical. The court's refusal to let counsel probe Trujillo on this point was deeply harmful error; on this point alone, appellant's conviction should be reversed.

## 2. Defense Counsel Should Have Been Allowed to Question Lombardy About a Previous Case in Which Her Mistaken Diagnosis of Sexual Penetration Led to a Suspect's Prosecution

Another key prosecution witness was Lombardy, the "expert" who concluded that Christian was anally penetrated based on her examination using a colposcope. The first doctor to examine the child, Herrera, found no visual signs of anal tearing or penetration, and defense expert Ajl disputed the assertion that any of the photographs or reports from Lombardy's examination were diagnostic of penetration. After Lombardy's testimony, defense counsel learned that in a prior case, her diagnosis of sexual penetration led to a suspect's arrest. Some months later, she changed her diagnosis in that case to state that no such penetration had occurred. (T:822). When counsel asked the court for permission to re-call Lombardy to ask about this, the court denied the request. (T:823). There are serious doubts as to whether Lombardy's assessment in the instant case was credible.[43] The court's failure to allow counsel to re-call her for impeachment was yet another devastating error.

---

[43] In fact, defense counsel had previously sought to question Lombardy on voir dire about a federal case in which her mentor, Dr. Silecchia, testified for the prosecution and the defendant's habeas corpus petition was granted after the appellate court discounted her testimony. (T:513). For the court's convenience, the case involved the Second Circuit's affirmance of a District Court's grant of a habeas corpus petition where Silecchia's findings at trial, which in part discussed the diagnostic value of smoothing of anal folds or rugae, were largely discounted based on contrary testimony of subsequent witnesses. See Gersten v. Senkowski, 426 F3d 588,608 (2d Cir. 2005). The original trial attorney's failure to call any experts to dispute the questionable diagnosis of anal penetration constituted ineffective assistance of counsel. Id.

The only evidence that Christian was sexually assaulted was his puzzling testimony[44] and Lombardy's professional opinion that he had been anally penetrated. There were no witnesses, no photo or video evidence, and no DNA or other biological evidence of an assault. If Lombardy's opinion is discounted, the only evidence of abuse comes from the questionable words of a six-year-old child.

Lombardy used a colposcope to take photographs of Christian's anus. The photographs confirmed that there was "smoothing" of folds in the anus, which she explained is consistent with anal penetration.[45] (T:544-45). Defense expert Ajl, a frequent prosecution witness, had a different analysis. He said the photographs depicting the smoothing of the folds, or "rugae," are not currently diagnostic of chronic penetration.[46] (T:1082). Instead, the scientific community generally recognizes that such findings "could be normal findings" or "could result from irritation or unspecific infection." (T:1082). There is thus serious dispute about Lombardy's conclusion.

In the pertinent prior case, Lombardy used a colposcope to examine the vagina and anus of two young girls. (T:1250). As a result of her examination, she determined that sexual abuse had occurred and the police relied upon this diagnosis to arrest a suspect. (T:1250). Eight months later, Lombardy came forward and admitted her mistake. (T:1250).

---

[44] Christian's improbable account has been described previously. Supra p.12.
[45] This was the very same medical observation and conclusion drawn by Silecchia, Lombardy's mentor, which the Second Circuit questioned in Gersten v. Senkowski. See supra FN 43.
[46] The Second Circuit accepted this viewpoint in Gersten v. Senkowski.

It is well within the trial court's discretion to determine the "admissibility and bounds of expert testimony." Cronin, 60 NY2d 430,433 (1983). However, an expert witness's credentials and prior experiences are critical to determining their credibility on the stand. If questions relating to the credibility of a witness are "always relevant," it stands to reason that defense counsel below should have been allowed to re-call Lombardy once he had learned about her prior misdiagnosis. Despite the People's suggestion that it was collateral and immaterial, the fact remains that Lombardy's medical findings were central to their case. As such, anything which might undermine her credibility and findings should have been presented to the jury. The court's error was compounded when the People later called Lombardy as a rebuttal witness and counsel was again denied the opportunity to question her about the prior case. (T:1236-37). Defense counsel repeatedly requested the opportunity to impeach Lombardy, and the court repeatedly abused its broad discretion in denying this request.

### 3. The Court Erroneously Denied Counsel Robust Cross-Examination of Osvaldo Lopez

Defense counsel was also denied the opportunity to question Osvaldo, the complainant's father, about several key facts. First, he attempted to elicit information about the witness's education and knowledge of appellant's education, but the court interrupted after a handful of questions, ordering counsel: "Move on to another area. Move on to another area. I've had enough testimony taken about

69

the defendant's schooling." (T:440-41). The court again prevented such questions later in cross-examination. (T:474). The questions were clearly relevant because appellant's literacy or lack thereof directly reflects upon the legitimacy of the statement he supposedly read and signed. See Point II.

The court also prevented Osvaldo from answering questions about when he typically saw appellant playing with the boys. (T:444). This obstructed defense counsel from clarifying when or if Osvaldo, who always worked late, could possibly have seen appellant alone with the children. Such information was certainly relevant, as it goes to whether anyone can pinpoint a time when appellant was alone with Christian, or whether appellant ever had an opportunity to commit the crimes charged.

When defense counsel tried to ask Osvaldo how many Mondays in May and June of 2005 appellant was home in the afternoon, the court refused to let the witness answer the question. Instead, it ordered counsel to "Get to the issues in this case." (T:541). Of course the scheduling which would have allowed or prevented appellant from being home alone with the boys was clearly relevant. Counsel also asked Osvaldo if he could recall a specific date when appellant took the children off the bus, but the court refused to let him answer, instead telling counsel, "Get to the issues in this case." (T:456).

As with the aforementioned witnesses, appellant's right to cross-examine his accusers was obstructed in devastating fashion.

70

B. The Court Erroneously Prevented Defense Counsel from Questioning Flor
About Christian's Prior False Accusations Against Appellant

The only piece of evidence directly inculpating appellant other than the

coerced statement was the testimony of young Christian. Although Christian

should never have been allowed to testify, once he did his credibility became an

important issue. Defense counsel questioned Ana Lopez about a prior incident in

which Christian falsely accused appellant of causing him physical harm. (T:931-

32). Counsel was not, however, allowed to ask Flor questions about the same

incident. (T:1026). There was no apparent reason for the court to obstruct this line

of questioning. A witness's credibility is always in issue, and this is particularly

true when the witness is the complainant and a young child.

According to Ana, Christian once told her that appellant had scratched him,

drawing blood on his arm. (T:932). She later discovered that the red markings on

Christian's arm were merely paint, and that he had not been physically harmed in

any way. (T:932). This incident reveals Christian's apparent motivation and

comfort in falsely accusing appellant. Defense counsel, who was permitted to ask

Ana questions revealing these facts, sought to ask Flor additional questions about

the encounter. (T:1022). This time, however, the People objected that it was

remote and immaterial hearsay; the court sustained this objection. (T:1024,1026).

71

The People made no similar objection when questions about the topic were asked of Ana.

The jury should have been allowed to hear Flor's testimony about the previous accusations, and should have heard the circumstances surrounding those accusations if Flor was a witness to them. The court precluded any inquiry into Flor's knowledge of the incident, and any inquiry into circumstances which were highly relevant to this case. If the then four-year-old child had made a false accusation against appellant, there is no reason to assume that the same child would not have done the same thing a year or two later. Such facts are relevant to the child's credibility, and thus the court should have allowed counsel's questions.

C. The Court Erred in Allowing Lombardy to Testify in Rebuttal, Denying Ajl the Chance to Observe That Rebuttal, and Preventing Counsel From Calling Ajl on Surrebuttal

Lombardy provided the only medical or scientific proof that a crime occurred when she testified that her findings indicated repeated anal penetration of Christian. Although defense counsel was not permitted to question her about issues highly relevant to her credibility, he was able to call a witness who disputed Lombardy's findings. Dr. Ajl testified that the photographs and medical reports which Lombardy identified as indicative of penetration were in fact "not diagnostic" of that in the recognized scientific community. This testimony disputed the prosecution witness's testimony, and should have been the end of the matter.

72

Instead, the People were permitted to re-call Lombardy in rebuttal solely for the purpose of disputing Ajl's testimony. This was clearly an improper subject of rebuttal, as it disturbed the equipoise of the two witnesses which had already been presented to the jury. To compound this error, the court then refused to grant a continuance so that defense counsel could produce Ajl to hear Lombardy's rebuttal, and then refused to allow counsel to call Ajl in surrebuttal. This likely gave the jury the impression that the court was sanctioning Lombardy as a better or more qualified expert witness on the subject. The court's error was inexcusable and a clear abuse of discretion.

Rebuttal evidence is "not merely evidence which contradicts the witnesses on the opposite side and corroborates those of the party who began, but evidence in denial of some affirmative fact which the answering party has endeavored to prove." Harris, 57 NY2d 335,345 (1982). The trial court has discretion to permit either party, "in the interest of justice," to allow evidence on rebuttal which may have been more appropriate on direct. Id. at 345; CPL §260.30(7). However, the People below offered Lombardy's medical conclusions during their case-in-chief, and she presented nothing new in her rebuttal testimony. In fact, the court expressly limited her testimony to "how the defense witness is wrong." (T:1231). The court said, "Each side... gets an opportunity to advance his own opinion and say how the other one is wrong." (T:1232).

73

Lombardy's testimony in rebuttal reiterated her prior comments and added statements which seemed to hurt her credibility. (T:1233-35). According to Lombardy, the "smoothing" of the rugae "in and of itself is not diagnostic; no finding in sexual abuse is." (T:1234). She went on to say "very few findings actually, I should say, are diagnostic..." (T:1234). Lombardy explained that the smoothing, combined with "easy dilatation with an asymmetry to different aspects of the rectum" as well as the "protrusion of the rectal tissues from the wall of the rectum into the rectal vault" were all suspicious findings. (T:1235). She believed these were all "any physician would need, to make a diagnosis of sexual abuse." (T:1235).

Her testimony was certainly not evidence in denial of an affirmative fact presented by appellant; it was rejection of an expert opinion which was itself a criticism of her own expert opinion.

There are circumstances in which rebuttal testimony is appropriate to impeach one of the other party's witnesses. E.g. Foster, 182 AD2d 701 (2d Dept. 1992). In such cases, however, the issue is generally impeachment because of possible perjurious testimony at trial. Id. Here, Lombardy offered nothing to impeach Ajl's testimony. Instead, her testimony essentially functioned as a reinforcement of her original testimony, relying on nothing new or different.

Assuming, arguendo, that the trial court below properly allowed Lombardy to be recalled, defense counsel should subsequently have been permitted to

74

produce Ajl for that testimony and then for surrebuttal. The Court of Appeals has held that another trial court's analogous ruling "effectively precluded defense counsel from offering any surrebuttal evidence" and this ruling "interfered significantly with his right to make an effective presentation on the only issue before the jury." Santana, 80 NY2d 92,99 (1992). The error was the trial court's refusal to let defense counsel have his own witness present while he cross-examined the People's witness. Id. at 100.

Although the subject of testimony in Santana was a critical affirmative defense, the Court's holding is not so narrow as to apply to it alone. The Court explained that defense counsel was hindered by the "Hobson's choice" presented, and effectively forced to forego any surrebuttal. Id. at 99. Defense counsel there needed and was entitled to have his expert present while he cross-examined the People's witness about the crucial issue of insanity. Id. at 101. The error prevented counsel from gaining advice of his expert and framing or presenting appropriate surrebuttal. Id. at 100. The issue in appellant's case, whether or not the child was penetrated, was indeed a vital one about which counsel should not have been restricted.

The court below erred first by allowing Lombardy to give inappropriate rebuttal testimony, then by preventing Ajl's presence, and finally by denying appellant's request for surrebuttal. These errors could have given the jury the impression that Lombardy, who testified twice to the same facts and conclusion,

75

was somehow more credible than Ajl.  This was gravely inappropriate and yet another example of how this court displayed a bias against appellant and his counsel.

## POINT FIVE

## THE COURT'S ERRONEOUS INSTRUCTIONS AND FAILURE TO ISSUE NECESSARY CHARGES TO THE JURY INDIVIDUALLY AND CUMULATIVELY INFLUENCED THE VERDICT

In order to reach a fair and just verdict, the jury must have a "proper comprehension of the law to be applied to the facts." Sobieskoda, 235 NY 411,421 (1923). The trial court must therefore make every effort to ensure that the jury understands the applicable law in the case. The best way to do so is to include a number of clarifying instructions in the jury charge. If a trial court commits numerous errors in this charge, and the result "tended to influence the verdict," it cannot be said that the defendant received a fair trial. Id. at 420.

The court below failed to give proper jury instructions on a number of issues including the adverse presumption of a missing witness, proper interpretation and application of hearsay contained in medical records, and the propriety of several misleading and prejudicial statements of the prosecutor. The number and subject matter of such errors was likely to influence the jury's verdict, and therefore appellant was denied a fair trial.

A. The Court Gave an Improper Missing Witness Charge

Defense counsel requested, and was granted, a missing witness charge pertaining to Detective Barbieri. The court was correct to grant this request, but then undermined it by giving an improper charge. There were two problems with

the court's charge.  First, the charge required the jury to find a number of elements based on facts not before it in order to draw an adverse inference from Barbieri's absence.  The court erred further when this flawed charge required that the jury find Barbieri "in control of the People and not in control of the defense for subpoena purposes" in order to justify the adverse inference.  Both errors were harmful, and in concert they likely prevented the jury from drawing any inference from the absence of a crucial prosecution witness.

A party's failure to "produce at trial a witness who presumably has evidence that would 'elucidate the transactions,' requires a trial court, upon timely request, to instruct the jury that an unfavorable inference may be drawn from the failure of the party to call such witness." Gonzalez, 68 NY2d 424,427 (1986).  The party requesting the instruction must make a prima facie showing that there is a witness with material knowledge who was not called by the other party, who would typically be expected to testify for that other party. Id. at 427-28.  If the court finds that this burden has been met, the other party will be given an opportunity to "account for the witnesses' absence or otherwise demonstrate that the charge is inappropriate." Id. at 428.  If the party fails to do so, the court will issue a missing witness charge.  The court evaluates the legal merits of the request, and the jury is then given the option of drawing an adverse inference.

The jury should not, however, be given the responsibility of evaluating the various elements of the legal test set out in <u>Gonzalez</u>.[47] To do so would make little sense, as presumably the jury has been given few or no facts about the absent witness, and would have no basis for determining details such as his material knowledge or his party allegiance. At no time during the trial below was Barbieri's availability or attendance discussed in front of the jury. The court therefore placed an improper, and really an impossible, burden on the jury in charging them to find the inference only if the elements of the <u>Gonzalez</u> test were met.

One prerequisite for a missing witness charge is a finding that the witness was in "control" of the opposing party. <u>Gonzalez, supra</u>, at 428. The Court of Appeals has discussed this element as it applies to police officer witnesses and noted that "although in a literal sense such a witness could be said to be available to both parties, he would be expected to be favorable to the People and hostile to the defense." <u>Brown</u>, 34 NY2d 658,660 (1974). The trial court below should have found Barbieri to be per se in the control of the People. As defense counsel objected, the court "should be charging the jury as a matter of law that the detective is in the control of the People." (T:1414). Instead, the court instructed

---

[47] According to the CJI, a missing witness charge may include the elements of the <u>Gonzalez</u> test only if there has been some evidence presented to the jury about the reason the witness was not called, or if one of the factors justifying the charge is in issue. Neither situation applies to appellant's case. The CJI cited a case, <u>Thomas</u>, 262 AD2d 213 (1st Dept. 1999), which itself gives no explanation as to why the court was allowed to place this burden on the jury. In any event, there appears to be little or no additional authority supporting this practice.

79

the jury that it could make an adverse inference regarding Barbieri only if it found that she was "in control of the People and not in control of the defense for subpoena purposes and would naturally be expected to testify favorably for the People." (T:1439-40). Counsel objected again after the entire charge was given, reiterating that a police officer is, as "a matter of law... in the control of the People." (T:1461). The court refused to correct itself. (T:1462).

The proper charge would have allowed the jury to more easily and appropriately draw an adverse inference from Barbieri's absence. Given her first-hand knowledge of very relevant facts about Christian's accusation and appellant's subsequent arrest,[48] such an inference was suitable and necessary. However, the court's incorrect charge placed a higher burden on the jury, requiring that they find her to be in "control" of the People, even though no such finding was required. The entire missing witness charge was flawed and provides the most odious example of the court's erroneous behavior regarding jury instructions.

B. The Court Erred in Denying Counsel's Request for a Charge About the Medical Hearsay Evidence

Defense counsel also requested an instruction pertaining to various hearsay statements contained in medical records admitted as evidence. Counsel explained that the statements should "not be considered by the jury for the truthfulness of them, only for the fact that" they were said. (T:1257). Such statements are

---

[48] See infra Point VII.

allowed as exceptions under the hearsay rule merely for "admission, diagnosis, treatment, and discharge." (T:1257). The court denied this request, giving the jury an improper opportunity to consider inadmissible hearsay statements for their veracity.

A number of hearsay statements were admitted at appellant's trial, most of which involved assertions made by Christian or his parents and relayed by someone other than Christian. See Point VI. Hearsay is less reliable evidence which should be admitted only under limited circumstances. Although admission of the statements contained in the medical reports alone was not harmful, the cumulative effect of all the hearsay statements was likely damaging to appellant. The deleterious impact could have been minimized had the court given the necessary instruction that the statements could be considered for their impact on Lombardy's analysis, but not for their truthfulness. The court had no reason to exclude such an instruction.

It is well-established that statements made to a doctor in the course of medical treatment may not later be admissible at trial unless they were relevant for diagnosis or said treatment. See Williams v. Alexander, 309 NY 283 (1955). Such statements are admissible because a typical hearsay declarant presumably would be more likely to tell the truth if he believed it would result in better care, and this motivation provides sufficient indicia of reliability. Prince, Richardson on Evidence §8-310 (Farrell 11th ed). The statements are still hearsay, however, and

therefore should not be considered for their truthfulness. Id. Counsel pointed this

out in requesting an instruction, but was rebuffed. (T:598-99). A court should

issue an instruction reminding the jury that the statement should only be

considered for the impact it may have had on the doctor's actions, and not for its

accuracy or veracity. The court's failure to do so here deprived appellant yet again

of a fair trial.

## C. The Court Should Have Given Instructions About Inappropriate Comments Made by the Prosecutor In Summation

Defense counsel also objected to inappropriate comments and statements of

law made by the prosecutor during her summation. These comments were

prejudicial to appellant's case, and the court was required to charge the jury in

order to minimize these errors. Instead, the court denied counsel's request for

necessary curative instructions.

As previously discussed, a missing witness charge was requested and

granted with regard to Barbieri. To obstruct the possibility of any adverse

inference, the prosecutor commented in summation that "every witness that

defense counsel referred to, whether it be Detective Diane Barbieri... , they're

available to him." (T:1387). Counsel objected, but the court overruled the

objection. (T:1387).

At colloquy following the summation, counsel reiterated that objection,

saying it was so "intellectually dishonest and disingenuous that I'm asking for a

82

mistrial." (T:1394). The court noted that the content of the missing witness charge was under consideration, and then ultimately failed to mention the prosecutor's inappropriate comments in the final charge given to the jury. (T:1439-40). Regardless of whether counsel formally requested a curative instruction, the court should have issued one so as to prevent prosecutor's comment from sabotaging the legitimate missing witness charge.

Defense counsel also objected to the prosecutor's comment in summation that "Detectives can make false statements in questioning a suspect and that does not render any subsequent confession...". (T:1369). Although counsel's objection interrupted this statement, the court overruled the objection and told the jury that it would be giving instructions about the law. (T:1369). At colloquy following summation, counsel requested a curative instruction, noting that police officers may not unconditionally lie or make false statements in questioning suspects. (T:1416).

There is indeed caselaw holding that trickery is an acceptable method of gaining a confession in many instances. See Sullivan, 224 AD2d 460 (2d Dept. 1996). However, there are limits to the bounds of such trickery. Deception will not be permissible if it is "so fundamentally unfair as to deny due process" or likely caused a false confession. See Tarsia, supra at 11. The Court in Tarsia cited one example of such unfairness as a police officer lying to a suspect about the results of a polygraph test. Id.

83

Defense counsel correctly summarized the law for the court, noting that police trickery is not allowed in all circumstances, and the jury was entitled to know this.  The court erred in denying appellant's request.

The right to a fair trial requires "presentation of legal evidence unimpaired by intemperate conduct" designed to distract the jury from its goal of determining the facts relevant to guilt or innocence.  Calabria, 94 NY2d 519,523 (2000).  When a prosecutor exceeds the bounds of fair advocacy and commits multiple acts of misconduct, the cumulative effect may substantially prejudice a defendant's right to a fair trial.  Id.  A prosecutor must proceed in a fair manner, and while he surely "may prosecute with earnestness and vigor" and "may strike hard blows, he is not at liberty to strike foul ones."  Berger v. United States, 295 US 78,88 (1935).

Here, the prosecutor made inappropriate comments which amounted to misleading statements of law.  Although the comments alone did not deny him a fair trial, appellant was entitled to instructions which could, at the very least, make the jury aware of these improprieties and correct any misconceptions resulting from them.  The failure to do so was another reason that the court's instructions were inadequate to the point of violating appellant's constitutional rights.

## POINT SIX

## THE COURT ERRED IN ALLOWING TESTIMONY ABOUT THE COMPLAINANT'S STATEMENTS AS ANY HEARSAY EXCEPTIONS WERE INAPPOSITE

Christian told his mother and father that appellant sexually abused him. They were subsequently permitted to describe his allegations at trial even though the statements had been made out of court by someone other than the testifying witness. The statements were offered to prove that appellant sexually abused Christian. These repetitions of what the child said were nothing more than hearsay statements which should have been precluded for their unreliability. Because the statements did not fall into any category of exceptions to the hearsay rule, there was no basis for their admission. The court's error in allowing them was highly prejudicial, and as a result appellant was denied a fair trial.

Before the first prosecution witness testified, defense counsel asked the court to rule on the admissibility of any statements made by the victim that could be relayed by other witnesses. The court deferred on the question of the mother's testimony, and agreed to rule on it at a later time. (T:353). Arguments were again presented later in the trial, and again the court refused to rule until it could "see how [her testimony] develops." (T:809-810). The court did, however, address the father's testimony.

## A. The Court Erroneously Permitted Osvaldo Lopez to Testify About Inadmissible Hearsay

Regarding the father's testimony, the court engaged in confusing and

speculative colloquy. First, the court discussed what the father might testify to.

> I assume there is going to be... testimony from the alleged victim's father that he had a conversation with the mother. That's permissible, the fact of a conversation, without stating the nature of the conversation. Then I assume that he's going to say, I had a... conversation with the defendant. That's okay up until this time.

(T:361). The court went on to note:

> if the father says to the defendant my son says that you engaged in ... anal sodomy... If there is an answer to that question, then that would be appropriate testimony.

(T:361-62). Counsel objected: "you're allowing the father to say in court what the

son said?" (T:362). The court allowed it because this was a "different issue" from

Ana testifying about Christian's statement to her. (T:362-63). Counsel argued that

allowing the father to repeat what the boy said is "still allowing the content of what

the boy is alleged to have said to come into evidence." (T:363).

> Court: That's true, as long as there was an answer to the question. If there is no answer to the question, then the father's testimony in that area will be precluded.

(T:363). The court believed that Christian's statement was admissible only if

appellant responded. (T:363). It failed to clarify why this was so and never ruled

on counsel's objections. (T:364). Defense counsel asked the court to rule on the

86

testimony in advance so as to avoid "opening up a risky can of worms." (T:366). The court refused. (T:366).

As a result, Osvaldo was permitted to testify about confronting appellant with Christian nearby. (T:390). After explaining how he told appellant about the accusation, Lopez was asked:

> Q: What did you see your son do next?
>
> A: He pointed at him and said, "You, Artemio, did something bad to me in this chair."

(T:390). Defense counsel objected, moving to strike the statement. (T:390). The court did not rule on the objection, instead asking about appellant's response to the accusation. Lopez testified "He only said, 'You're going to believe him?'" (T:390-91). As defense counsel had anticipated, the court never ruled on the objection, and allowed the testimony to continue.

Later, counsel moved to strike all of Osvaldo's testimony, arguing that it was hearsay which did not fall under any applicable exceptions. (T:429). The court responded:

> Because this witness didn't testify to any out-of-court statements made by Christian, except those made in the presence of the defendant, and those statements made in the presence of the defendant are really not what we're talking about. That's concerning admissions of a defendant.

(T:431).

The court went on to rule that Christian's statement as relayed by the father did not fall under the prompt outcry rule, but was admissible because it triggered some kind of admission by appellant. (T:431-33). The court later explained:

> This is a situation where this child is accusing the defendant in the defendant's presence, heard by the father. And basically the father is testifying that the defendant made a statement to the effect, "Are you going to believe him?"... It has to be admissible by silence, and the jury can consider that as evidence.

(T:797).

Counsel challenged the assertion that appellant's response was an admission by silence, arguing that appellant responded with a clear denial in the form of a question. (T:806). The court replied that the question

> could be considered by the jury as a denial, or it can be considered by the jury as a nondenial, period. That's a jury question. If it's a nondenial, they can consider it whatever they want to.

(T:807). The court apparently considered appellant's response, "Are you going to believe him?", an admission or an admission by silence and consequently deemed it and the child's statement triggering it admissible. (T:431-33,797,807). The court was wrong on both counts.

Hearsay, out-of-court statements offered to prove the truth of the matter asserted, may only be admitted at trial in limited circumstances where there are some indicia of truthfulness. Richardson, supra §8-101. Because the accusations

88

Christian made to his parents lacked any such indicia, they were merely out-of-court assertions offered to further prove appellant's guilt.

One exception to the hearsay rule involves declarations by accused parties which are inconsistent with their innocence and from which guilt could be inferred. See Baker, 251 AD2d 592 (2d Dept. 1998). Such statements, called "admissions," are not direct acknowledgments of guilt. Bretagna, 298 NY 323,326 (1949). Admissions are circumstantial evidence from which a jury might infer guilt. Id. Admissions are not precluded by the hearsay rule, and they will be allowed into evidence unless they were involuntarily made. Richardson, §8-251;cf. CPL §60.45. There is no rule that statements triggering an admission are admissible as part of the exchange. However, the court seemed to imply such a rule and found Christian's statements admissible under it. The question then becomes whether appellant made an admission either overtly or by failing to deny the statement.

Appellant's response to the accusation was "Are you going to believe [the child]?" It was neither a direct nor indirect acknowledgment of guilt. As defense counsel asserted below, it was a denial. (T:806). No reasonable juror would infer guilt from this denial, and therefore his statement was not an admission as the law recognizes it. The court clearly erred in identifying it as such.

When a person fails to deny a statement made in his presence which he would naturally deny if he believed it to be untrue, then that failure and the resulting "silence" is considered a tacit admission of the statement and is

89

admissible at trial.  Richardson, supra §8-223.  A critical component is whether the

defendant heard and understood the statement to which he would be expected to

respond.  Allen, 300 NY 222,225 (1949).  In the instant case, Osvaldo testified that

Christian said only "You, Artemio, did something bad to me in this chair."

(T:390).  On the basis of that statement alone, there was no way that appellant

could have known or fully understood what the accusation against him was.  Since

he could not fully understand the accusation, any failure to respond would not be

admissible under the hearsay exception.

Appellant's statement was not, and could not have been construed as, an

admission.  The court's basis for admitting Christian's statement as relayed by

Osvaldo is therefore invalid, and no other basis for admission exists.

## B. The Court Erroneously Permitted Ana Lopez to Testify About Inadmissible Hearsay

The court below also erred in allowing Ana to testify about the very same

exchange.  When asked questions about the same confrontation, Ana expressed her

reservations about revealing Christian's comments.  The court responded "You can

certainly give the details if you heard Christian say that.  As a matter of fact, it is

your duty to do so." (T:921).  Ana then testified that Christian said to appellant:

"You put me on the chair and you put your penis in my ass.  There was a roll of

paper... That's the paper you were cleaning me with." (T:921).  This was

dramatically different from Osvaldo's testimony.

What followed also differed from her husband's account.  After the child made the accusation, she said appellant responded "I didn't do that."  (T:922).  This is an unequivocal denial, and therefore the basis for admitting the child's hearsay statement is unclear.  It was not tangential to an admission or admission by silence, as the court asserted in reference to the father's testimony.  The court had already decided it was not admissible as prompt outcry before Osvaldo's description of the same conversation.[49]  (T:431-33).  It is difficult to see how the court could have construed the exchange to be prompt outcry when described by the mother, but not by the father.  Either way, the court would have been wrong to label it such.

The "prompt outcry" exception to the hearsay rule says that evidence of a prompt complaint by a victim of sexual assault is "admissible to corroborate the allegation that an assault took place."  McDaniel, 81 NY2d 10,16 (1993).  The complaint must have been timely.  A "timely" complaint is one made "at the first suitable opportunity."  Id. at 17.  This is a flexible rule, which means that timely could be a "relative concept dependent on the facts."  Id. at 17.

Though the rule is flexible, it must have some critical benchmarks.  Specifically, there must be some indication as to when the original incident occurred, in order to determine whether the delay was made within a reasonable amount of time.  Here, the People presented no evidence of a specific date or time

---

[49] Although the content of the exchange was different as described by Osvaldo and Ana, the precise words are not relevant to the prompt outcry inquiry.

when the alleged incidents occurred.[50] The indictment sets forth a broad two-month period, suggesting that the acts happened sometime in May or June of 2005. Lombardy, however, testified that the acts likely happened over a long period of time, probably "months to years." (T:555-56). None of the People's witnesses were able to provide a more specific date. It is impossible to determine whether the child's complaint here was timely if there is no way of knowing when the acts occurred, and the prompt outcry rule is thus inapplicable.

Furthermore, the Court of Appeals has repeatedly held that in prompt outcry scenarios, "only the fact of a complaint, not the details, is admissible." McDaniel, supra at 17; Rice, 75 NY2d 929,932 (1990). If, however, the statements somehow fall under the auspices of another hearsay exception, they may be admissible. See Riggio, 144 AD2d 951 (4th Dept. 1988). As defense counsel correctly argued below, the child's statements did not fall under the excited utterance, present sense impression, or state of mind exceptions to the hearsay rule suggested by the People.[51] (T:808-09). Therefore, even if the statement did qualify as prompt

---

[50] The only reference at trial to a date timeline was the "confession," which was factually and legally incredible.

[51] The "excited utterance" exception allows introduction of a spontaneous statement made "contemporaneously or immediately after a startling event" which describes the event. Richardson at §8-604. The "present sense impression" exception similarly applies when the declarant made a statement while he was observing an event or immediately afterwards. Brown. 80 NY2d 729,734 (1993). It applies when there was no "startling event" to trigger the observation. Christian did not make his accusation at the same time or immediately after he was allegedly abused, and therefore neither exception applies. The other exception suggested by the People was "state of mind," which is used to show a declarant's motive or reason for saying what he did. Richardson at §8-611. Christian's parents were not testifying about his statement to show his motivation or reason for anything, but rather to assert that his accusation was true.

outcry, the details of the child's statement were not admissible and the court erred in allowing them into evidence.

Osvaldo and Ana should have been prevented from introducing hearsay statements made by Christian.  The statements did not fall under any exceptions to the hearsay rule, and should have been precluded.   The court's failure to do so allowed the jury to wrongfully consider highly prejudicial evidence, which ultimately violated appellant's right to a fair trial.  This Court should thus reverse appellant's conviction and order a new trial.

## POINT SEVEN

## APPELLANT WAS DENIED HIS RIGHT TO A SHOWING OF PROBABLE CAUSE FOR HIS ARREST

Prior to appellant's trial, a hearing was held to determine whether the police had sufficient probable cause to arrest him, and to determine the legality of his subsequent "confession." The hearing was deficient because defense counsel was prevented from questioning Detective Barbieri, a critical witness. Even considering the absence of Barbieri's potentially exculpatory testimony, there was insufficient probable cause for appellant's arrest.

A. The Court Obstructed Appellant's Inquiry into the Probable Cause for His Arrest

The court prevented defense counsel from calling a necessary and highly relevant witness at the suppression hearing. Barbieri was the lead detective in the investigation, and expressed her opinion that the only person to directly inculpate appellant, then five-year-old Christian, may not have understood the difference between the truth and a lie. It is incomprehensible that she was not called by the People to testify at the hearing, and it was patently unconstitutional for the court to reject defense counsel's request to produce her. This error denied appellant a fair hearing and subsequently a fair trial.

The suppression hearing was held to address two issues: whether the police had sufficient probable cause to arrest appellant, and whether the statement he gave after that arrest was voluntary. A court addressing the sufficiency of probable

cause must allow the defendant to investigate the police conduct and facts surrounding the arrest. See Wise, 46 NY2d 321,329 (1978). "Unless the People establish that the police had probable cause to arrest... and unless the defendant is accorded an opportunity to delve fully into the circumstances attendant upon his arrest," a motion to suppress any evidence resulting from an illegal arrest should be granted. Misuis, 47 NY2d 979,981 (1979).

Consequently, if the court unfairly restricts the defendant's ability to test the People's proof of probable cause, the defendant is entitled to a new hearing on that issue. Id. This is true if the defendant was denied the opportunity to cross-examine one of the People's witnesses at a suppression hearing, Id., or was denied the chance to call an additional witness who might have relevant facts. See Sanchez, 236 AD2d 243,244-45 (1st Dept. 1997).

In Sanchez, the trial court refused to sign the defendant's subpoena for a police officer who had relevant knowledge about an arrest. Id. The appellate court held that the denial of the defendant's efforts to examine the "full circumstances surrounding his arrest" required a new hearing. Id. at 245. The facts of that case, in which the testifying officer and the non-testifying officer had different information about events leading to the defendant's arrest, are directly on point. The testimony of a second officer in both cases was necessary to understand the defendant's arrest.

The suppression court here should have given appellant an opportunity to investigate the circumstances of his arrest, and the failure to do so was grievous error. First, the court emphasized that counsel did not have a subpoena for Barbieri ready to be signed. (H:156-157). This was patently absurd, as counsel reasonably expected the People to call Barbieri after they had previously turned over *Rosario* material on her. A subpoena would also have seemed unnecessary to counsel given this earlier exchange:

> Court: I assume that the both of you are going to be available along with Detective Barbieri tomorrow, if we are not able to finish this today.
>
> ADA Finkelstein: Yes, Judge.

(H:42)(emphasis added).

After counsel told the court that he did not have a subpoena, the court asked for an offer of proof. Counsel explained that Barbieri knew about a medical report which might "shed serious credibility issues with respect to whether there's probable cause to even arrest the defendant." (H:156). Furthermore, she was present in the interrogation room for the duration of appellant's interrogation, and thus could answer questions about the voluntariness of the statement. (H:156). The court missed the significance of this showing, asking counsel afterwards "How would Detective Barbieri shed light on issues relevant to this hearing to undermine the People's burden of proving that the arrest was based on probable cause...?" (H:159). Counsel was flabbergasted, asking "Is the Court serious in asking that

96

question?" (H:160).  After a brief exchange, the court adjourned and threatened counsel with contempt charges.[52]  (H:160).

The next day, the court issued an oral ruling denying the defense request to call Barbieri, citing Witherspoon[53], 66 NY2d 973 (1985), for the proposition that defense counsel had not provided a "bona fide factual predicate" that Barbieri possessed "material, non-cumulative" evidence on a relevant issue.  (H:164). Defense counsel responded by restating the facts that Barbieri alone knew about the case.  He added that she observed in a case report, prior to appellant's arrest, that the victim could not tell the difference between a truth and a lie.  (H:165).  The court refused to address the request, denying appellant's motion for suppression. (H:177-79).

The court commented that a defendant may only call a police officer at a suppression hearing if he can show facts which demonstrate that the officer has "material evidence on the question of whether" evidence was obtained in a constitutionally permissible manner.  Witherspoon, supra at 974.  This requires a showing that the officer possesses relevant, non-cumulative evidence.  Williams, 205 AD2d 717 (2d Dept. 1994).

---

[52] The next day, counsel requested a recusal, suggesting that the threat, along with the raised voice and slamming of the Judge's door showed a lack of objectivity and frightened appellant. (H:169-170).  The court denied this request.  (H:176-77).
[53] The court also cited additional caselaw in its conclusion that counsel failed to provide a factual predicate "despite repeated opportunities and requests for him to do so." (H:164).  Counsel had, however, responded to the court's requests both before and after that statement with legitimate reasons for calling the witness.  (H:155,156,165-67).

Trujillo, the People's lone witness at the hearing, testified that appellant was arrested on the basis of two factors: the accusation of a five-year-old child, and the report from one doctor stating that the child had been penetrated. (H:69). According to Trujillo, these two pieces of evidence provided probable cause for the arrest. (H:69). Both may have been undermined by evidence about which Barbieri alone had relevant information.

Trujillo's interview of Christian was the only evidence at that time directly implicating appellant. This interview was not, however, the first conducted by a detective in this case. Prior to that interview, Detective Mercado had interviewed the child upon Barbieri's request. (H:53-54). After that first interview, Barbieri noted in a case report that the child did not know the difference between the truth and a lie. (H:165). Trujillo claimed he was never told about this, leaving Barbieri as the only person who could explain this assessment to the court. Had she presented testimony to this effect, it would have undermined the veracity of the only evidence directly linking appellant to the crime.

The other reason for appellant's arrest was "positive medical findings" that the victim had been anally penetrated. (H:69). However, *Rosario* material contained documents indicating that the pediatrician who initially examined Christian had found "no evidence of sexual abuse". (H:83). Barbieri knew about this conclusion prior to appellant's arrest; Trujillo did not. (H:69). In fact, Trujillo had no firsthand knowledge about the medical analysis, and had been briefed by

98

someone (Barbieri) who herself had learned it from a report rather than by direct observation or discussion.

That report, in conjunction with the child's failure to understand the concept of truth versus lie, greatly undermines the two justifications for appellant's arrest. Barbieri had information about both, and her testimony at the hearing would have been both relevant and non-cumulative.

In <u>Williams</u>, this Court rejected the defendant's argument that he was denied due process because the "hearing record raised no substantial issues as to the constitutionality of the police actions, the People's evidence was not notably incomplete, and the defendant did not otherwise establish a need for the second officer's testimony." <u>Williams</u>, <u>supra</u> at 718. The instant case contains all of the criteria absent in <u>Williams</u>. There are facts which undermine the reliability of the child's accusation and go directly to the constitutionality of appellant's arrest and subsequent statement. Since Trujillo was not aware of those facts, the People's evidence was not complete and there was a clear need for the second officer's testimony. (H:60). Barbieri's testimony would have been material, involved a question about the constitutionality of appellant's arrest, and would have filled in gaps in the People's evidence which raised substantial questions about the probable cause supporting appellant's arrest.

The court unduly restricted counsel's inquiry into the circumstances of appellant's detention and sufficiency of the probable cause leading to his arrest.

99

These errors made denial of his suppression motion improper, and this Court should now remand for a new hearing on the issue of probable cause for appellant's arrest in which Barbieri is present.

B. <u>There Was Insufficient Proof Of Probable Cause And Therefore Appellant's Statement Should Have Been Suppressed</u>

Considering Barbieri's absence, the People's evidence of probable cause was insufficient. The police arrested appellant because of the accusation of a five-year-old child and findings in a medical report. Although the report indicated that Christian was anally penetrated, it did not show that biological material from appellant had been found in or on the boy. Nor was any physical evidence presented linking appellant to the victim. Therefore, the only "undisputed" evidence the police had that appellant committed a crime was the accusation of a small child. Although the court erroneously denied defense counsel the ability to question Barbieri about her assessment of the victim's credibility, the court was certainly aware that the *Rosario* material contained an observation undermining the probable cause of the arrest.

This leaves the People's proof of probable cause in total disarray. There was an accusation of a young child, who may not have understood the importance of telling the truth, and a medical report which said that there had been some kind of penetration of the boy's anus. (H:69). No objectively reasonable police officer would have viewed this evidence alone as sufficient probable cause for an arrest.

The detectives had, "at best, reasonable suspicion to temporarily detain the defendant and demand an explanation." Marrero, 152 AD2d 746,749 (2d Dept. 1989). Instead, appellant was arrested and taken into custody, where he subsequently gave an inculpatory statement. This arrest was not supported by probable cause, and therefore appellant's Fourth Amendment rights were violated.

If the prosecution has not met its burden of proving that an arrest was supported by probable cause, any related confession must be suppressed unless it was an "act of free will [sufficient] to purge the primary taint of the unlawful invasion." Wong Sun, 371 US 471,486 (1963). The State must then show circumstantial evidence that the causal connection between the illegal arrest and the statement was broken and the taint was purged. Kaupp v. Texas, 538 US 626,633 (2003). The Supreme Court has held that the reading of Miranda rights to a suspect is not, by itself, enough to break the causal connection. Brown v. Illinois, 422 US 590,603 (1975). Instead, the court may consider the reading of Miranda rights a factor to be considered along with the "temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct." Id. at 603-604.

Appellant was arrested and brought to the police station where he was asked questions about pedigree information, and then read his rights. (H:15-24). At approximately 9:50 p.m., appellant was asked questions about the crime. By 10:30 p.m., the detective had enough information to begin writing a statement. (H:45).

There was no substantial time between appellant's arrest and his "confession." This is an important factor supporting the causal connection between the illegal arrest and the illegal "confession." Kaupp, supra at 633. Additionally, there was Trujillo's blatant misconduct threatening to harm appellant's penis if he did not confess, which raises the specter of inadmissibility under the Fifth Amendment. See Point II.

A defendant's statement which is admissible under the Fifth Amendment self-incrimination clause is not necessarily admissible pursuant to the Fourth Amendment. Brown, supra at 590. Since the two amendments serve different purposes, a statement which is acceptable under one might be inadmissible under another. Id. at 599. The exclusionary rule as applied to the Fourth Amendment is more expansive than in the Fifth Amendment context, as it is "directed at all unlawful searches and seizures..." Id. at 601.

As a result, "exclusion of a confession made without *Miranda* warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth." Id. A statement taken as the result of a questionable arrest must therefore satisfy both the Fourth and Fifth Amendments.

A warrantless arrest of an individual made in a public place will satisfy the Fourth Amendment's requirements only if it was supported by probable cause. See Watson, 423 US 411,424 (1976). Probable cause is "incapable of precise definition," and therefore a court must look at the totality of the circumstances

102

including the facts leading up to the arrest. <u>Maryland v. Pringle</u>, 540 US 366,370 (2003). This should include a look at whether those facts, "viewed from the standpoint of an objectively reasonable police officer, amounts to" probable cause. <u>Id.</u> citing <u>Ornelas v. United States</u>, 517 US 690 (1996). As suggested previously, the facts below failed in this inquiry.

The relatively short time between the illegal arrest and the statement, the lack of any intervening acts whatsoever, and the flagrant actions of the interrogating officer outweigh the fact that appellant was read his *Miranda* rights. As a result, there is insufficient proof of attenuation from the arrest, and appellant's statement was the direct result of a Fourth Amendment violation. It should have been suppressed, and the hearing court erred in refusing to do so. Given the tremendous weaknesses in the People's case, it cannot be said that this error, allowing a "confession" which likely impacted the jury's deliberations, was harmless. Appellant's conviction should be hereby be reversed and his case remanded for a new trial with the statement properly suppressed.

## CONCLUSION

**FOR THE FORGOING REASONS, APPELLANT'S CONVICTIONS FOR CRIMINAL SEXUAL ACT IN THE FIRST DEGREE AND SEXUAL ABUSE IN THE FIRST DEGREE SHOULD BE REVERSED AND THE ACCUSATORY INSTRUMENT DISMISSED, OR A NEW TRIAL ORDERED WITH THE STATEMENT SUPPRESSED; IN THE ALTERNATIVE, A NEW HEARING SHOULD BE ORDERED ON THE ISSUE OF PROBABLE CAUSE.**

Respectfully submitted,
KENT V. MOSTON
Attorney-in-Chief
Attorney for the Defendant-Appellant
BY:

David A. Bernstein, Esq.
Legal Aid Society of Nassau County
One Helen Keller Way
Hempstead, NY 11550
(516) 560-6400

Dated:       May 23, 2008
             Hempstead, New York

**OF COUNSEL;**
JEREMY L. GOLDBERG
DAVID A. BERNSTEIN

## CERTIFICATE OF COMPLIANCE
## Pursuant to 22 N.Y.C.R.R. §670.10.3(f)

The foregoing brief was prepared by computer. A proportionally spaced typeface was used as follows:

Name of typeface: Times New Roman
Point Size: 14
Line Spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 24,407.