UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

ARTEMIO CASTELLANOS,

                            Petitioner,                    **<u>MEMORANDUM & ORDER</u>**
                                                           10-CV-5075 (MKB)

                    v.

ROBERT KIRKPATRICK, *Superintendent of*
*Wende Correctional Facility*,

                            Respondent.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Petitioner Artemio Castellanos filed the above-captioned petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 on November 3, 2010, alleging that he is being held in state

custody in violation of his federal constitutional rights. (Pet., Docket Entry No. 1.) Petitioner's

claims arise from a judgment of conviction following a jury trial in the Supreme Court of New

York, Nassau County, (the "Trial Court") for committing a criminal sexual act in the first degree

and for sexual abuse in the first degree. (*Id.* at 1.) The Trial Court sentenced Petitioner to

concurrent terms of imprisonment of twenty-five years on the criminal sexual act count and

seven years on the sexual abuse count. (*Id.*) Petitioner appealed his conviction to the New York

Supreme Court Appellate Division, Second Department (the "Appellate Division"), which

affirmed the conviction. *People v. Castellanos*, 884 N.Y.S.2d 126 (App. Div. 2009). Petitioner

sought leave to appeal with the New York Court Appeals, which leave was denied. *People v.*

*Castellanos*, 13 N.Y.3d 858 (2009).

      On June 10, 2013, Petitioner filed a motion for leave to amend and to stay the petition

while he filed a motion to vacate his conviction pursuant to New York Criminal Procedure Law

section 440.10 with the Supreme Court of New York, Nassau County (the "440 Court"). (Pet'r Mot. to Amend and Stay Pet., Docket Entry No. 15.) By Memorandum and Order dated July 16, 2013, the Court granted the motion.[1] *Castellanos v. Kirkpatrick*, No. 10-CV-5075, 2013 WL 3777126, at *1–4 (E.D.N.Y. July 16, 2013). On June 18, 2013, Petitioner filed a motion to vacate his conviction under section 440.10 (the "440 Motion") with the 440 Court. (Supplemental Record ("SR") 1–49, Docket Entry No. 26-1.) By Decision and Order dated December 4, 2013, the 440 Court denied the 440 Motion. (SR 776–79.) On April 3, 2014, Petitioner filed an amended petition, adding the claim he raised in the 440 motion. (Am. Pet., Docket Entry No. 20.) By Memorandum and Order dated November 18, 2015 (the "November 2015 Order"), the Court denied the petition in part and stayed decision in part, pending *in camera* review of the arresting officer's personnel file. *Castellanos v. Kirkpatrick*, No. 10-CV-5075, 2015 WL 7312908, at *1–10 (E.D.N.Y. Nov. 18, 2015). For the reasons discussed below, the Court grants Petitioner habeas corpus relief on the remaining claim in the amended petition.

## I. Background

In June of 2005, Petitioner lived in Freeport, New York in the home of Osvaldo Lopez with Lopez's wife, Anna Lillian Rivas DeLopez, and the Lopez couple's two sons, C.L and N.L.[2] (T. 370:1, 902:23–904:14.)[3] C.L. was five years old and N.L. was six years old. (T. 381:12–14,

---

[1] In the motion to amend and stay the petition, Petitioner also moved for discovery, which the Court denied without prejudice. *Castellanos v. Kirkpatrick*, No. 10-CV-5075, 2013 WL 3777126, at *3–4 (E.D.N.Y. July 16, 2013).

[2] The names of the children are abbreviated in the public files because of their ages. *See* N.Y. Civil Rights Law § 50-b; Fed. R. Civ. P. 5.2(a)(3).

[3] "T." refers to the transcript of Petitioner's jury trial held from May 9 to May 24, 2006. (Docket Entry Nos. 6-16–31.). "H." refers to the transcript of the pretrial hearing held from April 4 to April 6, 2006. (Docket Entry Nos. 6-8–10.). "S" refers to the transcript of the

903:20–904:2.) At the time, Petitioner's girlfriend, Flor Sosa, lived in the Lopez family's home, as did DeLopez's brother, Minor Rivas, and two family friends, Elias and Dimas Ramirez. (T. 378:10–25, 380:7–20, 437:24–438:10, 906:3–10.) On the second floor of the home, Petitioner and Sosa shared a room, Elias had his own room, and Dimas slept on a mattress in the common area. (T. 376:6–380:20, 437:24–438:10.) On the first floor of the home, Rivas used a section of the living area as a bedroom and Lopez, DeLopez and the children slept in the bedroom. (T. 376:6–380:20, 437:24–438:10.)

On the evening of June 30, 2005, the members of the Lopez household were having dinner and Rivas and C.L. went to the living room to play. (T. 913:4–914:1.) While they were playing, Rivas observed that C.L.'s penis became erect and alerted DeLopez. (T. 913:24–914:2.) DeLopez asked C.L. why his penis was erect, but C.L. did not respond. (T. 914:18–915:3.) N.L. expressed that he knew why, explaining that C.L. had told him that Petitioner had done something to C.L. (T. 387:14–388:24, 915:8–23.) DeLopez then took C.L. into her bedroom and asked him to tell her what he had told to N.L. (T. 915:24–916:4.) C.L. was hesitant to answer, but eventually told DeLopez that Petitioner was sexually abusing him. (T. 916:8–25.) DeLopez waited for Lopez to finish his shift at work and went to pick him up. (T. 917:22–918:8.) When she picked him up, she told Lopez that Petitioner had been sexually abusing C.L. (T. 387:14–388:24, 918:9–14.) When they arrived home, Lopez took C.L. upstairs and confronted Petitioner about the alleged abuse. (T. 388:13–389:2, 918:15–919:1.) Lopez knocked on Petitioner's bedroom door, Sosa answered and Lopez stated that he wanted to speak to Petitioner. (T. 389:5–25, 113513–25.) Lopez asked C.L. what Petitioner had done to him, to

sentencing hearing held on July 10, 2006. (Docket Entry No. 6-12.) The Court refers to the original page numbers in the trial transcript and other state court hearings, not the page numbers assigned by the electronic document filing system (ECF).

which C.L. replied "[y]ou Artemio did something bad to me." (T. 390:6–15, 1136:5–8.) According to Petitioner, he then asked what the "bad thing" he had done was, received no response from C.L. and Lopez said, "[i]f you say nothing happened we'll leave it like that." (T. 1136:15–1137:13.)

The following day, July 1, 2005, C.L.'s parents took C.L. to see Dr. Luis Herrera, C.L.'s pediatrician. (T. 397:17–398:20, 602:14–23, 607:5–9.) C.L.'s parents told Dr. Herrera that C.L. may have been sexually abused. (T. 400:1–5, 608:5–609:5.) C.L. also told Dr. Herrera that Petitioner had anally penetrated C.L. with his penis. (T. 609:7–610:5.) After learning the reason for C.L.'s visit, Dr. Herrera inspected C.L.'s rectum. (T. 611:10–18.) The results of the exam were normal and inconclusive as to any sexual abuse. (T. 611:19–24, 618:16–619:18, 623:9–10.) Dr. Herrera, however, did not have the necessary instruments to determine whether C.L. had been anally penetrated, and he therefore recommended that C.L.'s parents take C.L. to an emergency room for a more thorough examination. (T. 612:2–613:1.) Given the nature of C.L.'s accusation, Dr. Herrera called the police and the Administration for Children's Services ("ACS"). (T. 612:18–613:1.) The police came to Dr. Herrera's office, spoke with C.L.'s parents and C.L. about the sexual abuse accusation and requested that C.L.'s parents bring him to the office where the police handle sexual abuse cases. (T. 400:12–401:24, 923:15–925:25.)

On July 7, 2005, C.L.'s parents took him to the Nassau County Police Department's ("NCPD") child abuse center, where C.L. was examined by Dr. Diane Lombardy. (T. 556:14–20, 926:1–11.) Dr. Lombardy physically examined C.L.'s genitalia, rectum and anus with the naked eye and with a colposcope, which is "a free-standing microscope" that has a camera capable of capturing photographs at four-to-twenty-five times magnification. (T. 506:8–23, 526:7–527:23.) Using the colposcope, Dr. Lombardy captured twenty-four photographs of C.L.'s genitalia,

rectum and anus. (T. 529:1–530:18.) The photographs revealed "smoothing" of the "folds of skin" on the outside of C.L's rectum and "trauma inside the rectal vault," which Dr. Lombardy opined indicated "repetitive penetration." (T. 543:7–552:20.)

The NCPD assigned the investigation into the alleged abuse to Detective Diane Barbieri. (T. 642:9–13, 645:9–646:6.) The NCPD also assigned Detective Edwin Trujillo to assist in the investigation because he had special training in investigating child abuse cases and spoke fluent Spanish; C.L. primarily spoke Spanish. (T. 642:9–646:14, 651:25–652:3.) On July 20, 2005, Detective Trujillo interviewed DeLopez and C.L. at the NCPD child abuse center. (T. 652:4–655:6.) During the interview, C.L. told Detective Trujillo how the sexual abuse took place. (T. 655:11–656:14.) As a result, Detective Trujillo decided to arrest Petitioner. (T. 659:13–21.)

### a. Petitioner's arrest, questioning and confession

On July 21, 2005, Detectives Trujillo and Barbieri located Petitioner at approximately 9:30 PM, and Detective Trujillo approached Petitioner and requested that he accompany them to the police station to discuss the investigation. (T. 659:15–660:25.) Because Petitioner was with Sosa, he asked Detective Trujillo if Sosa could join them. (T. 661:1–4.) Detective Trujillo consented to the request and Detective Barbieri drove Detective Trujillo, Sosa and Petitioner to the police station. (T. 661:4–662:23.) Petitioner sat, unrestrained, in the rear of the police vehicle with Sosa. (T. 661:4–662:23.)

After they arrived at the police station, Detective Trujillo took Petitioner to an office where the detectives' desks were located. (T. 663:10–24.) Detective Trujillo sat at his desk, Petitioner sat in a chair across from Detective Trujillo, Detective Barbieri sat at her desk and Sosa sat in a lounge outside the detectives' office. (T. 664:2–667:11.) Another detective that was not involved in Petitioner's investigation was also in the office. (T. 667:8–11.)

During the questioning, Detective Trujillo and Petitioner conversed in Spanish. (T. 669:15–19.) According to Detective Trujillo, he read Petitioner his *Miranda* rights from a form.[4] (T. 669:7–770:25.) Petitioner acknowledged that he understood his rights by signing the form and decided to proceed without an attorney present. (T. 675:9–677:6.) Initially, Petitioner denied that he had sexually abused C.L., but after Detective Trujillo informed him that there was medical evidence showing that he had sexually abused C.L., Petitioner admitted that he had anally penetrated C.L. on three separate occasions. (T. 677:15–682:13, 693:1–695:25.) Petitioner told Detective Trujillo that the acts took place in his bedroom on a "tan-colored chair." (T. 681:12–682:5.) Detective Trujillo memorialized Petitioner's statement in writing, read the statement aloud to Petitioner, asked Petitioner to correct any errors in the statement, had Petitioner read the statement and then had Petitioner sign the statement. (T. 682:6–683:16.) Thereafter, Petitioner was placed under arrest. (T. 696:4–697:12.)

Based on the foregoing alleged events, on November 1, 2005, Petitioner was charged with one of count of committing a criminal sexual act in the first degree and one count of sexual abuse in the first degree. (H. 5.) Petitioner rejected the State's plea offer, (H. 5–10), and the case proceeded to trial.[5]

---

[4] Petitioner disputes the content and circumstances of his confession. His version of what occurred is explained below.

[5] Prior to trial, Petitioner moved to suppress his confession and dismiss the indictment for lack of probable cause. (H. 1–182.) Detective Trujillo testified at the suppression hearing about his knowledge of the events as set forth above. (*See id.*) The Trial Court denied Petitioner's motions. (H. 177–79.) The Trial Court found that the confession was voluntary because there was no evidence that the confession resulted from "any use or threatened use of force, coercion or duress" and Petitioner "executed a Miranda waiver card that was printed in Spanish, signing same." (H. 178–79.) The Trial Court also found that Detective Trujillo possessed evidence that gave him probable cause to question Petitioner. (H. 177.)

### b. Trial

The trial spanned twelve days. (T. 315–1493.) The State's witnesses were Lopez, Dr. Lombardy, Dr. Herrera, Detective Trujillo, C.L. and DeLopez. (T. 1494.) Petitioner's witnesses were Sosa, Dr. Stephen Ajl and Petitioner.[6] (T. 1494.)

### i. Lopez testimony

On direct examination, Lopez testified that he and Petitioner were childhood friends in Guatemala. (T. 370:18–371:2.) Lopez believed that Petitioner could read Spanish because he read aloud from the Bible at church services in Guatemala. (T. 394:17–395:8.) Lopez immigrated to the United States in May of 2000. (T. 372:1–4.) Petitioner immigrated to the United States in approximately 2003, and upon arrival, lived with Lopez and his family. (T. 372:19–25.) Approximately six months after Petitioner moved into the Lopez family's home, Sosa immigrated to the United States and moved into Petitioner's bedroom. (T. 377:12–378:6.) Petitioner's bedroom was on the second floor of the home, Elias also had a bedroom on the second floor, and Lopez, his wife and two sons shared a bedroom on the first floor. (T. 375:22–376:25, 378:10–25.) In June of 2005, Dimas needed a place to stay while he looked for housing and Lopez allowed him to sleep in a common area on the second floor of his home. (T. 379:16–380:18.)

From the time Petitioner moved in, he appeared to have a good relationship with Lopez's sons; he often played with them and took them to the park. (T. 381:10–383:8.) In June of 2005, Lopez worked from 10:30 AM to 10:00 PM and DeLopez worked from 7:00 AM to 3:00 or 4:00 PM, and Petitioner would sometimes watch the children while Lopez and DeLopez were at work. (T. 383:12–385:25.) On June 30, 2005, DeLopez picked Lopez up from work and told Lopez

---

[6] Below, the Court recounts only the parts of each witnesses' testimony that it finds relevant for its analysis of the issues.

that something had occurred between Petitioner and C.L. (T. 387:14–388:24.) As a result of that conversation, when Lopez arrived home, he went to confront Petitioner with C.L. accompanying him. (T. 388:13–17.)

Lopez knocked on Petitioner's bedroom door and Sosa answered. (T. 389:19–25.) Lopez told Sosa that he wanted to speak with Petitioner. (T. 389:24–25.) Once Petitioner came to the door, Lopez asked if Petitioner "wanted Flor [Sosa] to listen to this," and Petitioner "changed color." (T. 390:1–5.) Lopez then instructed C.L. to state what Petitioner had done to him, to which C.L. said "[y]ou, Artemio, did something bad to me in this chair." (T. 390:6–15.) Petitioner responded by asking Lopez if he believed C.L., and Lopez said that he "[did not] want to believe it." (T. 390:22–391:1.)

Based on the conversation, Lopez decided to take C.L. to see Dr. Herrera. (T. 391:16–21, 398:3–21.) Lopez and his wife informed Dr. Herrera of the reason for C.L.'s visit, Dr. Herrera examined C.L. and then he called the police. (T. 397:17–400:15.) The police spoke with Lopez, DeLopez, C.L. and Dr. Herrera and then instructed C.L.'s parents to bring him to the NCPD's child abuse center. (T. 400:16–402:2.) A few days later, Lopez and DeLopez returned to the child abuse center for Dr. Lombardy to examine C.L. (T. 402:6–23.)

On cross-examination, Lopez remembered observing Petitioner playing with the children in the yard in front of his home, but could not recall specific instances of when Petitioner played with the children. (T. 444:6–23, 446:1–4, 449:5–450:14.) Although Petitioner worked during the week, he sometimes would be home alone watching the children while the other members of the home were at work. (T. 451:4–452:12, 462:6–18, 466:3–19.) When Lopez or DeLopez was unable to meet the children at their school bus stop after school ended, Petitioner would meet the children at the school bus stop and walk them home. (T. 453:18–458:9, 462:13–463:8.) Elias

and Dimas both lived in the home in May and June of 2005, when Petitioner allegedly abused C.L., and they sometimes watched the children when Lopez and DeLopez were at work. (T. 418:8–425:3, 437:11–438:13, 471:4–13.)

ii. **Dr. Lombardy testimony**

On direct examination, Dr. Lombardy testified that she is a licensed physician with a specialization in pediatrics, and at the time, was the attending physician at Nassau County University Medical Center. (T. 504:11–505:10.) In that position, she conducted "forensic evaluation[s]" of children who may have been sexually abused to determine whether there was any evidence of sexual abuse. (T. 506:1–11.) The forensic evaluation included, among other things, interviewing the child and examining the child with a colposcope. (T. 506:6–11.) A colposcope allows the examining physician to observe whether there are any "very small changes within the skin" that indicate sexual abuse. (T. 515:18–516:14.) During a forensic evaluation, a colposcope "is the [most] important instrument" used by the examining physician and allows the examining physician to observe changes that she could not observe with the naked eye. (T. 507:17–18, 520:1–7.) Dr. Lombardy had conducted approximately one thousand forensic evaluations over the course of her career. (T. 514:22–24.) The Trial Court qualified Dr. Lombardy as an expert. (T. 514:7–515:16.)

Dr. Lombardy explained that:

> [t]he tissue within the rectum is a mucosal type of tissue, . . . that [is] very similar to the tissue in your mouth. And the anal tissue is very similar to the tissue on your skin. All of these tissues have a lot of folds in them so they can expand to allow for defecation . . . [and] [they] heal[] very rapidly.

(T. 520:14–521:4, 523:2–524:3.) If a child has been anally penetrated, the physician cannot determine whether the penetration was conducted with a penis or some other object. (T. 519:2–7.)

Dr. Lombardy examined C.L.'s penis, scrotum, anus and rectum with the naked eye and used the colposcope to capture photographs of the areas.  (T. 526:7–527:23.)  The photographs were admitted into evidence and shown to the jury.  (T. 528:2–535:23, 542:1–544:24.) Dr. Lombardy opined that the photographs of C.L.'s rectum showed "smoothing" of the folds of skin, which was "abnormal."  (T. 544:12–545:18, 548:5–549:4.)  Dr. Lombardy explained that "if you were to stretch [] out" the rectal tissue, it "would make a big circle [] because there [are] folds of skin where they fold in on one another so that there [are] parts that are sticking up and parts that are deep within a crevice."  (T. 548:2–16.)  Dr. Lombardy further explained that smoothing means that the "folds are no longer as evident, [t]he creases are not as deep and [] not as frequent as you go around" the rectal tissue.  (T. 548:17–549:4.)  Dr. Lombardy explained that smoothing of the rectal folds "indicates that the tissues themselves have been stretched over a period of time, that the natural folds of the tissue are no longer present in that area," and is "associated with repetitive penetration."  (T. 545:11–18, 549:17–550:13.)  Dr. Lombardy also opined that some of the photographs showed that a portion of C.L.'s rectal tissue was "sticking out into the rectal vault" when it "should be actually against the [rectal] wall," indicating that C.L.'s rectal tissue had "been stretched and traumatized."  (T. 549:17–550:13.)  Dr. Lombardy explained that the findings could result from chronic constipation, but C.L. had no history of chronic constipation.  (T. 555:21–556:5.)  Dr. Lombardy concluded that the "findings [were] consistent with sexual assault over an extended period of time."  (T. 555:15–20.)

On cross-examination, Dr. Lombardy explained that she reached her conclusion that the findings were consistent with sexual assault and not chronic constipation because she spoke with DeLopez, who told her that C.L. never suffered from chronic constipation, and nothing in his medical history documented any past chronic constipation.  (T. 557:1–559:7.)  Petitioner's

counsel highlighted that prior to examining C.L., Dr. Lombardy did not have knowledge of the triage assessment that was taken at Nassau County Medical Center when C.L. went to visit Dr. Herrera. (T. 560:3–563:25.) Dr. Lombardy restated that while her findings indicated repetitive penetration, she was unable to conclude whether the penetration was conducted with a penis or some other object. (T. 566:1–568:18.) Dr. Lombardy explained that she did not find any scars, fissures or bleeding in C.L.'s rectum during her examination, but given the speed with which the rectum heals, a lack of scars, fissures or bleeding is inconclusive. (T. 570:7–22, 577:1–578:23.) Dr. Lombardy also explained that she could not determine the date at which the penetration occurred. (T. 572:21–573:2.) Dr. Lombardy further explained that her findings are consistent with repetitive penetration, meaning that penetration occurred on ten to one-hundred separate occasions. (T. 575:6–577:23.) Dr. Lombardy stated that smoothing of the rectal tissue may be a result of a biological disorder and not penetration, but C.L. lacked the indicators and medical history of any such disorders. (T. 586:9–588:10.)

### iii. Dr. Ajl testimony

Dr. Ajl testified for the defense to rebut Dr. Lombardy's testimony. On direct examination, Dr. Ajl testified that he is a licensed pediatrician, and at the time of trial, had been practicing for approximately thirty years. (T. 1068:5–13.) He was the medical director of the Jane Barker Child Advocacy Center in Brooklyn, New York, which focused on treating and investigating cases of sexual abuse against children. (T. 1069:1–11.)

Dr. Ajl reviewed the medical reports related to the case, examined the photographs taken by Dr. Lombardy with the colposcope and read Dr. Lombardy's testimony. (T. 1077:2–14.) Dr. Ajl opined that the medical evidence was insufficient to establish that C.L. had been anally penetrated. (T. 1080:13–24.) Dr. Ajl explained that:

the "smoothing of the [rectal tissue] and flattening of the [rectal tissue] and the dilatation of the anus, were findings on which the conclusion was based that there was chronic penetration. The current state of the scientific understanding of those findings is that those findings are not findings which are diagnostic, . . . for children who were anally penetrated. They are findings which could be normal findings, they are findings which could result from irritation or unspecific infection. They are not findings which are, as I said, which are accepted by the medical child abuse community and substantiated by scientific literature to be findings that are diagnostic of chronic penetration.

(T. 1082:1–15.) On cross-examination, Dr. Ajl stated that he could not opine that C.L. had not been sexually abused. (T. 1084:7–8, 1093:13–16.) The assistant district attorney ("ADA") asked Dr. Ajl if there are cases where a child has been sexually abused, but there is no medical evidence showing the abuse. (T. 1087:5–7.) Dr. Ajl agreed that such cases exist. (T. 1087:8.) Dr. Ajl also admitted that smoothing of the folds of the rectal tissue may indicate that anal penetration has occurred. (T. 1089:25–1090:4.) The ADA highlighted that Dr. Ajl did not examine or speak with C.L. and that his opinions were based only on reviewing the documents and testimony. (T. 1092:8–18.)

### iv. Dr. Lombardy's rebuttal testimony

Because Dr. Ajl opined that Dr. Lombardy's findings were not indicative of anal penetration, the Trial Court allowed Dr. Lombardy to explain why she disagreed with Dr. Ajl's opinion. Dr. Lombardy testified that:

the smoothing in and of itself is not diagnostic; no finding in sexual abuse is. Very few findings actually, I should say, are diagnostic. Diagnostic is something like, you come in, you're in an accident, you come into the hospital. You've got a bone sticking out of your arm. . . . [If] [i]t's not sticking out of your arm. We do an x-ray. That's diagnostic. That's very clear cut. Most things in medicine are not clear-cut like that. But what this child had was more than smoothing, which is very suspicious for child abuse. He had smoothing with easy dilatation with an asymmetry to different aspects of the rectum, which is usually symmetrical on any side. Whether you look from front to back or side to side, there is always

symmetry there. And he had protrusion of the rectal tissues from the wall of the rectum into the rectal vault. That's four aspects of very suspicious findings in one patient. That is all I personally need to make that, with a disclosure of having been penetrated rectally. That's what I need, what I feel any physician would need, to make a diagnosis of sexual abuse.

(T. 1234:19–1235:18.)

### v. Dr. Herrera testimony

On direct examination, Dr. Herrera testified that he is a licensed physician, specializing in pediatrics, and at the time, owned a private pediatric practice in Freeport, New York. (T. 602:10–604:3.) C.L. became a patient of his practice in February of 2004. (T. 605:5–10.) On July 1, 2005, C.L.'s parents brought him in for a visit because they believed that "a penis was inserted in C.L.'s rectum." (T. 607:6–610:5.) When C.L. spoke with Dr. Herrera, he explained how the sexual abuse had occurred. (T. 610:10–611:5.) Dr. Herrera then visually examined C.L. to determine whether he had signs of sexual abuse, but found none. (T. 611:10–11.) Dr. Herrera explained that his examination was inconclusive because he did not have a colposcope, which is necessary to determine whether there are signs of sexual abuse. (T. 611:12–612:9.) Given the nature of the reason for C.L.'s visit, Dr. Herrera recommended that C.L.'s parents take him to an emergency room for a more thorough examination and he called the police as well as ACS. (T. 612:19–613:22.)

On cross-examination, Petitioner's counsel asked Dr. Herrera if he would agree that appropriate medical protocol in a case of suspected sexual abuse of a child requires a physician to interview the child outside of the parents' presence. (T. 616:13–25.) Dr. Herrera disagreed. (T. 616:25.) Petitioner's counsel highlighted that Dr. Herrera's examination revealed no signs of sexual abuse. (T. 618:16–619:18, 624:12–15.) Dr. Herrera explained that even though the examination revealed no signs of sexual abuse, he called the police and recommended further

evaluation because his examination was insufficient to determine conclusively whether C.L. had been sexually abused.  (T. 623:15–624:23.)

### vi.  Detective Trujillo testimony

Before Detective Trujillo's direct examination, the ADA moved *in limine* to exclude Petitioner's counsel from questioning Detective Trujillo about prior allegations accusing him of coercing confessions.  (T. 639:8–640:13.)  The Trial Court denied the motion and stated that it would address the issue if it arose.  (T. 640:14–17.)

On direct examination, Detective Trujillo testified that he had been employed with the NCPD for over twenty years, eleven of which were as a detective.  (T. 642:15–22.)  At the time, he was assigned to the Special Victims Squad, which consisted of "a group of detectives that investigate cases of a sexual nature."  (T. 642:23–643:5.)  Within the Special Victims Squad, there was a subgroup of detectives called the Child Abuse Section that specifically investigated alleged sexual offenses against children under the age of thirteen and Detective Trujillo was a member of that subgroup.  (T. 643:2–20, 646:7–10.)  He had specialized training in investigating alleged sexual offenses against children and a certification for interpreting and translating Spanish to English.  (T. 644:1–645:1, 651:8–24.)

The NCPD assigned Petitioner's investigation to Detective Barbieri and assigned Detective Trujillo to assist her because she did not speak Spanish and was not a member of the Child Abuse Section.  (T. 646:4–6, 648:4–8.)  After Detective Trujillo learned that the case involved allegations of sexual abuse of C.L., he made arrangements to interview C.L.  (T. 646:11–647:11.)  Detective Trujillo interviewed C.L. on July 20, 2005, and DeLopez was present during the interview.  (T. 650:19–25, 652:1–13.)  C.L. told Detective Trujillo the specific circumstances surrounding the alleged sexual abuse and how it occurred.  (T. 655:11–656:14.)  Detective Trujillo also spoke to DeLopez, who provided him with all the information she had

concerning the allegations.  (T. 653:8–654:13.)  Based on his conversations with C.L. and DeLopez, Detective Trujillo decided to arrest Petitioner.  (T. 659:13–19.)

On July 21, 2005 at approximately 9:40 PM, Detectives Trujillo and Barbieri brought Petitioner to the police station for questioning.  (T. 659:20–663:24.)  Detective Trujillo sat at his desk in the detectives' office, Petitioner sat across from him, unrestrained, Detective Barbieri was a few feet away at her desk and another detective that was not involved in Petitioner's investigation was approximately ten feet away at his desk.  (T. 665:15–667:15.)  Because Detective Trujillo and Petitioner were conversing in Spanish, Detective Barbieri did not participate in the questioning.  (T. 668:19–669:6.)

At the outset of the questioning, Detective Trujillo read Petitioner his *Miranda* rights from a police form.  (T. 669:7–671:10, 675:9–676:10.)  Petitioner acknowledged that he understood his *Miranda* rights by signing the form and agreed to participate in the questioning without an attorney.  (T. 675:9–677:10.)  Detective Trujillo told Petitioner that he wanted to speak with him about the investigation, to which Petitioner said that "the child was lying [and] he didn't know what the child was talking about."  (T. 677:8–14.)  Detective Trujillo informed Petitioner that "the child was examined by a specialist" who found that there was "evidence of repetitive penetration of the child's anus."  (T. 677:21–24.)  Petitioner denied that such evidence existed.  (T. 677:25–678:2.)  Detective Trujillo told Petitioner that the NCPD had crime-scene investigators who can take an impression of Petitioner's penis and compare it to evidence obtained from C.L.'s anus, even though no such impression or comparison could be performed.  (T. 680:3–681:4.)  In response, Petitioner said that he had "made a mistake."  (T. 681:5–7.)  Detective Trujillo asked Petitioner how many times he had anally penetrated C.L. and Petitioner said only once.  (T. 681:12–13.)  Detective Trujillo explained that the medical evidence showed

"that there was repetitive penetration . . . , that this activity had occurred many times."
(T. 681:13-16.)  Petitioner stated that it occurred three times.  (T. 681:20–23.)  After Detective
Trujillo asked where the events occurred, Petitioner said that they occurred on a tan-colored chair
in his bedroom.  (T. 681:24–682:5.)

Detective Trujillo wanted to get Petitioner's admissions in writing; he asked Petitioner to
explain how the sexual abuse occurred and typed Petitioner's statements as he made them.
(T. 684:7–19.)  Once the typewritten confession was complete, Detective Trujillo read the
confession to Petitioner and asked Petitioner if he wanted to make any changes; Petitioner did
not request any changes.  (T. 682:20–683:2.)  Detective Trujillo then printed the confession and
told Petitioner to read it.  (T. 683:3–4.)  Petitioner read the first few lines aloud and then
Detective Trujillo told Petitioner to read the remainder of the confession to himself.  (T. 683:4–
11.)  After Petitioner finished reading the confession, Detective Trujillo asked Petitioner if it was
accurate and Petitioner said it was.  (T. 683:12–14.)  Detective Trujillo then had Petitioner sign
the bottom of each page of the confession.  (T. 683:14–16.)  After Petitioner signed the
confession, he was arrested and processed.  (T. 696:6–11.)

The Trial Court admitted into evidence both the original typewritten confession, which
was in Spanish, and an English translation of the confession.  (T. 687:9–689:12, 691:25–692:8.)
Detective Trujillo read the English translation of the confession into the record.  (T. 692:18–
695:2.)  Detective Trujillo testified that he did not touch, yell, threaten, or promise anything to
Petitioner during the course of the questioning and recording of the confession.  (T. 695:13–25.)

Before cross-examination, the Trial Court raised the issue of whether Petitioner's counsel
could cross-examine Detective Trujillo regarding prior allegations that Detective Trujillo had
coerced false confessions.  (T. 699:19–700:17.)  Petitioner's counsel wanted to question

Detective Trujillo on the circumstances that resulted in Petitioner's allegedly false confession and requested that the State provide him with any materials related to previous allegation against Detective Trujillo for coercing or falsifying confessions pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963). (T. 701:3–20, 704:4–23.) Petitioner's counsel argued that the information was relevant to Petitioner's case because it could support the defense's theory that Petitioner's confession was false or coerced. (T. 701:21–702:23.) The Trial Court ruled that Petitioner's counsel was limited to asking Detective Trujillo whether he "knowingly [took] a false confession." (T. 700:18–22, 703:23–704:3, 706:3–6.)

On cross-examination, Detective Trujillo testified that when he interviewed C.L., he did not take any notes of what occurred during the interview. (T. 720:22–24, 723:10–13.) Petitioner's counsel then focused on the circumstances surrounding Detective Trujillo's questioning of Petitioner. (T. 723:23–754:20.) Detective Trujillo testified that Sosa was not allowed to sit in on the questioning because Petitioner was in custody and it was safer to keep Sosa in a separate room. (T. 725:13–726:8.) Without Sosa in the detectives' office, Detective Trujillo and Petitioner were the only people who spoke Spanish. (T. 726:9–14.) Petitioner's counsel highlighted that the questioning was not recorded on audio or video. (T. 765:17–21.) Detective Trujillo admitted that he did not read the medical report; he only knew what was in the medical report because Detective Barbieri told him. (T. 731:1–732:3.) The medical report also did not specify that C.L. was penetrated with a penis; Detective Trujillo learned that from C.L. (T. 732:4–19.) Regarding the statement Detective Trujillo made to Petitioner about the crime-scene investigators taking an impression of his penis for comparison to the medical evidence from C.L.'s anus, Petitioner's counsel highlighted that no such impression or comparison could be performed and therefore Detective Trujillo's statement was untrue. (T. 757:1–764:1, 851:3–

852:6.)  Petitioner's counsel noted the litany of questions Detective Trujillo did not ask Petitioner

during the questioning, such as the specific dates and times of when the alleged sexual abuse

occurred, how C.L. reacted and whether Petitioner had ever sexually abused N.L.  (T. 768:7–

771:23.)  Petitioner's counsel asked Detective Trujillo if he had ever framed a suspect by

coercing or falsifying confession.  (T. 755:16–18, 860:24–860:6.)  Detective Trujillo said that he

had not.  (T. 755:19; 861:8–10.)

### vii.  C.L. testimony

At the time of trial, C.L. was six years old.  (T. 876:17–18.)  Before deciding whether to

allow C.L. to testify, the Trial Court conducted an inquiry to determine whether C.L. understood

the importance of testifying under oath.  (T. 825:2–829:10.)  The Trial Court heard argument

from counsel as to whether C.L. could testify under oath, without oath, or not at all, after which

the Trial Court ruled that C.L. could testify as an unsworn witness.  (T. 829:11–838:1.)

On direct examination, C.L. testified that Petitioner had done "bad things" to C.L.,

specifically, Petitioner "put his dick in [C.L.'s] ass."  (T. 879:10–17.)  The sexual abuse took

place in Petitioner's room on "a chair that is brown" and "there was no one else there."

(T. 879:18–22.)  The sexual abuse occurred "many times."  (T. 879:23–24.)  On cross-

examination, C.L. again testified that the sexual abuse always occurred in Petitioner's bedroom

"on a brown chair" and had occurred "many times."  (T. 882:20–883:6.)  C.L. testified that the

sexual abuse always occurred at night.  (T. 883:7–12.)  He could not recall the first or the last

time the sexual abuse occurred.  (T. 884:16–24.)  At times, N.L. and Rivas were in the home

when C.L. was being sexually abused in Petitioner's bedroom; N.L. was watching television and

Rivas was asleep in his bedroom.  (T. 889:17–890:2, 893:21–894:2.)  To get C.L. alone,

Petitioner would ask C.L. to come upstairs to Petitioner's bedroom.  (T. 896:3–9.)  After

Petitioner sexually abused C.L., he told C.L. "[t]o not tell [his] mom or [his] dad."  (T. 886:21–25.)  On redirect examination, C.L. identified Petitioner.  (T. 897:7–900:6.)

### viii.  DeLopez testimony

On direct examination, DeLopez testified that she came to know Petitioner in Guatemala because Petitioner and her husband were friends.  (T. 908:1–10.)  In 2005, Petitioner was living with DeLopez and her family.  (T. 908:18–25.)  Petitioner could read Spanish, as evidenced by the occasions when he read aloud from the Bible in church in Guatemala and read letters addressed to him or Sosa that came to DeLopez's home.  (T. 926:19–927:8.)

In June of 2005, DeLopez worked part-time at a ninety-nine cents store.  (T. 909:2–8.)  Her schedule fluctuated — sometimes she worked from 3:30 PM to 7:30 PM and other times she worked from 9:00 AM to 3:00 PM.  (T. 909:12–23.)  When she and her husband were at work and her children were out of school, either Petitioner, Sosa or DeLopez's brother would watch the children.  (T. 909:24–910:5.)  On occasion, Petitioner took the children to the park to play and he often played with the children in the living room of DeLopez's home.  (T. 910:19–911:2.)  While she and her husband were at work, there were times when Petitioner would be home alone with the children for the evening or until Rivas came home.  (T. 911:15–912:24.)

On the evening of June 30, 2005, DeLopez's brother, Cesare, was playing with C.L. in the living room of the home when Rivas called for her because C.L. had an erect penis.  (T. 913:2–914:6, 965:10–12.)  When DeLopez asked C.L. why his penis was erect, N.L. answered and stated that C.L. told N.L something related to C.L.'s erection.  (T. 914:19–915:23.)  Based on what N.L. told DeLopez, she asked C.L. why he said what he said to N.L.  (T. 915:24–916:2.)  C.L. hesitated, but eventually answered and said that "he was being abused sexually."  (T. 916:2–917:21.)  C.L. hesitated before answering because his abuser told him not to tell his parents.  (T. 917:18–21.)

When DeLopez picked Lopez up from work, she informed him of what C.L. had told her. (T. 918:8–14.)  She and Lopez went directly home.  (T. 918:15–16.)  Lopez expressed that he could not believe Petitioner had sexually abused C.L. and then confronted Petitioner about the alleged sexual abuse.  (T. 918:17–919:7.)  With C.L. accompanying him, Lopez went upstairs to talk to Petitioner; DeLopez stayed downstairs.  (T. 919:8–15.)  Lopez instructed C.L. to tell Petitioner what C.L. had said to DeLopez and C.L. said "[y]ou put me on the chair and you put your [dick] in my ass" and "told me not to tell my mom."  (T. 919:17–921:21.)  After Petitioner denied the accusation, C.L. reasserted that Petitioner had indeed done so, adding that Petitioner "would place [him] onto the chair."  (T. 922:5–8.)  DeLopez stated that there was a "yellowish color" chair in Petitioner's bedroom.  (T. 922:9–12.)  After the conversation ended, DeLopez and Lopez decided that they should take C.L. to the doctor.  (T. 923:3–8.)

The following day, July 1, 2005, C.L.'s parents took him to the see Dr. Herrera. (T. 923:9–16.)  DeLopez explained the reason for C.L.'s visit to Dr. Herrera.  (T. 923:17–18.) Dr. Herrera also conversed with C.L. directly.  (T. 923:24–924:11.)  Dr. Herrera subsequently called the police, and a few days later C.L. went to another doctor to be examined.  (T. 924:17–20, 926:1–11.)  To her knowledge, C.L. never suffered from chronic constipation.  (T. 928:24–925:11.)

On cross-examination, DeLopez testified that prior to the time of the events at issue, C.L. had accused Petitioner of scratching him, but the alleged scratch was actually paint.  (T. 932:7–16.)  DeLopez testified that in June of 2005, Petitioner would look after the children whenever he was not at work.  (T. 936:9–14.)  Petitioner's counsel impeached DeLopez with her grand jury testimony, during which she testified that Sosa looked after the children when DeLopez and Lopez were both working.  (T. 937:12–24.)  Between May and June of 2005, Petitioner met the

children at their school bus stop and walked them home approximately five or six times. (T. 985:9–17.) Petitioner was alone with the children occasionally and once or twice he was alone with them all day. (T. 951:22–952:2, 987:19–988:4.) Petitioner's counsel again impeached DeLopez with her grand jury testimony, highlighting that she testified that she "would never leave [her children] alone, . . . [t]here was always someone there." (T. 958:24–962:12.) In response, DeLopez explained that she never left the children by themselves, and therefore, at times, she would leave them with Petitioner. (T. 962:13–14.)

Regarding the event when DeLopez's brother was playing with C.L. in the living room and noticed his penis was erect, DeLopez testified that when she asked C.L. why his penis was erect, N.L. stated that "[C.L.'s] penis gets that way when he's with [Petitioner]." (T. 968:2–9.) Thereafter, when DeLopez questioned C.L. about N.L.'s statements, she threatened to hit C.L. with a belt if he did not explain the basis for his statements to N.L. (T. 970:18–971:10.) In response to DeLopez's threat, C.L. told her that Petitioner had been sexually abusing him. (T. 971:8–972:1.)

### ix.  Sosa testimony

On direct examination, Sosa testified that she began dating Petitioner in approximately 1998 and they have a daughter together, who, at the time, was seven months old. (T. 1021:1–9.) Petitioner could not read and he only knew how to write his name. (T. 1038:23–1039:4.) In 2003, she immigrated to the United States and moved into the Lopez family's home, where she and Petitioner shared a bedroom. (T. 1021:14–24, 1028:5–7.)

In June of 2005, she worked at deli across the street from the Lopez family home. (T. 1031:21–1032:7.) She worked Monday through Friday from 7:00 AM to 4:00 PM. (T. 1031:2–1032:1.) During the month of June of 2005, Petitioner worked seven days a week from 6:30 AM to approximately 7:00 PM. (T. 1032:8–1033:16.) If DeLopez and Lopez were

not home, then one of their family members or family friends would watch the children. (T. 1034:21–25.) Sosa only watched the children one time between May and June of 2005, and did not recall a single instance when Petitioner was home alone with the children. (T. 1037:153–17, 1053:18–21.) On June 30, 2005, Lopez knocked on the door of Sosa's shared room with Petitioner and told Petitioner that DeLopez said that Petitioner was sexually abusing C.L. (T. 1044:3–16.) Petitioner asked Lopez to clarify what he meant, but Lopez did not answer. (T. 1044:16–17.) Petitioner then asked C.L. what he meant when he said Petitioner was sexually abusing him, but C.L. did not answer. (T. 1044:24–1045:2.) Sosa has never known Petitioner to do anything sexual with a child. (T. 1051:9–13.)

On cross-examination, Sosa testified that in May and June of 2005, Petitioner worked seven days a week from 7:00 AM to 7:00 PM, he only took one day off, and he never played with the children. (T. 1102:2–1103:9, 1116:18–1117:2.)

### x. Petitioner's testimony

Petitioner testified on direct examination that he was born in Guatemala, where he received only three weeks of schooling when he was seven years old. (T. 1122:3–13.) When he attended church in Guatemala, he never read aloud from the Bible because he could not read. (T. 1123:4–12.) In 2003, at nineteen years old, he immigrated to the United States and moved into the Lopez family home. (T. 1123:1–3, 1123:13–24.) After arriving in the United States he obtained two jobs: the first was in construction, working Monday to Friday from 6:30 AM to approximately 5:00 PM; the second job was washing vehicles, working on Saturdays and Sundays.[7] (T. 1124:12–22, 1126:1–5.) In May and June of 2005, he never missed a day of work.

---

[7] Petitioner did not testify to the hours he worked on Saturdays and Sundays. (*See* T. 1122:3–1166:7.)

(T. 1126:14–18.)  Whenever he arrived home from work, the children were there with either their mother or one of their uncles.  (T. 1135:6–12.)

On June 30, 2005, Petitioner and Sosa were asleep in their bedroom when Lopez knocked on the door.  (T. 1135:13–18.)  Sosa answered the door and Lopez said that he needed to talk to Petitioner.  (T. 1135:18–25.)  Lopez asked Petitioner if he wanted Sosa to hear the conversation and Petitioner replied that he had nothing to hide from her.  (T. 1136:1–4.)  Lopez then told Petitioner that C.L. told DeLopez something that Petitioner did to him.  (T. 1136:5–8.)  Petitioner asked C.L. what Petitioner had done and C.L. said, "[y]ou did something bad to me." (T. 1136:15–17.)  Petitioner asked C.L. what the bad thing was, but C.L. did not respond. (T. 1136:18–20.)  Petitioner then asked Lopez what the bad thing was and why he would believe C.L. if C.L. could not explain what the bad thing was.  (T. 1136:21–1137:5.)  Petitioner first testified that Lopez did not explain what the bad thing was and told Petitioner that if "[y]ou say nothing happened, . . . we will leave it like that."  (T. 1137:6–13.)  Later in Petitioner's testimony, he stated that Lopez told him that C.L. told DeLopez what Petitioner had done after DeLopez questioned C.L. for having an erection when he was playing with his uncle. (T. 1138:15–20.)  Petitioner responded, "[w]hat does it have to do that I told him something to get [his] penis erected?  This makes no sense."  (T. 1140:2–4.)  Lopez then said that he did not "believe any of this, but let's leave it like that."  (T. 1140:6–7.)

On July 21, 2005, Detective Trujillo approached Petitioner, asked Petitioner his name and informed Petitioner that he wanted to speak to Petitioner at his office.  (T. 1142:14–1143:15.) Petitioner agreed to speak with Detective Trujillo at his office and asked if Sosa could come along.  (T. 1143:16–17.)  Detective Trujillo said she could.  (T. 1143:18.)  When they arrived, Detective Trujillo and Petitioner went into the detectives' office and Sosa waited in another area.

(T. 1144:3–6.)  Detective Barbieri and another detective were in the room during the questioning.  (T. 1159:19–1160:4.)  Detective Trujillo informed Petitioner that he wanted to speak with him about his investigation regarding something that occurred between Petitioner and C.L.  (T. 1144:7–24.)  Petitioner stated that he was unaware of the nature of the accusations.  (T. 1144:25–1445:5.)  Detective Trujillo told Petitioner that C.L. had accused Petitioner of sexually abusing him.  (T. 1145:6–7.)  After Petitioner denied that he ever sexually abused C.L., Detective Trujillo told Petitioner that he had a medical report showing that C.L. had been sexually abused.  (T. 1145:10–12.)

Petitioner testified that Detective Trujillo did not read Petitioner his *Miranda* rights from the form, but he did sign the form.  (T. 1148:9–1149:5.)  Because Petitioner informed Detective Trujillo that he could not read, Detective Trujillo read Petitioner the typewritten confession.  (T. 1147:14–19, 1160:13–15.)  Detective Trujillo read Petitioner the demographic information contained in the statement as well as Petitioner's living arrangements and the fact that C.L. lived in the home.  (T. 1151:8–1152:2, 1153:3–23.)  Detective Trujillo did not read Petitioner the statements saying that Petitioner waived his *Miranda* rights, the statements concerning the conversation with Lopez and the statements that Petitioner sexually abused C.L.  (T. 1152:3–1153:2, 1154:2–1155:10.)  Petitioner did not read any portion of the confession either to himself or aloud or certify that he read the confession and that it was accurate.  (T. 1150:22–1151:4, 1156:7–17.)  When Petitioner refused to sign the confession, Detective Trujillo told him that he would "take [Petitioner] to a place where they're going to put a mold on your penis and that's going to hurt you a lot[,] [a]nd that mold can even ruin your penis.  I have experience with this. There are people that [] cannot use their penis afterwards."  (T. 1157:1–23.)  After Detective Trujillo reassured Petitioner that he read Petitioner the entire confession, Petitioner signed it.

(T. 1157:25–1158:10.)  During the questioning, Detective Trujillo was friendly toward Petitioner. (T. 1158:16–17, 1159:6–8.)  Petitioner testified that he had never performed any sexual acts with C.L. and he never touched or hurt C.L. in anyway.  (T. 1141:8–13.)

On cross-examination, Petitioner testified that as a part of his duties washing vehicles, he had to drive a car.  (T. 1171:9–11.)  Petitioner had a driver's license from Michigan, but only took the road test to obtain it, and there was an interpreter in the car when he took the road test. (T. 1171:23–1174:21, 1175:13–1176:13.)  Petitioner did not take a written test and he obeyed the rules of the road even though he could not read the road signs.  (T. 1171:23–1174:21, 1175:13– 1176:13.)  Petitioner had a bank account to deposit the checks he received from his employer and a tax identification number, but the employees at each institution filled out the forms for him. (T. 1192:13–1194:6, 1199:7–24.)  Petitioner initially testified that he never played with the children either in front of the Lopez family's home or at the park.  (T. 1180:2–11.)  He later testified that he would sometimes play with the children in front of the Lopez family home, but that was prior to June of 2005.  (T. 1205:20–1206:17.)

The ADA highlighted that Detective Trujillo was "polite," "spoke to [Petitioner] like a gentleman" and never placed Petitioner in handcuffs.  (T. 1208:20–1209:8.)  The ADA also highlighted that Petitioner provided Detective Trujillo with the background and demographic information in the confession.  (T. 1210:19–211:14.)  Petitioner denied that the police ever asked him if he had any injuries or needed medical attention after his questioning, even though he signed a form saying that he did not have any injuries or need any medical treatment. (T. 1165:20–1166:7.)

### xi.  Verdict and Sentencing

The jury found Petitioner guilty of committing a criminal sexual act in the first degree and sexual abuse in the first degree.  (T. 1490:17–24.)  The Trial Court sentenced Petitioner to

concurrent terms of imprisonment of twenty-five years on the criminal sexual act conviction and seven years on the sexual abuse conviction.  (S. 70:22–71:21.)

### c.    Direct appeals

On May 23, 2008, Petitioner appealed the convictions to the Appellate Division, arguing that his convictions were against the weight of the evidence, his confession was coerced, C.L. should not have been allowed to testify, the Trial Court improperly limited the witness examinations, the jury charge was erroneous and incomplete, the Trial Court erred by admitting hearsay evidence and his arrest was not supported by probable cause.  (Pet'r App. Div. Brief 1–105, Docket Entry No. 6-2.)  The Appellate Division affirmed the convictions.  *Castellanos*, 884 N.Y.S.2d at 127–28.  Petitioner sought leave to appeal with the Court of Appeals, which leave was denied.  *Castellanos*, 13 N.Y.3d at 858.

### d.    Section 440 motion

On June 18, 2013, Petitioner filed his 440 Motion, arguing that the State committed a *Brady* violation by failing to disclose evidence that Petitioner's trial counsel could have used to cross-examine Detective Trujillo and convince the jury that Detective Trujillo coerced or falsified Petitioner's confession.  (SR 1–49.)  Both Petitioner and the State submitted multiple documents related to the alleged *Brady* material.  The documents consisted of: court documents related to the State's prosecution of Jarol Escobar, where Escobar alleged that Detective Trujillo and another officer beat him in order to coerce him to confess to a crime he did not commit, (SR 52–61); court documents from Escobar's civil suit against the NCPD and Detective Trujillo, (SR 207–11, 638–56, 717–66); court documents related to the State's prosecution of Jose Martinez, where Detective Trujillo interrogated and obtained a confession from Martinez, but another individual later confessed to the crime, (SR 163–69, 201–02, 252–99, 324–26, 346–48, 638, 767–70); court documents from Martinez's civil suit against the NCPD and, among others,

Detective Trujillo for coercing Martinez into signing a false confession, (SR 171–79, 300–23, 327–45, 675–709); court documents from a civil suit brought by Santos Castillo against the NCPD and Detective Trujillo, where Castillo alleged that Detective Trujillo and another officer beat him in order to coerce him to confess to a crime he did not commit, (SR 212–19, 657–72, 710–16); and Detective Trujillo's internal affairs tracking sheet from the NCPD, showing that between 1992 and 2003, internal affairs investigated Detective Trujillo on six different occasions, (SR 50–51).[8] In addition, the State submitted documents from Detective Trujillo's personnel file for *in camera* review by the 440 Court. (SR 86, 89, 775.)

The 440 Court denied Petitioner's motion. (SR 776–79.) The 440 Court found that the documents related to Martinez were not *Brady* material because Petitioner's counsel represented Martinez in his criminal action and therefore the information was not undisclosed. (SR 778.) In addition, the 440 Court found that because Petitioner's counsel represented Martinez in his criminal action, he possessed the information to challenge on direct appeal the State's failure to disclose the Martinez materials. (SR 778.) The 440 Court also found that the alleged *Brady* material was irrelevant to Petitioner's case because he did not allege that Detective Trujillo physically mistreated him during the questioning to obtain the confession. (SR 778–79.) Finally, the 440 Court found that Petitioner's *Brady* claim failed because "there was overwhelming evidence of guilt against [Petitioner]," namely "the medical evidence, unsworn testimony of the child victim, and [Petitioner's] statements against interest made to the child's

---

[8] The parties also submitted to the 440 Court articles and book excerpts on the prevalence, nature and use of false and coerced confessions. Because none of the articles or book excerpts relate to Detective Trujillo or the questioning practices of the NCPD, the materials are not relevant to this Memorandum and Order.

parents." (SR 779.) Petitioner sought leave to appeal the 440 Court's decision, which the Appellate Division denied. (SR 780–803, 814.)

### e. Habeas petition

On November 3, 2010, Petitioner filed a petition for a writ of habeas corpus with the Court, alleging that his conviction resulted from violations of his Sixth Amendment right to confrontation based on the Trial Court limiting witness examinations, Fourteenth Amendment right to due process based on the use of a coerced confession, Fourth Amendment right to be free from an unlawful seizure based on an arrest that lacked probable cause, and Eighth Amendment right to be free from cruel and unusual punishment based on being held for a crime he did not commit. (Pet. 1–15.) Petitioner filed a motion to amend the petition and requested that the Court stay the petition to allow Petitioner to file the 440 Motion with regard to the *Brady* claim. (Pet'r Mot. to Amend and Stay Pet.) The Court granted the motion. *Castellanos*, 2013 WL 3777126, at *1–4. After the 440 Court issued its decision and the Appellate Division denied leave to appeal, Petitioner filed an amended petition adding the *Brady* claim. (Am. Pet.) In the November 2015 Order the Court denied the petition as to all claims except the *Brady* claim because, while the Court found that the withheld documents were favorable to Petitioner and suppressed by the State, the Court lacked the information it needed to determine whether Petitioner was prejudiced by the alleged *Brady* violations. *Castellanos*, 2015 WL 7312908, at *1–10.

## II. Discussion

### a. Standard of review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A petitioner is required to show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Kernan v. Hinojosa*, 578 U.S. ---, ---, 136 S. Ct. 1603, 1604 (May 16, 2016) (per curiam); *Hittson v. Chatman*, 576 U.S. ---, ---, 135 S. Ct. 2126, 2126 (Jun. 15, 2015); *Johnson v. Williams*, 568 U.S. ---, ---, 133 S. Ct. 1088, 1091 (Feb. 20, 2013). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001)); *see also Kernan*, 578 U.S. ---, 136 S. Ct. at 1606; *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Under the 2254(d) standards, a state court's decision must stand as long as "fairminded jurists could disagree on the correctness of the . . . decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and internal quotation marks omitted).

For the purposes of federal habeas review, "clearly established law" is defined as the "the holdings, as opposed to dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Glebe v. Frost*, 547 U.S. ---, ---, 135 S. Ct. 429, 431 (Nov. 17, 2014) (per curiam) ("As we have repeatedly emphasized, however, circuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court [under] § 2254(d)(1)."); *Parker v. Matthews*, 567 U.S. ---, ---, 132 S. Ct. 2148, 2155 (June 11, 2012) (per curiam) ("The Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the [state] [c]ourt's decision."). A state court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision (1) is contrary to Supreme Court precedent on a question

of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412–13. In order to establish that a state court decision is an unreasonable application, the state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The decision must be "objectively unreasonable." *Id.* In addition, factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### b. *Brady* claim

Petitioner argues that the State violated *Brady* when it withheld documents regarding allegations that Detective Trujillo had coerced suspects into signing false confessions because, had Petitioner's trial counsel possessed the documents, he could have impeached Detective Trujillo, bolstered his argument that Detective Trujillo coerced or falsified Petitioner's confession and likely convinced the jury to find him not guilty. (Pet'r Suppl. Mem. of Law in Supp. of Am. Pet. ("Pet'r Mem.") 15–53, Docket Entry No. 20-1.) Petitioner argues that because he could have utilized the withheld documents to challenge Detective Trujillo's taking of the confession, the 440 Court's decision finding that he failed to establish prejudice was contrary to and an unreasonable application of clearly established federal law. (*Id.*) Respondent argues that Petitioner fails to show prejudice under *Brady* because the documents are not relevant and likely would have been inadmissible impeachment material, Petitioner testified that Detective Trujillo did not physically mistreat him during the questioning and the confession was only one piece of evidence that supported the conviction. (Resp. Suppl. Mem. of Law in Opp'n to Am. Pet.

("Resp. Mem.") 10–35, Docket Entry No. 21.) Respondent argues that, as a result, the 440

Court's decision was reasonable and the Court should dismiss the amended petition.[9] (*Id.*)

In a criminal prosecution, the government has a constitutional obligation to disclose

material, exculpatory evidence to the defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Under *Brady*, the government has a constitutional duty to disclose favorable evidence to the

accused where such evidence is "material either to guilt or to punishment." *Strickler v. Greene*,

527 U.S. 263, 281 (1999) (quoting *Brady*, 373 U.S. at 87). A *Brady* violation consists of three

factors: (1) "[t]he evidence at issue must be favorable to the accused, either because it is

exculpatory or impeaching"; (2) "that evidence must have been suppressed by the State, either

willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler*, 527 U.S. at 281–82.

Evidence is material and prejudice results if "there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been

different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" of a

different result exists where the nondisclosure "undermines confidence in the outcome of the

trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "A reasonable probability does not mean that

the defendant would more likely than not have received a different verdict with the evidence,

---

[9] The Court notes that the 440 Court also held that the Petitioner's *Brady* claim was procedurally barred because Petitioner's counsel possessed information about the Martinez materials prior to Petitioner's direct appeal and therefore "should have [] brought [the *Brady* claim] before the Appellate Division." (SR 778.) However, because Respondents fail to raise procedural default, the Court finds that procedural default has been waived. *See Cone v. Bell*, 556 U.S. 449, 486 n.6 (2009) (Alito, J. concurring) ("Unlike exhaustion, procedural default may be waived if it is not raised as a defense"); *Tavarez v. Larkin*, 814 F.3d 644, 648 n.2 (2d Cir. 2016) (holding that "on federal habeas review, procedural default is not a jurisdictional bar, but rather a defense that the state is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter" (alteration and internal quotation marks omitted) (quoting *Trest v. Cain*, 522 U.S. 87, 89 (1997))).

only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles*, 514 U.S. at 434) (internal quotation marks omitted).

Because the Court found in the November 2015 Order that the withheld documents were favorable to Petitioner and suppressed by the State, here, the Court only addresses whether the 440 Court's finding that there was no prejudice was contrary to or an unreasonable application of clearly established federal law. *See Castellanos*, 2015 WL 7312908, at *9–10. The Court first recounts the relevant documents that the State withheld and then determines whether the 440 Court's finding that there was no prejudice was unreasonable.

### i. The withheld *Brady* documents

Before the 440 Court, the parties submitted documents related to the separate criminal prosecutions of and civil suits commenced by Jarol Escobar, Santos Castillo and Jose Martinez (SR 52–61, 163–79, 201–02, 207–219, 252–345, 346–48, 638–72, 675–770); and Detective Trujillo's internal affairs tracking sheet from the NCPD dated December 29, 2003, showing that between 1992 and 2003, internal affairs investigated Detective Trujillo on six different occasions, (SR 50–51). In addition, the State submitted documents from Detective Trujillo's personnel file for *in camera* review by the 440 Court, (SR 86, 89, 775), which, in response to the November 2015 Order, the State has provided to the Court for *in camera* review.[10] *See Castellanos*, 2015 WL 7312908, at *10. The approximately 640 pages of *in camera* documents contain: the NCPD internal affairs' investigations into the separate civilian complaints made to

---

[10] The State asserts that all of the documents submitted to the Court for *in camera* review were submitted to the 440 Court. (Resp. Letter dated Dec. 3, 2015, Docket Entry No. 36.) Therefore, the Court may consider the documents in analyzing the amended petition. *See Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) (holding that habeas review "is limited to the record before the state court that adjudicated the claim on the merits").

the NCPD by Escobar, Martinez, and two other individuals; the settlement agreements from the separate civil suits brought by Castillo, Martinez and another individual against the NCPD and, among others, Detective Trujillo; and a Concise Officer History dated August 7, 2013, noting that between 1992 and 2013, eleven individuals lodged civilian complaints against Detective Trujillo.  The Court recounts the substance of the relevant portions of the documents below.

In 1998, Detective Greg Lesmeister was investigating the murder of Rigoberto Reyes, which led him to suspect Escobar of the murder based on statements from witnesses regarding the car the assailant used to flee the scene.  (IAU 73-1998 at 1–2, Docket Entry Nos. 37-1–9.) Escobar alleged that he was questioned by Detectives Lesmeister and Trujillo, during which he confessed to the murder because Detective Trujillo punched him and hit him over the head with a telephone book.  (*Id.* at 9; SR 732–41.)  Escobar also alleged that the confession contained information he did not provide, that Detective Trujillo prepared the confession in Spanish and did not allow him to read it, and that Detective Trujillo beat him until he signed it.  (SR 754–61.) The detectives denied physically mistreating Escobar.  (IAU 73-1998 at 13–14.)  Escobar was charged with gang assault in the second degree.  (*Id.* at 162.)  The charges against Escobar were dismissed after another individual confessed to the NCPD that he was responsible for the murder and that Escobar was not involved in any way.  (*Id.* at 95–98, 110, 221–22.)  Internal affairs investigated Escobar's civilian complaint against Detective Trujillo and concluded that Escobar's allegations were "unfounded."[11]  (*Id.* at 9.)  The district attorney's office also investigated

---

[11]  Internal affairs reaches one of four conclusions at the end of an investigation: "Founded – Substantial evidence exists to corroborate the allegations against an [o]fficer"; "Unfounded – Witnesses and evidence, clearly and unequivocally, establish[] that the allegation by the complainant in untrue, fabricated, or simply a distortion of the facts"; "Undetermined – Insufficient evidence is available either to prove or disprove the allegation"; and "Exonerated –

Escobar's allegations against Detective Trujillo and determined that there was insufficient evidence of criminal conduct.[12] (SR 61.)

In 2000, the NCPD arrested Castillo under the suspicion that he committed a crime.[13] (SR 657–58.) Detective Trujillo was one of the officers that participated in Castillo's interrogation. (SR 659–60.) Castillo alleged that during the course of the interrogation he "was struck and beaten about the head, face and body, his arms were twisted, and his fingers and hair were pulled by the [] [o]fficers." (SR 661.) Castillo also alleged that he "was subjected to psychological coercion, verbal abuse, racial insults and threats and was cursed at and falsely accused repeatedly." (SR 662.) Castillo filed a civil suit against, among others, the NCPD and Detective Trujillo, alleging that the officers used excessive force during the course of his interrogation. (SR 671.) The parties settled the case without an admission of guilt by defendants. (Castillo Settlement Agreement, Docket Entry No. 37-21.)

In 2001, Detective Trujillo was investigating the murder of Jose Cruz, which led him to suspect Martinez of the murder based on witness statements. (SR 261–81.) Detective Trujillo interrogated Martinez in Spanish and obtained a confession. (SR 281–86.) Detective Trujillo recorded Martinez's confession in writing in Spanish and then read the statement to Martinez. (SR 286.) The district attorney's office charged Martinez with manslaughter in the second degree. (SR 287.) The district attorney's office dropped the charges against Martinez when,

---

The incident did occur, however the actions of the [o]fficer were justified, lawful and proper." (Complaint Tracking Findings 1, Docket Entry No. 37-18.)

[12] Escobar brought a civil suit against the NCPD and Detectives Lesmeister and Trujillo, but the case was dismissed for failure to prosecute. (SR 208–11.)

[13] The record before the Court does not reveal what crime Castillo was suspected of committing or whether he was charged after he was arrested.

months later, the NCPD obtained information that another individual murdered Cruz.  (SR 295–

99, 767.)  After the charges were dismissed, Martinez filed a civil suit alleging, *inter alia*, that

Detective Trujillo coerced him into signing a false confession.  (SR 171–74.)  Martinez asserted

that during the questioning he repeatedly told Trujillo that he was innocent, but Trujillo

physically mistreated him until he signed the confession.  (SR 683–89.)  Martinez asserted that

he did not read the confession before he signed it and that it contained information that he did not

provide to Trujillo.  (SR 685, 688.)  The parties settled the case without an admission of guilt by

the defendants.  (Martinez Settlement Agreement, Docket Entry No. 37-22.)  Internal affairs

investigated Martinez's civilian complaint against Detective Trujillo and concluded that

Martinez's allegations were "undetermined."  (IAU 04-2002 at 1–27, Docket Entry Nos. 37-12–

13.)  The district attorney's office also investigated Martinez's allegations against Detective

Trujillo and found that the available evidence was insufficient to warrant criminal prosecution.

(*Id.* at 28.)

### ii.    Petitioner's trial counsel could have cross-examined Detective Trujillo about the allegations contained in the withheld documents

As a threshold matter, the Court addresses Respondent's argument that Petitioner fails to

establish prejudice because Petitioner's trial counsel could not have used the withheld documents

to question Detective Trujillo about the specific circumstances underlying the allegations that he

previously coerced false confessions from suspects in other cases.  (Resp. Mem. 17–22.)

The New York Court of Appeals recently held that it has long been established that police

officers, like any other prosecution witness, may be cross-examined about allegations of prior

bad acts in unrelated cases, even when the allegations have not been proven at a trial.  *People v.

Smith*, 27 N.Y.3d 652, 659–63 (2016).  In addition, the Court of Appeals previously held that a

defendant may obtain disclosure of, and cross-examine a police officer about, prior bad acts

contained in the officer's personnel file if the alleged prior bad acts are relevant for impeachment purposes. *See People v. Gissendanner*, 48 N.Y.2d 543, 549–50 (1979).

In *Smith*, the Court of Appeals addressed three cases in which the defendants argued that the trial courts abused their discretion by prohibiting the defendants from cross-examining police officers about specific allegations underlying federal civil suits that had been filed against the officers. *Smith*, 27 N.Y.3d at 659. The court held that "law enforcement witnesses should be treated in the same manner as any other prosecution witness for the purposes of cross-examination," meaning that a defendant may cross-examine a police officer about prior allegations that "bear on a law enforcement officer's credibility as a witness." *Id.* at 659, 661. As an example, the court cited to an earlier case where it held that the prosecution should have turned over materials concerning allegations against a detective for coercing confessions because:

> although it did not explicitly allege that the confession the same detective procured was false, the complaint described coercive tactics the same detective allegedly used to extract a confession against the Plaintiff's will, [which was] evidence [that] favored [the] defendant's false confession theory in that case.

*Id.* at 661 (alterations and internal quotation marks omitted) (citing *People v. Garrett*, 23 N.Y.3d 878, 886 (2014)). The court held that a defendant's counsel must have a good-faith basis to question an officer about relevant prior bad acts and that a federal lawsuit may provide that good-faith basis. *Id.* at 661–62. The court explained that:

> our recognition of the relevance of prior bad acts that have been alleged in court filings, but not proved at trial, is consistent with our precedent; we have previously decided that there is no prohibition against cross-examining a witness about bad acts that have never been formally proved at trial. Likewise, a police witness's prior bad act that similarly has not been proved in a criminal prosecution or other court proceeding also can be proper fodder for cross-examination. . . . [A]llegations of police misconduct do not lose their relevance to police witness's credibility simply because the

alleged prior bad acts are not regarded in all cases as criminal or
immoral.

*Id.* (citing *People v. Sorge*, 301 N.Y. 198, 201 (1950)).

While the court in *Smith* focused on a defendant's use of information contained in federal

lawsuits to cross-examine a police officer about relevant prior bad acts, in an earlier case the

Court of Appeals had held that a defendant may use information obtained from an officer's

personnel records to cross-examine an officer about relevant prior bad acts. *See Gissendanner*,

48 N.Y.2d at 549–50. The court held that "when prior bad acts allegedly contained within

disciplinary or personnel records bear peculiar relevance to the circumstances of the defendant's

case, detailed cross-examination and disclosure, usually after an in camera inspection [are]

permitted." *Id.* at 549 (citations omitted); *see also People v. Henry*, 662 N.Y.S.2d 967, 968 (App.

Div. 1997) (holding that the state is required to disclose information in an officer's personnel file

if a defendant shows that the personnel file contains materials that are relevant to guilt,

innocence or the officer's credibility); *Flores v. City of New York*, 615 N.Y.S.2d 400, 402–03

(App. Div. 1994) (holding that a plaintiff has a right to access a police officer's personnel records

as well as internal affairs investigations and civilian complaints against the officer if the plaintiff

shows that the materials contain information that is relevant to the plaintiff's case). The court

explained that a defendant's rights under the Sixth Amendment Confrontation Clause require that

"police confidentiality must always yield to the demands of a defendant in a criminal case" when

the confidential information "could very well affect the outcome of the trial." *Gissendanner*, 48

N.Y.2d at 548.

Here, Petitioner's trial counsel could have cross-examined Detective Trujillo about the

prior allegations against him for coercing or falsifying confessions because the allegations were

evidence that "favored [Petitioner's] false confession theory." *See Smith*, 27 N.Y.3d at 661. The

withheld documents contained allegations that Detective Trujillo previously coerced or falsified confessions, (*see, e.g.*, SR 171–74), and a central theory of Petitioner's case was that his confession was false, (T. 1150:22–1151:4, 1152:3–1153:2, 1154:2–1155:10, 1156:7–17, 1157:25–1158:10). Therefore, the withheld documents were relevant support for Petitioner's theory that the confession was false. *See Smith*, 27 N.Y.3d at 661. Because Petitioner's trial counsel could have cross-examined Detective Trujillo about the prior bad acts alleged in the withheld documents, the Court finds Respondent's argument unavailing. *See Smith*, 27 N.Y.3d at 661–62; *Gissendanner*, 48 N.Y.2d at 549–50.

### iii. Petitioner is entitled to habeas relief on the *Brady* claim

The 440 Court's decision denying Petitioner's *Brady* claim was based in part on its finding that the materials related to Martinez were "not new evidence" because Petitioner's trial counsel "represented Martinez in the criminal case where [Martinez] was ultimately exonerated." (SR 778.) Relying on the 440 Court's finding as to the Martinez materials, Respondent argues that Petitioner's *Brady* claim fails because Petitioner's trial counsel "was aware of the existence of investigations and prior accusations against Trujillo" or "could easily have uncovered virtually all of the . . . material[s]." (Resp. Mem. 44–47.) Respondent argues that the Martinez materials were therefore not undisclosed *Brady* material and, as a result, Petitioner's *Brady* claim fails. The 440 Court also held that Petitioner's *Brady* claim failed because the withheld documents were irrelevant as Petitioner did not allege that Detective Trujillo physically mistreated him and because "the evidence against [Petitioner] was overwhelming." (SR 778–79.) Respondent argues that the 440 Court's finding was well-founded in view of the totality of the evidence presented at the trial and the fact that the circumstances surrounding his allegedly false confession are distinguishable from the accusations by other individuals against Detective Trujillo for coercing or falsifying confessions. (Resp. Mem. 12–15.) For the reasons set forth

below, the Court finds that the 440 Court's decision was an unreasonable application of clearly established federal law and thus grants Petitioner habeas corpus relief on the *Brady* claim.

The "touchstone" of the prejudice analysis under *Brady* and its progeny is that there must be "a reasonable probability of a different result." *Kyles*, 514 U.S. at 434 (internal quotation marks omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the [withheld] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* The reasonable probability test also "is not a sufficiency of the evidence test[,] [a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434–35. Nor does "[a] reasonable probability . . . mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Smith*, 565 U.S. at 75 (quoting *Kyles*, 514 U.S. at 434) (internal quotation marks omitted). In analyzing whether there was a reasonable probability of a different result, the withheld evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436.

### 1. Petitioner's trial counsel's knowledge of or access to the Martinez materials does not defeat the *Brady* claim

Respondent argues that the Martinez materials were not undisclosed *Brady* material and, as a result, Petitioner's *Brady* claim fails. The Court finds Respondent's argument unavailing.

First, the 440 Court found that the Martinez materials were "not new evidence" because Petitioner's trial counsel "represented Martinez in the criminal case where [Martinez] was ultimately exonerated" and therefore, as to the Martinez materials, "it [was] a matter that should have been brought before the Appellate Division and dealt with on direct appeal." (SR 778.)

Because New York state courts must deny hearing the merits of a claim that could have been presented on direct appeal, the Court understands the 440 Court's decision as finding that the portion of the *Brady* claim relying on the Martinez materials was procedurally barred. *See* N.Y. C.P.L. § 440.10(2)(c) ("[T]he court must deny a motion to vacate a judgment when [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal perfected by him."); *Hudyih v. Smith*, --- F. App'x ---, ---, 2017 WL 1175653, at *1–2 (2d Cir. Mar. 29, 2017) (holding that a petitioner's claim was procedurally defaulted where, pursuant to section 440.10(2)(c), the state court denied the petitioner's motion to vacate). As previously discussed, Respondent has not raised a procedural default defense. *See supra* note 9.

Second, Petitioner's trial counsel denied that he possessed affirmative knowledge of the Martinez confession, and the State appears to have withheld the Martinez materials from Petitioner. Petitioner's trial counsel wanted to cross-examine Detective Trujillo as to whether he had previously coerced or taken a false confession. (T. 754:22–756:12.) Petitioner's trial counsel averred that he lacked any knowledge as to the circumstances of Martinez's confession because he "was relieved as counsel . . . from Martinez's case . . . before Martinez was even indicted and certainly before any of the issues in the case were litigated." (SR 816). When Petitioner's trial counsel asked the State to provide him with any *Brady* material related to Detective Trujillo coercing or falsifying confessions, the State refused to disclose any materials, arguing that "Brady material pertains to prior statements of a witness who is testifying on a case as to any statement given in relation to that case, not any other case." (T. 701:17–23, 708:19–

709:7.)  The State, however, is not relieved of its duty to disclose evidence favorable to

Petitioner by arguing that Petitioner's trial counsel should have discovered the evidence through

the exercise of due diligence.  The State's "duty to disclose [favorable] evidence is applicable

even though there has been no request by the accused and that duty encompasses impeachment

evidence as well as exculpatory evidence." *Greene*, 527 U.S. at 280 (citiations omitted).  As

previously discussed, under New York law, the accusations against Detective Trujillo alleging

that he coerced or falsified confessions, is proper impeachment material.

Even assuming that Petitioner's trial counsel had or should have had knowledge of the

fact that Martinez accused Detective Trujillo of coercing him into giving a false confession and

was seeking to question Detective Trujillo about the Martinez confession, the Martinez materials

were not the only materials containing information about allegations that Detective Trujillo had

coerced or falsified confessions from individuals suspected of committing a crime.  In analyzing

whether there was a reasonable probability of a different result, the withheld evidence must be

"considered collectively, not item by item." *Kyles*, 514 U.S. at 436.  Therefore, notwithstanding

the Martinez materials, the withheld documents may be prejudicial if they "strengthen the

inference" of Petitioner's theory that the confession was false. *See Cone v. Bell*, 556 U.S. 449,

469 (2009) (holding that a petitioner established prejudice under *Brady* where the prosecution

withheld evidence supporting petitioner's intoxication defense).

Accordingly, Petitioner's trial counsel's alleged familiarity with the Martinez case does

not defeat Petitioner's *Brady* claim.

## 2. The 440 Court's finding that there was no prejudice was an unreasonable application of clearly established federal law

Respondent argues that the 440 Court's finding that there was no prejudice was well-

founded in view of the totality of the evidence presented at the trial and the fact that the

circumstances surrounding his allegedly false confession are distinguishable from the accusations against Detective Trujillo for coercing or falsifying confessions. (Resp. Mem. 12–15.) Supreme Court precedent illustrates the unreasonableness of the 440 Court's finding that Petitioner was not prejudiced by the State's withholding of the documents regarding the allegations against Detective Trujillo. In *Kyles v. Whitley* and *Banks v. Dretke*, the Supreme Court held that a state's withholding of documents related to one of the state's important witnesses resulted in prejudice under *Brady*. *See Kyles*, 514 U.S. at 441–46; *Banks v. Dretke*, 540 U.S. 668, 698–703 (2004).

In *Kyles*, the petitioner had been convicted and sentenced to death for murder in the first degree. *Kyles*, 514 U.S. at 421. The victim had been killed in the parking lot of a supermarket after she had placed her groceries in the trunk of her car. *Id.* at 423. The assailant drove away in the victim's car. *Id.* At the scene, the police took statements from six eyewitnesses, which were consistent only as to the race of the assailant. *Id.* An informant subsequently came forward, stating that he had information that was relevant to the murder investigation and believed the assailant sold him the victim's car. *Id.* at 424. The informant told the officers that he and the petitioner were friends, that the petitioner often carried a firearm, that on the night of the murder he drove the petitioner to the parking lot of the supermarket to retrieve the petitioner's vehicle and provided several additional details leading to evidence that indicated the petitioner committed the murder. *Id.* at 424–30. The informant spoke with the officers on four separate occasions and portions of the information he provided changed each time. *Id.* The police paid the informant $1600 for his assistance in the investigation. *Id.* at 431. The police never investigated the informant as a potential suspect, the informant did not testify at the petitioner's trial and the prosecution did not provide the petitioner with the informant's statements to the

officers.  *Id.* at 429–30.  The prosecution also did not provide the petitioner with any of the eyewitness statements taken at the scene.  *Id.* at 428.  At the trial, the prosecution presented the testimony of four of the eyewitnesses who identified the petitioner at the murder scene, the petitioner presented witnesses whose testimony suggested that the informant may have been the assailant, and the petitioner testified that he was innocent.  *Id.* at 430–31.  The jury convicted the petitioner of murder in the first degree.  *Id.* at 431.  After the state courts affirmed the conviction on appeal and the petitioner learned of the withheld evidence, he filed a petition for a writ of habeas corpus, arguing that the prosecution committed a *Brady* violation when it failed to turn over the statements by the informant and the eyewitnesses.  *Id.*  The district court denied the petition and the court of appeals affirmed the district court's decision.  *Id.*

The Supreme Court reversed, holding that the "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable."  *Id.* at 441.  First, the Court held that the petitioner's counsel could have impeached the eyewitnesses with their statements at the scene, given that none of their statements were as consistent or specific as their later identifications of the petitioner.  *Id.* at 441–45.  Second, the Court held that the informant's statements would have allowed the petitioner to attack the evidence linking him to the murder as well as "the thoroughness and even the good faith of the investigation."  *Id.* at 445–46.  The Court noted that even if the petitioner's counsel did not call the informant as a witness, he "could have examined the police [officers] to good effect on their knowledge of [the informant's] statements and so have attacked the reliability of the investigation."  *Id.* at 446.  The Court held that prejudice exists under *Brady* when "withheld *Brady* evidence carried within it the potential for the discrediting of the police methods employed in assembling the case."  *Id.* (alterations, citations and internal quotation marks omitted).

In *Banks*, the petitioner had been convicted of murder in the first degree and sentenced to death. 540 U.S. at 674. The victim had been shot and killed in a park in Nash, Texas. *Id.* at 676. The officers assigned to the case learned from two witnesses that the petitioner was with the victim on the night of the murder. *Id.* at 676. The lead investigator subsequently received a call from a confidential informant that the petitioner was traveling to a residence in Dallas, Texas to pick up a firearm that may have been the murder weapon. *Id.* The officers surveilled the petitioner as he traveled to Dallas, stopped at a residence and then proceeded to return to Nash. *Id.* The officers stopped the petitioner on the return trip and recovered a firearm from the vehicle. *Id.* The officers also returned to the residence the petitioner visited and, after searching the premises, recovered a second firearm. *Id.* The officers later discovered that the second firearm was the murder weapon. *Id.*

At a pretrial hearing, the petitioner sought information regarding the identity of the confidential informant and the prosecution refused to turn over any information. *Id.* at 676–77. At trial, witnesses testified to seeing the petitioner with the victim on the night of the murder, hearing gunshots in the park and observing the petitioner driving the victim's car the following day. *Id.* at 677. Robert Cook, the owner of the Dallas residence, testified that the petitioner came to his home the day after the murder driving the victim's car, had blood on his leg, confessed to killing the victim and stealing the victim's car and left a firearm at Cook's residence. *Id.* at 677. Another witness, Robert Farr, corroborated Cook's testimony and testified that he traveled with the petitioner to Cook's residence, where the petitioner intended to retrieve a firearm. *Id.* Farr testified that no one helped him prepare his testimony and that he did not receive anything from the officers in exchange for his assistance. *Id.* at 678. The petitioner did not present a case. *Id.* at 679.

During the penalty phase of the petitioner's trial, Farr and a second witness testified. *Id.*
at 679–80. The second witness testified to a previous violent encounter he had with the
petitioner and Farr testified that the petitioner wanted to retrieve his firearm from Cook's
residence to commit a robbery with Farr. *Id.* Petitioner's counsel asked Farr if he was the
person who informed the lead investigator of the petitioner's trip to Dallas and if the prosecution
offered him anything in exchange for his cooperation, and Farr answered no to both questions.
*Id.* at 680. The petitioner presented two witnesses who impeached Farr's testimony, but the
prosecution impeached those witnesses. *Id.* The petitioner testified and denied that his purpose
for attempting to retrieve the firearm was to commit a robbery with Farr. *Id.* at 681.

After his conviction and sentencing, the petitioner moved for state collateral relief,
arguing that the prosecution violated *Brady* by withholding evidence that Farr was the
confidential informant who informed the lead investigator of the Dallas trip and received
favorable treatment from the officers in exchange for his assistance with the investigation. *Id.* at
682–83. The state court denied the motion on the grounds that the petitioner failed to show that
the prosecution withheld any evidence related to Farr. *Id.* at 683. The petitioner subsequently
filed a petition for a writ of habeas corpus, arguing, *inter alia*, that the prosecution violated
*Brady. Id.* 683–84. The district court granted the petitioner's discovery motion and discovery
revealed that Farr was the confidential informant who had informed the lead investigator of the
Dallas trip and the officers paid Farr for his assistance in the investigation. *Id.* at 684–87.
Discovery also revealed that Farr asked the petitioner to drive to Dallas to procure a firearm and
assist Farr in committing a robbery. *Id.* at 684. The district court granted the petition on the
*Brady* claim as to the penalty phase of the petitioner's trial but denied it on the guilt phase. *Id.* at
686–87. The court of appeals denied a certificate of appealability on the district court's decision

as to the guilt phase and reversed as to the penalty phase decision, resulting in a complete denial

of the petition on the *Brady* claim. *Id.* at 687–89. The court of appeals held that the petitioner

failed to establish prejudice based on the prosecution's withholding of Farr's status as a paid

confidential informant, because the petitioner's witnesses testified that Farr had been a

confidential informant in Arkansas and other witnesses corroborated Farr's testimony. *Id.* at 688.

The Supreme Court reversed, holding that there was a reasonable probability of a

different result regarding the penalty phase had the petitioner been given the information about

Farr and his assistance in the investigation. *Id.* at 698–703. The Court held that Farr's testimony

that the petitioner went to Dallas to retrieve the firearm and commit a robbery was the only

evidence the prosecution had showing that the petitioner should receive the death penalty

because he had a propensity to commit future violent felonies. *Id.* at 699. Therefore, Farr's

status as a paid informant who helped arrange the Dallas trip was material impeachment

information. *Id.* at 699–700. The Court held that the petitioner was prejudiced by the

prosecution's withholding of that information. *Id.* at 700–03. The Court noted that, in addition

to the aforementioned information, the withheld information revealed that Farr was not

prosecuted for possible drug charges in exchange for his assistance in the investigation. *Id.* at

701. The Court held that if the jury had known about all of the information regarding Farr's

assistance in organizing the Dallas trip, his status as a paid informant and his favorable treatment,

"they might well have distrusted Farr's testimony, and insofar as it was uncorroborated,

disregarded it." *Id.* at 701. The Court distinguished the petitioner's case from *Strickler*, 527

U.S. at 292–96, holding that:

> The witness whose impeachment was at issue in *Strickler* gave
> testimony that was in the main cumulative and hardly
> significant . . . . Other evidence in the record, the Court found,
> provided strong support for the conviction even if the witness'

> testimony had been excluded entirely: Unlike [the petitioner's] prosecution, in *Strickler*, considerable forensic evidence and other physical evidence linked the defendant to the crime.

*Id.* at 700–01 (alterations and internal quotation marks omitted).

Here, the State's withholding of the documents related to the allegations against Detective Trujillo for coercing and falsifying confessions was prejudicial to Petitioner because Petitioner's trial counsel could have used the information to attack the validity of the confession. At Petitioner's trial, the State's direct evidence linking Petitioner to the crime consisted of C.L.'s statements, C.L.'s unsworn testimony and the confession, and the circumstantial evidence consisted of the medical findings by Dr. Lombardy. At the time of trial, C.L. was six years old and testified as an unsworn witness. The Trial Court instructed the jury that:

> Under [New York] law, a defendant may not be convicted of an offense solely upon unsworn testimony. Therefore, before you may convict [Petitioner] on the unsworn testimony of [C.L.] alone, you must find his unsworn testimony is credible in material aspects that is supported by other evidence which tends to establish the offense was in fact committed and which tends to connect the defendant with the commission of the offense.

(T. 1432:12–22.) Thus, C.L.'s statements and testimony alleging that Petitioner sexually abused him were insufficient alone to support the jury's conviction of Petitioner. *See People v. Groff*, 71 N.Y.2d 101, 104 (1987) (holding that "when proof of the charges depends upon the testimony of an unsworn victim, . . . the evidence is sufficient if the unsworn victim's testimony is corroborated by evidence tending to establish the crime and *connecting [the] defendant with its commission*" (emphasis added)). The medical findings did not establish that Petitioner sexually abused C.L. Dr. Lombardy testified regarding her findings from her examination of C.L. and explained that while there was evidence that C.L. had been anally penetrated, she could not determine the object used for the penetration or the date(s) when the penetration occurred. (T. 519:2–7, 544:21–545:18, 572:21–573:2, 566:1–568:18.) Petitioner's expert, Dr. Ajl, also

testified that Dr. Lombardy's findings were not indicative of penetration. (T. 1077:1–1082–15.) Notably, nothing in the medical findings pointed to Petitioner as the person responsible for the anal penetration. C.L.'s parents' testimony only established that C.L. told them Petitioner sexually abused him. Therefore, the confession was the only evidence that connected Petitioner to the sexual abuse of C.L. and corroborated C.L.'s testimony and statements that Petitioner, not someone or something else, was responsible for the anal penetration.

Regarding the confession, Detective Trujillo testified that after Petitioner confessed, he wanted to put Petitioner's admissions in writing; he asked Petitioner to explain how the sexual abuse occurred and typed Petitioner's statements as he made them. (T. 684:7–19.) Detective Trujillo testified that once the typewritten confession was complete, Detective Trujillo read the confession to Petitioner, asked Petitioner if he wanted to make any changes and Petitioner did not request any changes. (T. 682:20–683:2.) Detective Trujillo testified that he then printed the confession and told Petitioner to read it and Petitioner read the first few lines aloud and the remainder of the confession to himself. (T. 683:3–11.)

Petitioner testified that because he informed Detective Trujillo that he could not read, Detective Trujillo read Petitioner the typewritten confession, but he later discovered that Detective Trujillo only read parts of the confession to him. (T. 1147:14–19, 1160:13–15.) Petitioner testified that Detective Trujillo read Petitioner the demographic information contained in the confession as well as Petitioner's living arrangements and the fact that C.L. lived in the home. (T. 1151:8–1152:2, 1153:3–23.) He also testified that Detective Trujillo did not read him his *Miranda* rights, the statements saying that he waived his *Miranda* rights, the statements concerning the conversation with Lopez or the statements that he sexually abused C.L. (T. 1152:3–1153:2, 1154:2–1155:10.) Petitioner further testified that after Detective Trujillo

reassured Petitioner that he read Petitioner the entire confession, Petitioner signed it, (T. 1157:25–1158:10), and he did not read any portion of the confession either to himself or aloud. (T. 1150:22–1151:4, 1156:7–17.) When asked by his counsel, Petitioner stated that he had never performed any sexual acts with C.L., and he never touched or hurt C.L. in any way. (T. 1141:8–13.)

In view of the evidence presented at Petitioner's trial, the 440 Court's decision finding that Petitioner was not prejudiced by the withheld documents was an unreasonable application of clearly established federal law. There was a reasonable probability of a different result if Petitioner's counsel had the opportunity to develop his cross-examination of Detective Trujillo with the information from the documents showing that Detective Trujillo had been subject to several investigations by internal affairs based on allegedly coercing or falsifying confessions and had been sued on four different occasions for allegedly coercing or falsifying confessions. On cross-examination, Detective Trujillo testified that Sosa was not allowed to sit in on the questioning because Petitioner was in custody and it was safer to keep Sosa in a separate room. (T. 725:13–726:8.) Without Sosa, Detective Trujillo and Petitioner were the only people in the detectives' office who spoke Spanish. (T. 726:9–14.) Petitioner's counsel asked Detective Trujillo if he had ever framed a suspect by coercing or falsifying a confession. (T. 755:16–18; 860:24–860:6.) Detective Trujillo said that he had not. (T. 755:19; 861:8–10.) Even though Petitioner's trial counsel asked the State to provide him with any materials related to Detective Trujillo coercing or falsifying confessions, the State never provided the materials. (T. 701:3–20, 704:4–23.)

Petitioner's trial counsel could have questioned Detective Trujillo on the circumstances of the confession if he had the withheld documents. Had he been in possession of the withheld

documents, Petitioner's trial counsel "could have examined [Detective Trujillo] to good effect" and "so have attacked the reliability of the investigation." *See Kyles*, 514 U.S. at 446. Petitioner's trial counsel could have questioned Detective Trujillo specifically as to whether he had ever written a suspect's confession and included information that the suspect had not provided, *see* (SR 683–89, 754–61), which Petitioner testified occurred in his case, (T: 1150:22–1151:4, 1151:8–1153:23, 1154:2–1155:10, 1156:7–17, 1157:25–1158:10.) Petitioner's trial counsel could have also questioned Detective Trujillo regarding the fact that he had previously taken two confessions that turned out to be false because other individuals confessed to the crimes. (*See* IAU 73-1998; SR 95–98, 110, 221–22.) The line of questioning could have supported Petitioner's testimony that the confession was false and accordingly the "withheld *Brady* evidence carried within it the potential for the discrediting of the police methods employed in assembling the case." *See Kyles*, 514 U.S. at 446. If the jury had learned that on two prior occasions, suspects alleged that Detective Trujillo created false confessions by including information that the suspects did not provide, "they might well have distrusted [Detective Trujillo's] testimony, and insofar as it was uncorroborated, disregarded it." *See Banks*, 540 U.S. at 700–01. None of the other detectives that were present during the questioning could corroborate Detective Trujillo's testimony because none of them spoke Spanish. (T. 726:9–14.)

    The likelihood that the jury's knowledge of the allegations against Detective Trujillo could have affected the outcome of Petitioner's case is bolstered by the fact that the confession was the only direct evidence that corroborated C.L.'s unsworn testimony and statements that Petitioner sexually abused him. *See Banks*, 540 U.S. at 699–701 (holding that the petitioner suffered prejudice under *Brady* because had the witness at issue been impeached, "the

prosecution would have had slim, if any, evidence" to convince the jury to impose a capital sentence); *see also Smith*, at 565 U.S. at 76 (holding that the petitioner suffered prejudice under *Brady* because a witness' testimony "was the only evidence linking [the petitioner] to the crime"); *Groff*, 71 N.Y.2d at 104 (holding that "when proof of the charges depends upon the testimony of an unsworn victim, . . . the evidence is sufficient if the unsworn victim's testimony is corroborated by evidence tending to establish the crime and *connecting [the] defendant with its commission*" (emphasis added)). Without the confession, the jury would have had only Dr. Lombardy's challenged medical findings to corroborate C.L.'s statements and testimony. But even if the jury accepted the medical findings and Dr. Lombardy's opinion about the findings, they did not establish that Petitioner anally penetrated C.L.; they only established that something or someone penetrated C.L's anus. *See Banks*, 540 U.S. at 700–01 (holding that the petitioner established prejudice under *Brady* where the prosecution withheld potential impeachment evidence related to the witness that linked the petitioner to future criminality because "[u]nlike [petitioner's] prosecution, in *Strickler*, considerable forensic evidence and other physical evidence linked the defendant to the crime").

The reasonable probability that the withheld evidence could have affected the outcome of the trial is also bolstered by another important fact: unlike *Kyles*, *Banks* and *Smith*, the potential impeachment evidence at issue here was not related to a lay witness who provided assistance to a police investigation, but to a police officer who was responsible for taking the confession, arguably the most important piece of evidence at the trial. *Cf. Kyles*, 514 U.S. at 441–43, 445; *Banks*, 540 U.S. at 699; *Smith*, 565 U.S. at 74. The Supreme Court has held that a confession "can be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence, . . . [a]nd, as with any other part of the prosecutor's case, a confession may be shown

to be insufficiently corroborated or otherwise unworthy of belief." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (alteration, citation and internal quotation marks omitted). The Supreme Court explained that in cases where there is a confession, "the one question every rational juror needs answered [is]: If the defendant is innocent, why did he previously admit his guilt?" *Id.* "Accordingly, . . . a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." *Id.* Here, the withheld documents hindered Petitioner's trial counsel's ability to do just that — "convince the jury that the manner in which the confession was obtained" made it false and incredible. *See id.*

Based on the foregoing, the Court finds that the 440 Court's decision on Petitioner's *Brady* claim was contrary to or an unreasonable application of clearly established federal law.

## III. Conclusion

Accordingly, the Court grants Petitioner habeas corpus relief on the *Brady* claim. Petitioner shall be released unless the State affords him a new trial within ninety (90) days of the date of this Memorandum and Order.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  June 29, 2017
        Brooklyn, New York